IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Criminal Action Nos.: 13-83-1-GMS |
| DAVID THOMAS MATUSIEWICZ, LENORE ) | 13-83-2-GMS |
| MATUSIEWICZ, and AMY GONZALEZ ) | 13-83-3-GMS |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM

### I. INTRODUCTION

On August 6, 2013, David Thomas Matusiewicz, Lenore Matusiewicz, and Amy Gonzalez were indicted on four counts of stalking. (D.I. 2; D.I. 68 at 3.) Their trials are scheduled for October 9, 2013. (D.I. 46.) Presently before the court are David Thomas Matusiewicz's Motion for Transfer of Venue Pursuant to Federal Rule of Criminal Procedure 21(a), (D.I. 48), and Lenore Matusiewicz's Motion to Join in Defendant David Matusiewicz's Motion for Transfer of Venue Pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, (D.I. 61).[1] For the reasons that

---

[1] The Defendants' venue transfer motions were both filed on January 17, 2014. David Thomas Matusiewicz was the first to file his Motion for Transfer of Venue Pursuant to Federal Rule of Criminal Procedure 21(a). (D.I. 48.) In his motion, Mr. Matusiewicz requested that the court "transfer[] this matter to the United District Court for the Eastern District of Pennsylvania or another District within the Third Circuit Court of Appeals." (Id. at 17.) Subsequently, Lenore Matusiewicz filed a Motion to Join Defendant David Matusiewicz's Motion for Transfer of Venue Pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. (D.I. 61.) In her motion, Ms. Matusiewicz adopted the averments and arguments in Mr. Matusiewicz's motion and likewise requested that the court enter an order transferring this matter to another district within the Third Circuit. (Id. at ¶¶ 2, 4.) Because Ms. Matusiewicz joined Mr. Matusiewicz's motion, the court addresses both motions together in this memorandum and order.

Unlike Ms. Matusiewicz, Amy Gonzalez did not join in Mr. Matusiewicz's Motion for Transfer of Venue. Instead, Ms. Gonzalez filed an Omnibus Motion for Transfer for Trial Pursuant to Federal Rule of Criminal Procedure 21(a) and Relief from Prejudicial Joinder Pursuant to Federal Rule of Criminal Procedure Rule 14. (D.I. 62.) In her motion, Ms. Gonzalez requested that the court transfer her case to another venue for trial and sever her from the trials of Mr. and Ms. Matusiewicz. (Id. at 5.) Because Ms. Gonzalez's motion raises additional issues of prejudicial joinder beyond

follow, the court will grant Lenore Matusiewicz's Motion to Join in Defendant David Matusiewicz's Motion for Transfer of Venue, but deny David Thomas Matusiewicz's Motion for Transfer of Venue.

## II.  BACKGROUND

This case arises from the shooting deaths of Christine Belford and Laura Mulford in the lobby of the New Castle County Courthouse on February 11, 2013. (D.I. 2; D.I. 48 at 2; D.I. 68 at 3.) Thomas Matusiewicz, David Thomas Matusiewicz's father, shot and killed the two women before taking his own life. (D.I. 48 at 2; D.I. 68 at 3.) Subsequently, an investigation revealed that prior to the shootings, Ms. Belford had been locked in a particularly acrimonious and longstanding dispute with her former husband, David Thomas Matusiewicz, over custody of their three children. (D.I. 68 at 3.)

Immediately after the shootings, there was heavy media coverage as news outlets investigated and publicized the events. (D.I. 48, *passim*.) Both the Attorney General and the Mayor of Wilmington released public statements. (D.I. 48 at 3.) On August 6, 2013, the Defendants were indicted on four counts of stalking.[2] (D.I. 2; D.I. 68 at 3.) The Indictment alleges that between December 2009 and February 11, 2013, the Defendants conducted a campaign of intimidation against Ms. Belford in which they stalked her using the internet, falsely accused her of sexually and physically abusing her children, directed others to spy on both her and her children, and left both her and her children in constant fear of death or serious injury. (D.I. 2; D.I. 68 at 4.)

---

the scope of Mr. and Ms. Matusiewicz's venue transfer motions, the court will address it in a separate memorandum and order.

[2]  Count One of the Indictment charges all three defendants with conspiracy to commit interstate and cyberstalking, in violation of 18 U.S.C. §§ 2261A(1), 2261A(2)(A), and 371. Count Two charges Lenore Matusiewicz with interstate stalking, in violation of 18 U.S.C. §§ 2261A(1) and 2261(b). Count Three charges both Lenore Matusiewicz and David Thomas Matusiewicz with interstate stalking resulting in death, in violation of 18 U.S.C. §§ 2261A(1) and 2261(b). Count Four charges all three defendants with cyberstalking resulting in death, in violation of 18 U.S.C. §§ 2261A(2) and 2261(b).

Although the news coverage has diminished over time, each of the proceedings in this case has received varying degrees of coverage. (D.I. 48, *passim*.)

### III.  LEGAL STANDARD

Under the Sixth Amendment, criminal defendants have the right to trial by an impartial jury. In accordance with this guarantee, Federal Rule of Criminal Procedure 21(a) provides that "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Transfer of venue is not mandatory, however, and is instead at the court's sound discretion. *See Martin v. Warden, Huntington State Corr. Inst.*, 653 F. 2d 799, 804 (3d Cir. 1981).

A court may presume prejudice sufficient to warrant a change of venue "[w]here media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process[.]" *Rock v. Zimmerman*, 959 F.2d 1237, 1252 (3d Cir. 1992). "The community and media reaction, however, must have been so hostile and pervasive as to make it apparent that even the most careful *voir dire* process would be unable to assure an impartial jury." *Id.* It is rare that adverse pretrial publicity will establish a presumption of prejudice. *See Skilling v. United States*, 561 U.S. 358, 380 (2010) ("A presumption of prejudice, our decisions indicate, attends only the extreme case."); *Zimmerman*, 959 F.2d at 1252; *United States v. De Peri*, 778 F.2d 963, 972 (3d Cir. 1985). Factors that the court should consider in determining whether media coverage presumptively deprives the defendant of due process include: the size and characteristics of the community in which the crime occurred; the content of the coverage; the timing of the coverage; and the existence of media interference with court proceedings. *See Skilling*, 561 U.S. at 382-385.

## IV.  DISCUSSION

### A. Size and Characteristics of the Community

The size and characteristics of the community in which the crime occurred may mitigate or increase the risk of prejudice to the defendants. *See, e.g.*, *Skilling*, 561 U.S. at 382. The Defendants argue that they cannot receive a fair and impartial trial in the District of Delaware because media coverage of the shootings reached "all age groups and socioeconomic classes" in Delaware and was "provided through all known media formats." (D.I. 49 at ¶ 46.) In addition, they argue that "Delaware is a small state with a population of approximately 917,000. Thus, it is highly likely that potential jurors may know a victim or courthouse employee, someone who does, or may have been impacted by the closing of schools and streets on the day of the shooting." (*Id.* at ¶ 48.) The government argues in response that Delaware's jury pool of 917,092 is diverse and that the Defendants do not provide any verifiable statistics or case law to support their claim that this pool is too small for the court to be able to select an impartial jury. (D.I. 68 at 8.) The government also argues that the *voir dire* process would easily reveal which jurors have been impacted by the shootings in the way that the Defendants describe. (*Id.*) For the following reasons, the court concludes that the government has the right of this and that the size and characteristics of the community weigh against transferring the Defendants' cases.

As an initial matter, even if, as the Defendants suggest, virtually everyone in Delaware has been exposed to and recalls media coverage of the courthouse shootings, this alone in itself is insufficient to establish that the Defendants cannot receive a fair trial here. *See, e.g.*, *Skilling*, 561 U.S. at 381 ("Prominence does not necessarily produce prejudice and juror impartiality, we have reiterated, does not require ignorance."); *United States v. De Peri*, 778 F.2d 963, 972 (3d Cir. 1985) ("The mere fact that community members are cognizant of the crimes and of the defendants' identities does not, by itself, render the trial constitutionally unfair.") In addition, while, as the

Defendants have pointed out, (D.I. 71 at 6), many cases in which courts have found the risk of prejudice mitigated by the size of the jury pool have indeed involved millions of potential jurors, there is no particular size required of the jury pool. *See, e.g., Gentile v. State Bar of Nev.*, 500 U.S. 1030, 1044 (1991) (Concluding that that a population in excess of 600,000 persons was sufficient to minimize the likelihood of prejudice.)

Beyond the size of the jury pool, one of the characteristics that a court may consider is the familiarity of the population with serious crimes. *See Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (Concluding that the potential for prejudice was mitigated partly by the fact that "hundreds of murders are committed each year" in Washington D.C.) Considering the unfortunate fact that Delaware's rate of violent crimes has long placed it among the top 10 most dangerous states, the population of Delaware can hardly be argued to consist entirely of easily scandalized naïfs. *See, e.g.*, Charley Blaine & Michael B. Sauter, *The Most Dangerous States in America*, 24/7 Wall St, Oct. 4, 2013, http://247wallst.com/special-report/2013/10/04/the-most-dangerous-states-in-america/2/ (Ranking Delaware sixth among all states by violent crime rate from 2012 to 2013 based on data collected by the FBI.); United States Census Bureau, *State Rankings — Statistical Abstract of the United States — Violent Crime Rate*, 2006, http://www.census.gov/statab/ranks/rank21.html (Ranking Delaware seventh among all states by violent crime rate from 2005 to 2006 based data collected by the FBI.) No doubt many other violent crimes occurred and were publicized before, after, and during media coverage of the issues in this case. All things considered, the court concludes that the size and characteristics of the District of Delaware mitigate any prejudice against the Defendants that may exist.

**B. Content of the Media Coverage**

Where the media coverage is not only widespread, but also sensationalistic or grossly unfair, it may be so prejudicial that viewers cannot be reasonably expected to put it out of their

minds. *See Skilling*, 561 U.S. at 382-83. The Defendants argue that the media coverage in question is extremely prejudicial because it "painted the Matusiewicz family in a very poor light" and because some sources "relied upon the content of police search warrants as a basis for the information" and "covered sordid details of David Thomas Matusiewicz's prior criminal and custody cases, and domestic troubles." (D.I. 49 at 5-7.) They also introduce the results of a study that they argue indicates that pretrial publicity necessarily inclines jurors to be biased against Defendants. (D.I. 71 at 9-11.) As the government contends, however, (D.I. 68 at 10-15), none of this is sufficient to establish that the general content of the media coverage here is so highly inflammatory that it can only permanently prejudice the jury pool.

While the media coverage that the Defendants detail does indeed contain negative information about the Defendants, it is overwhelmingly factual in nature. For instance, the excerpts that the Defendants present in their briefs describe the shootings as "stemm[ing] from a long-running custody dispute", (D.I. 49 at 6, n.4), expand on the fear in which Ms. Belford lived prior to her death and the measures she took to protect herself, (*Id.* at 7, n.6-7), and discuss David Thomas Matusiewicz's criminal history and court appearances, (*Id.* at 8, n.10). All of this information is easily verifiable. It is well established that the mere fact that truths about the Defendants might be less than flattering does not render media coverage of these facts prejudicial. *See, e.g., Skilling*, 561 U.S. at 382 (Finding no evidence of prejudice because "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."); *Zimmerman*, 959 F.2d at 1253 (Rejecting defendant's characterization of media coverage as giving rise to a presumption of juror prejudice where "there was extensive adverse publicity" but "[n]othing in the record suggests that these news accounts were unfair or sensationalistic."); *De*

*Peri*, 778 F.2d at 972 (Explaining that extensive pre-trial publicity did not sustain a presumption of prejudice where there was "a lack of inflammatory, sensational journalism".)

Additionally, apart from being mostly factual in nature, the articles that the Defendants themselves adduce indicate that the media coverage in question here was balanced. For instance, The News Journal, the main newspaper for Wilmington, Delaware and the areas around it, not only included quotes from the Defendants and their relatives in its coverage, but also interviewed them at length so that they could present their views of the events that transpired before and after the shootings.[3] (*See, e.g.*, D.I. 56, Ex. 7B.) In short, the news coverage here is simply not the sort that courts have found grossly skewed, hyperbolic, or otherwise prejudicial. *Compare, e.g., Rideau v. La.*, 373 U.S. 723, 726 (1963) (Concluding that court proceedings could only be "a hollow formality" where tens of thousands of people saw broadcast in which the defendant "admitt[ed] in detail the commission of robbery, kidnapping and murder, in response to leading questions by the sheriff.")

### C. Timing of the Media Coverage

In considering the timing of the media coverage, the court asks whether sufficient time has elapsed between the adverse publicity and the commencement of trial to permit a "cooling off" of any prejudice that may have resulted from the media coverage. *See Patton v. Yount*, 467 U.S. 1025, 1033-34 (1984) ("That time sooths and erases is a perfectly natural phenomenon, familiar to all."); *Zimmerman*, 959 F.2d at 1253-54. The Defendants argue that the level of media interest in this case is so high that a cooling off period will not be possible. (D.I. 49 at 9.) The government begs to differ, pointing out that most of the television coverage that the Defendants cite occurred

---

[3] The court must also take note of the fact that the information available from mainstream news outlets was not the only source of information publicly disseminated about this case. In YouTube videos, Lenore Matusiewicz and other relatives publicized their views of Christine Belford and how she treated her children. This further weighs against the defendants' argument that publicly available information on this case is grossly one-sided and prejudicial.

7

within a week after the shootings and that over a year will have elapsed between the trial and both the courthouse shootings and Indictment. The court concludes that the timing of the media coverage does not weigh in favor of transferring venue.

First, even where pretrial publicity is extensive and there has been no cooling off period, media coverage that is factual, rather than sensationalistic and unfair, will not in itself require a change of venue. *Zimmerman* at 1253; *United States v. De Peri*, 778 F.2d 963, 972 (3d Cir. 1985). As discussed above, *see supra* IV.B, the media coverage here has been primarily factual and there has been little sensationalism of the already compelling facts of this case. Thus, there is no cooling period required here. Second, although a cooling off period is not necessary, the government points to evidence that establishes that media coverage has tapered off, (D.I. 68 at 15-17), and the Defendants do not contest this evidence, (D.I. 49 at 9; D.I. 71 at 7-12). Instead, the Defendants rely on hypothetical arguments about the flurry of media activity that may accompany trial. (D.I. 49 at 9.) Although it is not unreasonable to assume that the media will take an interest in the trial, it is not the province of the court to speculate about the degree of future media coverage. Ultimately, by the first day of trial on October 9, 2014, 20 months will have passed since the February 11, 2013 courthouse shootings and 14 months will have elapsed since the August 6, 2013 Indictment.[4] In the absence of evidence that a high level of media interest had continued since the shootings, the court concludes that a period of more than a year is a sufficient cooling off period. *See, e.g., Hetzel v. Lamas*, 372 Fed. Appx. 280, 284 (3d Cir. 2010) (Concluding that any prejudice had dissipated where there was a burst of media coverage shortly after the defendant's offense, followed by only sporadic reports over the next 15 months until the defendant's trial.)

---

[4] Defendant Lenore Matusiewicz has submitted a motion requesting that the trial date be postponed. (D.I. 91.) Thus, the trial date may very well be even later than October 9, 2014, depending on the court's ruling on Ms. Matusiewicz's motion.

### D. Existence of Media Interference with Court Proceedings

Media interference with proceedings in the court can so corrupt the judicial process as to deprive defendants of due process. *See, e.g., Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966); *Estes v. Tex.*, 381 U.S. 532, 549 (1965). The Defendants do not present any credible evidence that such interference has occurred here, however. The Defendants' only evidence consists of two occasions on which they claim news reporters delayed their entry into and exit out of court. (D.I. 49 at 10.) Even taking Defendants' allegations as true, having to navigate through members of the media at the entrance of the court does not constitute the type and level of interference that this factor was meant to address. *See, e.g., Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966) (Interference consisting of a "carnival atmosphere" in which "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially [the defendant]."); *Estes v. Tex.*, 381 U.S. 532, 549 (1965) (Interference consisting of throngs of reporters overrunning the courtroom and "bombard[ing] the community with the sights and sounds" of the proceedings via live radio and television broadcasts.)

### V. CONCLUSION

For the foregoing reasons, the court concludes that the Defendants have not established that media coverage of this case has so prejudiced potential jurors that the court should presume it is impossible for the Defendants to receive a fair trial in the District of Delaware. Accordingly, the court will grant Lenore Matusiewicz's Motion to Join In Defendant David Thomas Matusiewicz's Motion for Transfer of Venue Pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, but deny David Thomas Matusiewicz's Motion for Transfer of Venue Pursuant to Federal Rule of Criminal Procedure 21(a).

Dated: May 29, 2014

_____
CHIEF, UNITED STATES DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DAVID THOMAS MATUSIEWICZ, LENORE ) <br> MATUSIEWICZ, and AMY GONZALEZ ) <br> ) <br> Defendants. ) <br> ) | Criminal Action Nos.: 13-83-1-GMS <br> 13-83-2-GMS <br> 13-83-3-GMS |

## ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. David Thomas Matusiewicz's Motion for Transfer of Venue Pursuant to Federal Rule of Criminal Procedure 21(a), (D.I. 48), is DENIED; and

2. Lenore Matusiewicz's Motion to Join In Defendant David Thomas Matusiewicz's Motion for Transfer of Venue Pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, (D.I. 61), is GRANTED.

Dated: May 29, 2014

CHIEF, UNITED STATES DISTRICT COURT