```
 1                        - VOLUME 13 -

 2            IN THE UNITED STATES DISTRICT COURT

 3            IN AND FOR THE DISTRICT OF DELAWARE

 4
      UNITED STATES OF          :   CRIMINAL ACTION
 5    AMERICA,                  :
                                :
 6              Plaintiff,      :
                                :
 7       vs.                    :
                                :
 8    DAVID THOMAS              :
      MATUSIEWICZ, LENORE       :
 9    MATUSIEWICZ, and AMY      :
      GONZALEZ,                 :
10                              :   NOS. 13-83-1-GAM
                                :         13-83-2-GAM
11              Defendants.     :         13-83-3-GAM

12                          - - -

13
                         Wilmington, Delaware
14                       Wednesday, June 24, 2015
                         9:06 o'clock, a.m.
15
                            - - -
16
      BEFORE:  HONORABLE GERALD A. McHUGH, U.S.D.C.J., and
17    a jury

18                          - - -

19    APPEARANCES:

20            EDWARD J. McANDREW, ESQ.
              JAMIE M. McCALL, ESQ. and
21            SHAWN WEEDE, ESQ.
              Assistant United States Attorneys
22

23                   Counsel for Plaintiff

24                     Valerie J. Gunning
                       Official Court Reporter
```

```
 1     APPEARANCES, (Continued):

 2

 3              EDSON A. BOSTIC, ESQ. and
                DINA CHAVAR, ESQ., ESQ.,
 4              Assistant Federal Public Defenders

 5

 6                   Counsel for Defendant
                     David Thomas Matusiewicz
 7

 8

                KENNETH C. EDELIN, JR. ESQ.
 9              BY:  KENNETH C. EDELIN, JR.
                     (Philadelphia, Pennsylvania)
10

11                   Counsel for Defendant
                     Lenore Matusiewicz
12

13

                JEREMY GONZALEZ IBRAHIM
14              (Chadds Ford, Pennsylvania)

15

16                   Counsel for Defendant
                     Amy Gonzalez

17

18                        -   -   -

19

20

21

22

23

24
```

```
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in the

 4       courtroom beginning at 9:06 a.m.)

 5

 6              THE COURT:  Good morning, counsel.

 7              (Counsel respond, "Good morning,

 8       your Honor.")

 9              THE COURT:  Are we ready for the

10       jury?

11              MR. McCALL:  Judge, just because

12       the logistics of the next witness are a little

13       tricky, I just want to talk about the process

14       with the Court.

15              THE COURT:  You say the next

16       witness is a little tricky?  A little judicious

17       humor.  Go ahead.

18              MR. McCALL:  So it's the case

19       agent and we're going to be covering a lot of

20       documents with the case agent.

21              THE COURT:  Right.

22              MR. McCALL:  We have tried on the

23       front end to go through and redact all the

24       exhibits in line with the Court's orders and how
```

```
 1        we've been proceeding in the case.  I think

 2        we're really close, but it just seems like in

 3        talking with counsel, we're just off a little

 4        bit on small things with some of the exhibits.

 5                    THE COURT:  Everyone has to be on

 6        their toes and everyone should be quick with the

 7        kill switch, mainly me.

 8                    MR. IBRAHIM:  Judge, there is one

 9        we have that we can kill it right now.  I've

10        discussed it with --

11                    THE COURT:  Please, be seated,

12        everyone, while we're having the discussion.

13                    MR. IBRAHIM:  I discussed it with

14        Mr. McCall.  It's Exhibit 196.

15                    THE COURT:  All right.

16                    MR. IBRAHIM:  You probably don't

17        have -- does the Court have the new --

18                    MR. McCALL:  Judge, we put all the

19        redacted versions in your binders.  And, Judge,

20        may I invite with your permission Jackie Nobling

21        up to our table?  She's going to be running the

22        computer today.

23                    THE COURT:  Yes.  Absolutely.

24                    MR. McCALL:  Thank you, sir.
```

```
 1                    THE COURT:  You've already given

 2      me redacted versions.

 3                    MR. McCALL:  I have, your Honor.

 4      We put them in your binders.

 5                    THE COURT:  All right.  So if

 6      essentially what you are saying is despite best

 7      efforts there may be some issues we need to deal

 8      with, and obviously defense counsel will be

 9      alert.  If they think we're at such a stage, I

10      will be quick on the button, and if there's a

11      need to darken the screens, and we'll do the

12      best we can.

13                    So 196, Mr. Ibrahim?

14                    MR. IBRAHIM:  Yes.

15                    THE COURT:  Let me pull the

16      redacted one up.

17                    MR. McCALL:  It's on the screen,

18      too, Judge.

19                    THE COURT:  All right.  All right.

20      What does this purport to be, Mr. McCall?

21                    MR. McCALL:  This is an e-mail

22      found in the Edcouch residence in the bedroom

23      with the women's clothing we believe is Lenore

24      Matusiewicz's bedroom.  It's an e-mail from
```

```
 1      David Matusiewicz to the A1BBQ account.  It

 2      appears to be David Matusiewicz forwarding to

 3      the A1BBQ account comments by a good friend of

 4      his, Magda Menner, about really the issues of

 5      this case, which are, you know, utilizing Amy's

 6      testimony that she knew of Laura's child abuse

 7      and didn't report it and why that doesn't seem

 8      credible.

 9                  And it's incredibly relevant to

10      the government because it's putting David

11      Matusiewicz on as well as the reader of the

12      A1BBQ account, in this case the circumstantial

13      evidence would suggest Lenore Matusiewicz

14      because it's found in her bedroom, that these

15      claims are false and fabricated.  And here's

16      someone outside the family telling them, this

17      does not make any sense, and yet they press on

18      and continue with the false claims.

19                  THE COURT:  All right.  Let me

20      hear from the defense.

21                  MR. IBRAHIM:  Your Honor, this is

22      someone else's opinion of how they perceive the

23      beliefs of another individual.  This is not a

24      witness, and even if they were a witness, their
```

```
 1        own personal belief would be irrelevant.  Here
 2        we have someone else, a random individual,
 3        saying, here's what I think.
 4                    THE COURT:  Yes, except that one
 5        of the alleged co-conspirators it's forwarded
 6        to.
 7                    MR. IBRAHIM:  Understood.  He's
 8        forwarding -- here's essentially what I think.
 9        Whether it's forwarded or they themselves are
10        the ones who received it, it's a double hearsay
11        situation of somebody's opinion on, precisely as
12        the government points out, a crucial part of the
13        case.  So this is a totally random person
14        telling the jury, this is what I think, and,
15        one, I can't cross-examine this person.
16                    Two, even if they were here, I
17        would suggest their testimony and their personal
18        beliefs and opinion would be irrelevant.  So all
19        he's doing is forwarding it on, saying, hey,
20        look at what somebody thinks.  He's not even
21        saying he adopts it.
22                    THE COURT:  Mr. McCall?
23                    MR. McCALL:  Again, it is clearly
24        evidence of a conspiracy between David
```

```
 1     Matusiewicz, and, again, in this case, based on
 2     the circumstantial evidence, Lenore Matusiewicz.
 3     It is someone telling the family that this is
 4     not a credible claim, and it goes exactly to the
 5     heart of the issue, which is, is this
 6     defamatory?  Were they on notice?  Do they have
 7     knowledge?  What's their intent?  And this
 8     combined with the other evidence in the case,
 9     it's all part of the same thing.  It shows
10     they're working together.  They're in concert,
11     and people are telling them outside of their
12     little conspiratorial unit that this is, that
13     this claim just does not add up, and yet they
14     continue to press the claim.  In this instance,
15     the e-mail is dated March 21st, 2011, right
16     smack in the middle of the TPR hearing.
17                     THE COURT:  Let me hear back from
18     you, Mr. Ibrahim.
19                     MR. IBRAHIM:  Judge, I have six
20     binders of information that's coming in, e-mails
21     that come in that have expressed what the
22     government has said is the essence of their
23     case.
24                     The fact is, Agent Gordon couldn't
```

```
 1      get up there and say, based upon what I've read,

 2      this does not make any sense for the following

 3      reason because that's his opinion.  All this is

 4      is somebody else's opinion, and, again, you

 5      know, all that is reported -- again, I've got to

 6      take issue even though the jury is not here, the

 7      family.  I mean, all I heard was somebody else

 8      saying, oh, this is why I don't think what Amy

 9      is doing makes sense where it's found in one

10      person's bedroom, but it's from David.  There is

11      not the reliability, the hearsay exceptions

12      don't apply to this.  This is just the opinion

13      of Magda Menner on what my client -- you know,

14      by her understanding.

15                  THE COURT:  I have taken in the

16      argument of counsel.  I think I'm going to

17      overrule the objection, and I'm going to

18      overrule it on this basis, Mr. Ibrahim.  The

19      fact that Mr. Matusiewicz is forwarding it, and

20      the fact that it tends to support the argument

21      that what was being put forth in public was

22      being carefully crafted, and I take this as a

23      situation where Mr. Matusiewicz is raising a

24      cautionary note from someone whose opinion he
```

1    solicited that can take this course, could

2    potentially undermine the credibility.

3              And I'm happy when we reach that

4    exhibit to give a cautionary instruction to the

5    effect that it can only be considered for a

6    limited purpose, and also to take pains to point

7    out to the jury that your client is neither the

8    recipient nor the sender of the e-mail.  All

9    right?

10             MR. IBRAHIM:  I would request that

11   be done, then.

12             THE COURT:  Well, please prompt me

13   when the time comes.

14             MR. IBRAHIM:  Yes, sir.

15             MR. EDELIN:  Your Honor, so our

16   record is clear, I join in that objection, and I

17   understand the Court's ruling.

18             THE COURT:  All right.

19             MR. BOSTIC:  I join in the

20   objection for slightly different reasons, but I

21   think to the extent that any instruction is

22   given has to be given to all the defendants as a

23   whole.

24             THE COURT:  Of course.

1          MR. BOSTIC:  That this is just one

2    person's take on some information they received.

3          THE COURT:  Right.

4          MR. BOSTIC:  Thank you, your

5    Honor.

6          THE COURT:  All right.  Any other

7    particular issue that we should at this point

8    try to address?

9          MR. McCALL:  Do you have any other

10   exhibits you want to raise before we start?

11         MR. BOSTIC:  Your Honor, I've gone

12   through most of them with Mr. McCall and there

13   are some in the latter part of the day that I

14   think we may be able to review ourselves before

15   they get to it.

16         THE COURT:  All right.

17         MR. McCALL:  I will say this.  The

18   order of movement, which I think is important so

19   everybody knows what I'm doing, I'm going to

20   start with the documents that were found on Tom

21   Matusiewicz's body with the agent and then move

22   into the red notebook.

23         I know in the red notebook Mr.

24   Bostic had indicated, there's a series of pages,

3487

1    your Honor, that have David Matusiewicz's

2    contact information in his various prison

3    facilities.

4               THE COURT:  Right.

5               MR. McCALL:  And they're relevant

6    for the government because the front of the

7    book, as the Court knows, says, important

8    information for David Matusiewicz, and having

9    all his contact information in the book is

10   circumstantial evidence that all of the other

11   information in the book was being conveyed to

12   David Matusiewicz.  That combined with the

13   series of e-mails that we I think addressed in

14   our papers that show he had some knowledge of

15   what was going on with his family while he was

16   in prison.

17               And, you know, we have not

18   redacted the contact information as it indicates

19   the prison facilities.  I don't think at this

20   point that it's an issue.  We've had witness

21   testimony from Courtney Emerson, for example,

22   that he was in Salem County, Philadelphia FDC,

23   Brooklyn, so on and so forth.

24               I just ask that we keep it going.

1    If the Court wants to give an instruction at

2    that point, maybe it's appropriate.  I could

3    slow downright when I start.

4                    THE COURT:  All right.  Mr.

5    Bostic?

6                    MR. BOSTIC:  Your Honor, let me

7    say this.  This case has been inundated with

8    references to my client being incarcerated at

9    various different locations.  It is another

10   thing to put up an address, the specific name of

11   the facility, as well as the Marshal's number.

12   I think we're getting to the point where it's so

13   lopsided --

14                    THE COURT:  Here's how I'm going

15   to solve this.  While I realize, Mr. McCall, you

16   don't want to break the rhythm early, I think

17   when that comes up, I will break it.

18                    Members of the jury, you need to

19   understand someone that if someone is in the

20   federal system, the fact that they are in more

21   than one institution has no significance.

22                    MR. McCALL:  Absolutely, your

23   Honor.

24                    THE COURT:  As an administrative

```
 1      matter, as they're moved around, you shouldn't
 2      attach any significance that this suggests
 3      anything about Mr. Matusiewicz.
 4                  MR. McCALL:  Absolutely.
 5      Absolutely, your Honor.
 6                  THE COURT:  All right.
 7                  MR. McCALL:  That's an example of
 8      a page in the book.
 9                  THE COURT:  And, you know, there
10      may be times, government, where sua sponte I do
11      break in just to make sure that we have
12      perspective.  All right?
13                  MR. McCALL:  Absolutely, your
14      Honor.  I was more thinking if we have to go
15      back and redact it, we will have to take a
16      minute, redact it.
17                  THE COURT:  All right.
18                  MR. McCALL:  I totally understand
19      the Court's concern.
20                  THE COURT:  Let me also say to all
21      defense counsel, I appreciate the effort that
22      has gone into redacting these documents, but no
23      one should hesitate if they think their client's
24      rights are at issue to object.  All right?
```

```
 1                    MR. McCALL:  Judge, there are a

 2       lot of documents.  We've tried our best to

 3       capture everything in line with the Court's --

 4                    THE COURT:  I will repeat on the

 5       record what I said before.  All counsel have

 6       worked with remarkable professionalism and

 7       cooperation in a complex case and the Court

 8       appreciates that.  All right.

 9                    MR. McCALL:  Thank you.

10                    MR. EDELIN:  Your Honor, if I

11       could just approach and talk to Mr. McCall for a

12       second?

13                    THE COURT:  You may.

14                    Are you going to be starting in

15       binder 2, Mr. McCall?

16                    MR. McCALL:  I'm going to be

17       starting in I think the end of 1, Judge.

18                    THE COURT:  All right.  That's

19       fine.  All right.

20                    (The jury entered the courtroom

21       and took their seats in the box.)

22                    THE COURT:  Good morning, ladies

23       and gentlemen.  Please be seated.

24                    We had some temperamental
```

 1     technology this morning, but we are live and

 2     ready to go.  So, Mr. McCall?

 3                    MR. McCALL:  Judge, with your

 4     permission, we call Special Agent Gordon.

 5                    THE COURT:  All right.  Special

 6     Agent Gordon, take the stand, please.

 7                    ... JOSEPH GORDON, having been

 8           duly sworn as a witness, was examined

 9             and testified as follows ...

10                    MR. McCALL:  Judge, with your

11     permission, may I proceed?

12                    THE COURT:  You may.

13                        DIRECT EXAMINATION

14   BY MR. McCALL:

15                    Q.   Good morning, Special Agent.

16                    A.   Good morning.

17                    Q.   Let's talk again about your role

18     as the case agent in this matter.  All right?

19     Again, one of the duties as the case agent in an

20     investigation that you're conducting is to

21     review the evidence that's collected; is that

22     right?

23                    A.   That's correct.

24                    Q.   Okay.  Can you just briefly tell

Gordon - direct                3492

1       the jurors the significant sources of evidence,

2       where it came from and what you reviewed in

3       connection with this case before we start

4       looking at the documents?

5                A.    Sure.  We obviously, in

6       conjunction with the State Police, collected

7       evidence initially from the courthouse, which

8       would include Mr. Thomas Matusiewicz, the house

9       that the Matusiewiczes stayed in the night

10      before, which was the house in Elkton, Maryland.

11      We also coordinated with the search down in

12      Edcouch, Texas, which was conducted, you know, a

13      day after the incident.

14                A little bit later we conducted

15      other searches at the residence of Amy

16      Matusiewicz, and also throughout the course of

17      the investigation we gathered evidence through

18      search warrants on e-mail accounts, interviews.

19      And as the case agent, I coordinated all the

20      evidence coming in, conducting the interviews,

21      asking others to maybe conduct an interview at

22      some distant location, and then I would read the

23      reports, look at the evidence, bring it all back

24      to our office here in Wilmington.

1        Q.   All right.   I think you mentioned

2    you conducted a search of Amy Matusiewicz.   Is

3    that Amy Gonzalez?

4             A.   I'm sorry.   Amy Gonzalez.

5             Q.   Okay.

6             A.   Correct.

7             Q.   Now, I want to first turn to some

8    of the evidence that was collected at the

9    courthouse on the day of the shooting.   Okay?   I

10   want to talk about some of the evidence that was

11   taken off of the body of Thomas Matusiewicz as

12   well as from David Matusiewicz that day.   All

13   right?

14            A.   Sure.

15            MR. McCALL:   Judge, with your

16   permission, I would like to approach the

17   witness.

18            THE COURT:   You may, and at any

19   time throughout the exam, feel free.

20            MR. McCALL:   Thank you, your

21   Honor.

22   BY MR. McCALL:

23            Q.   Special Agent, I've handed you

24   Government's Exhibits 40.   Is that 40-A on the

1    left?

2              A.    That is 40-A on my right.

3              Q.    Thank you.  Your right.  Thank

4    you.  And Government Exhibit 38; is that

5    correct?

6              A.    That is correct.

7              Q.    All right.  Let's start with the

8    green folder.  Where did that come from?  Can

9    you hold it up and just tell the jurors?

10             A.    Sure.  This was recovered on

11   February 11th, 2013, from David Matusiewicz by

12   the U.S. Marshals when he was taken into

13   custody.

14             Q.    And, Special Agent, after that

15   folder was recovered, you had an opportunity to

16   inspect its contents; is that correct?

17             A.    I did.

18             Q.    And was there a DD214 form that

19   was found inside that folder?

20             A.    There was.

21             Q.    And can you tell the jurors what

22   we're talking about?

23             A.    A DD214, if you have been in the

24   military, you should be familiar, familiar with

Gordon - direct                          3495

1      it.  It's the discharge from the military.

2      Usually with that it lists what type of

3      discharge you had, such as an honorable, or less

4      than honorable.

5                  So it's the paperwork, you know,

6      detailing, you know, who you are, what you are,

7      and that you were discharged from the military,

8      and then there's usually a certificate that goes

9      along with it.

10            Q.   All right.  Can you reach inside

11     the green folder and pull out the DD214 form

12     that you recovered that day, or that was

13     recovered that day, I should say.

14            A.   So as I said, it's actually, you

15     know, in this case two forms.  It's the

16     honorable discharge certificate, if you will,

17     and then along with it is the detailed

18     information or the DD214 listing the name of the

19     individual, what branch they served in, their

20     dates of service, awards, commendations and what

21     type of discharge.

22            Q.   Okay.

23            A.   As well as other personal

24     information.

1          Q.   All right.  Can you just hold it

2     up, please, so the jurors can see it?  And what

3     was unique about that particular document when

4     you found it in the green folder?

5          A.   Just the way it was folded.  It

6     was relevant to the investigation.

7          Q.   Okay.  Let's turn now to

8     Government Exhibit 38.  Push that off to the

9     side.

10          All right.  Go ahead and pull out

11     Government Exhibit 38.

12          A.   These are the --

13          Q.   What is it?

14          A.   These are the documents that were

15     recovered from the body of Thomas Matusiewicz.

16          Q.   All right.  And specifically what

17     are those documents that you are holding up

18     there?

19          A.   They were -- they were four pieces

20     of paper within the documents.  There was the

21     two certificates of death, one in the name of

22     Christine Belford, one in the name of Timothy

23     Hitchings, the pictures of the children, and

24     then behind that was the poem, or the

1    "Reflection of the Dog" poem as we call it.

2         Q.   Take a moment, put those back

3    together.  And, again, could you just hold that

4    up, please?  And what is significant or what's

5    unique about that?

6         A.   It was folded in the same manner.

7         Q.   Can you show the jurors how the

8    DD214 form from the green folder matches up to

9    the documents taken off the body of Thomas

10   Matusiewicz?  Thank you.

11             MR. McCALL:  All right.  Judge,

12   may I retrieve the exhibits?

13             THE COURT:  You may.  Again, at

14   all times feel free to move back and forth.

15             MR. McCALL:  Thank you, your

16   Honor.  Creature of habit.

17             THE COURT:  That's okay.  Just

18   makes your job easier.

19   BY MR. McCALL:

20        Q.   All right.  So we just looked at

21   how the folds in DD214 form from the green

22   folder that was on David Matusiewicz matched the

23   documents on Thomas Matusiewicz; is that

24   correct?

```
 1            A.    Correct.

 2            Q.    Let's turn now to some of the

 3      other documents that were recovered by you and

 4      law enforcement from that green folder.  All

 5      right?

 6            A.    Yes, sir.

 7            Q.    Could you please pull up

 8      Government Exhibit 40.01.  And, again, this is

 9      the outside of the green folder, just a

10      photocopy of it?

11            A.    Correct.  Just a scan of the

12      outside.  Slightly see-through.  That's why you

13      see some of the document.

14            Q.    Could you please turn to 40.02.

15      All right.  And 40.02, this is an e-mail that

16      we've seen before in this case; is that correct?

17            A.    It is an e-mail from

18      RANIM@aol.com, which is known to me as the

19      e-mail address of Amy Gonzalez to the attorney

20      Heriberto Medrano.

21            Q.    The date of this is April 4th,

22      2009; is that correct?

23            A.    That's correct.

24            Q.    Can you blow up the bottom
```

```
 1     portion, which is the Amy section?  Right.  And

 2     the significance of this particular e-mail to

 3     Mr. Medrano was what, or is what?

 4              A.   She's detailing the allegations,

 5     but no mention of G-spot.

 6              Q.   Okay.  And the date on this

 7     e-mail, Special Agent Gordon, right, it's

 8     April 4th, 2009; is that correct?

 9              A.   That is correct.

10              Q.   When were the children of

11     Christine Belford brought back and reunited with

12     her?

13              A.   Approximately a month earlier.

14              Q.   And Mr. Medrano was whose

15     attorney?

16              A.   Mr. Medrano was David's attorney,

17     David Matusiewicz's attorney.

18              Q.   Could you please turn to 40.06.

19     And as we continue to look at the documents that

20     are in the green folder that Mr. Matusiewicz or

21     I should say David Matusiewicz possessed, this

22     is the polygraph result; is that correct?

23              A.   It is.

24              Q.   For Amy Gonzalez?
```

1          A.   Yes.

2          Q.   All right.  And we can run through

3     it and go to page 10.

4               Okay.  Page 10 of this exhibit was

5     a Mediation Guide; is that correct?

6          A.   Yes, from the Family Court in the

7     State of Delaware.

8          Q.   All right.  And can you turn to

9     paragraph 7, which is on page 11.  Now, before

10    we talk about paragraph 7, just help the jurors

11    understand, what is this document?

12         A.   This is put forward by the Family

13    Court of the State of Delaware.  It's to

14    instruct somebody who is going through a process

15    with Family Court as to what happens with the

16    mediation process and cases moving forward, how

17    they may, how they may move forward depending on

18    how things are resolved or not resolved.

19         Q.   All right.  Now, could you please

20    read paragraph 7.

21         A.   What happens if mediation is not

22    successful?  If no agreement is reached at

23    mediation, the parties may be taken before a

24    Commissioner that same day for temporary or

1    permanent order.  Therefore, you should come to

2    mediation prepared to go to trial if your

3    mediation is unsuccessful.  If you do not see a

4    hearing officer that day, the case will be

5    scheduled for a formal court hearing.

6              In custody/visitation cases,

7    parents must complete a parent education program

8    before their case is scheduled before a judge.

9    The mediator may recommend an interim order, a

10   temporary order, for the Judge or Commissioner

11   to sign if there's no prior order for visitation

12   or support.

13             Q.   So, Agent Gordon, if mediation

14   isn't successful on that day, you have, based on

15   this document, a hearing that day, or one will

16   be scheduled in the future; is that correct?

17             A.   That's correct.

18             Q.   Could you please turn to page 12.

19   All right.  What is page 12 of this exhibit?

20             A.   This is a letter mailed, dated

21   December 2nd, 2012, mailed to the Family Court

22   in New Castle County by David Matusiewicz.

23             Q.   Could you please read the body of

24   the letter where it starts, "Dear Sir."

1          A.   "Dear Sir Or Madam, enclosed

2     please find the financial report in the

3     above-captioned matter.  In that I am presently

4     serving federal probation and cannot leave Texas

5     without authorization from my probation officer

6     and in that the Family Court has recognized my

7     status as a pauper and I cannot afford to travel

8     to Delaware, I hereby request to be allowed to

9     participate in the coming hearing on 12/10/12 at

10    8:30 a.m. Eastern Standard Time by

11    teleconference.  Please send instructions to the

12    number to call so that I may participate in the

13    scheduled hearing by phone.

14              "Since time is some of the essence

15    in this matter, you may call or e-mail with the

16    details. "

17         Q.   And then it says, "Thank you,

18    David Matusiewicz."  Is that correct?

19         A.   Correct.

20         Q.   With the P.O. Box Edcouch, Texas

21    address that we've seen in this case?

22         A.   That's correct, with the e-mail

23    address at the bottom as well.

24         Q.   All right.  Now, can you put this

```
1     letter in context for the jurors.  This is

2     December 2nd, 2012?

3              A.   That's correct.

4              Q.   What happens later on in this

5     month that is significant to this case?

6              A.   They do have the mediation hearing

7     by telephone.

8              Q.   Okay.  And the reason that he's

9     asking for a telephonic mediation hearing in

10    this letter is what, Special Agent?

11             A.   Well, two reasons.  Financially,

12    he's essentially stating he can't afford to

13    travel.  He's also on probation, so in order to

14    travel, he would have to request and be given

15    authorization to travel.

16             Q.   Okay.  Could you please turn to

17    page 15 of the green folder.  All right.  What

18    is page 15?

19             A.   If so this is the Board of

20    Examiners for Optometry for the State of

21    Delaware.  You know, Dave Matusiewicz was an

22    optometrist, and essentially this is a

23    revocation of his optometry license.

24             Q.   And page 19 is the last page of
```

1      the order; is that correct?

2                  A.    It is.

3                  Q.    And can you read the highlighted

4      part?

5                  A.    "By unanimous vote, the Delaware

6      Board of Examiners in Optometry revokes the

7      optometry license of David T. Matusiewicz,

8      License No. 13-00001202.

9                  Q.    What's the date of the order?

10                 A.    27 May 2011.

11                 Q.    Several months before the TPR

12     order comes down; correct?

13                 A.    That's correct.

14                 Q.    Page 20.  All right.  Page 20 is

15     what?

16                 A.    This is from the Family Court,

17     State of Delaware, obviously, or, I apologize,

18     for New Castle County, and it's the final

19     custody order between Christine Belford and

20     David Matusiewicz.

21                 Q.    And the second page lists the

22     date; is that correct?

23                 A.    It does.

24                 Q.    And, again, the date is what?

 1              A.    21 November.

 2              Q.    What year?

 3              A.    2008.

 4              Q.    Page 22 of the green folder.  This

 5       is the first page of what order?

 6              A.    This is the termination of

 7       parental rights.  This was, you know, decided

 8       and mailed on August 18th, 2011.  This

 9       terminates David's, David Matusiewicz's parental

10       rights.

11              Q.    Okay.  Page 23, please.  What is

12       page 23 of the green folder?

13              A.    This is a letter addressed to

14       David Matusiewicz at 819 Sinatra Drive,

15       Edinburg, Texas, which is the residence of Amy

16       Gonzalez, and the return address is 15 Donegal

17       Court, Newark, Delaware, which is the residence

18       of Christine Belford.

19              Q.    Next page, please.  Page 24.

20       And, again, this is the June 30, 2012 letter

21       that has already been read into the record from

22       Christine Belford to David Matusiewicz; is that

23       correct?

24              A.    Correct.  This is the -- in

1          summary, she asks for no more contact.  A little

2          further down it reads, do not contact me, lists

3          the children.

4                    Q.   And the next document, page 25.

5                    A.   Now --

6                    Q.   Go ahead.

7                    A.   This is an earlier, as you can

8          see, dated November 21st, 2011.  It's actually a

9          letter from Christine Belford to David

10         Matusiewicz.  And this is Christine -- to

11         summarize, Christine giving updates on the

12         children, how they are doing in school, you

13         know, what activities they're, they're involved

14         in.

15                   Q.   All right.  So in this green

16         folder Dave Matusiewicz brings to the courthouse

17         the day of the shooting, he has the TPR order;

18         is that correct?

19                   A.   Correct.

20                   Q.   That takes away his parental

21         rights?

22                   A.   Correct.

23                   Q.   He has got the final custody order

24         from 2008 that stripped his custody of the kids

```
 1      from him; is that right?

 2              A.   Correct.

 3              Q.   He has the optometry revocation

 4      order that took away his ability to be an

 5      optometrist in Delaware; is that correct?

 6              A.   Correct.

 7              Q.   And he has got the June 30, 2012

 8      letter from Christine Belford that says, no more

 9      contact; right?

10              A.   Correct.

11              Q.   And he also has his dad's DD214

12      form.

13              A.   That is correct.

14              Q.   All right.  Can we turn to

15      Government Exhibit 60, page 1, please.

16                   All right.  You've seen this

17      exhibit before; is that correct?

18              A.   It is.  We refer to it as the red

19      notebook.

20              Q.   And, again, where was the red

21      notebook found?  In the CRV; is that correct?

22              A.   The CRV parked across the street

23      from the courthouse the day of the shooting,

24      this was found at the CRV.
```

1          Q.   Okay.  In the back, I think either

2     in or by a bag; is that correct?

3          A.   It -- you recall the video.  It

4     falls out of the bag when the pack file, or

5     robot, I'm not the technical guy for that one,

6     when the robot pulls it out and it falls out.

7          Q.   And, again, the bag that this red

8     notebook was near, what else was contained in

9     that bag?

10         A.   That is, that contained the

11    bulletproof vest, three sets of handcuffs, a

12    cattle prod, a large, I would describe as a

13    military-style knife.

14         Q.   And ammunition?

15         A.   As well as some ammunition,

16    correct.

17         Q.   It's tough to make out there, but

18    I think you can see it on the other screen.

19    What does the front of the notebook say?

20         A.   It says, important info for David

21    Matusiewicz.

22              THE COURT:  All right.  Counsel,

23    maybe at this point I will give the jury some

24    instructions.

```
 1                     When this document was raised

 2          before, ladies and gentlemen of the jury, I

 3          broke into the testimony.  Some of the documents

 4          in the case, there's an agreement as to who

 5          authored the documents and what the source of

 6          the documents is.  There is no such agreement in

 7          this case by the parties, so one of your jobs as

 8          jurors will be to look at the document, to look

 9          at what's in the document, to consider where it

10          was found and the circumstances under which it

11          was found, and you will as part of your

12          deliberations attach such significance to it as

13          you will.  All right?

14                     So this is one of those instances

15          where you as the jurors will serve an

16          evidentiary function in deciding what to make of

17          the document, which I told you you may consider

18          as an exhibit.  All right?

19                     MR. McCALL:  Judge, thank you,

20          sir.

21      BY MR. McCALL:

22              Q.  Okay.  Could we please turn to

23          page 2.  Okay.  And the top of page 2 is

24          highlighted.  And, Special Agent, can you tell
```

Gordon - direct                    3510

1        the jurors what, or can you read this portion of

2        the red notebook to the jurors?

3                A.    Sure.   So we're now into the red

4        notebook, paging through.   In this case, it

5        says, Hidalgo CTY.   Hidalgo County is the county

6        where Edcouch, Texas is located.   It says,

7        Hidalgo County Sheriff's Department Reports, and

8        then listing number one and number two.

9                     The first one says credit theft

10       with a number, which appears to be a complaint

11       number you would get from a police department if

12       you filed a complaint with an officer's name,

13       Omar Olamen.

14                    And then the second is circled.

15       It says, Lee poisoning, again with a number that

16       appears to be the Sheriff's report.   Complaint

17       number appears an officer or sheriff's deputy

18       named Vegenag.   And these are dated.

19               Q.    What is the date that is in the

20       bottom right corner of the highlighted portion?

21               A.    The one below No. 2, Complaint No.

22       1/19/11.

23               Q.    We saw during Dr. Bocanegra's

24       testimony a police report from the Hidalgo

1    County Sheriff's Office; is that correct?

2              A.   We did.

3              Q.   And it recounted, just focusing on

4    No. 2, a claim of poisoning on the part of

5    Lenore Matusiewicz against Christine Belford; is

6    that correct?

7              A.   Yes, with a cup of tea.

8              Q.   Right.  And again the date that is

9    1/19/2011; is that correct?

10             A.   That's correct.

11             Q.   And what else can you tell the

12   jurors was significant, Special Agent, on

13   January 19th, 2011, as it related to this case?

14             A.   Well, the termination of parental

15   rights trial, it's not a trial like we're having

16   now where all the days are consecutive.  They're

17   at different days as the Court allows.  So that

18   was one of the days of the termination of

19   parental rights trial where they, they held

20   court.

21             MR. McCALL:  Okay.  Judge, with

22   your permission, I'm going to put up on the Elmo

23   the first three pages of the transcript from

24   January 19th, 2011, to show who one of the

 1    witnesses was that testified that day.

 2                    THE COURT:  Hearing no objection,

 3    you may.

 4    BY MR. McCALL:

 5                    Q.   Again, this is the transcript from

 6    January 19th, 2011.

 7                    A.   That is correct.

 8                    Q.   And so the same date that is

 9    indicated in the red notebook with the Court is

10    filed, who testified that day?

11                    A.   Christine Belford.

12                    Q.   Could we please turn to page 3 of

13    the red notebook.

14                    What do we see here?  And you can

15    highlight the information on the document.  I'm

16    sorry.  Blow it up.  Enlarge it.  Thank you.

17                    What is listed here?

18                    A.   So these are vehicles with their

19    year.  So the first one, 2010 Toyota Camry,

20    black, or blk, four-dr, which I believe is

21    four-door with a license plate No. 233370.

22    Dela.  And then 2009 Honda Odyssey, purple/tan

23    with a license plate number as well.

24                    Q.   What I'd like to do is compare

 1     this exhibit to another exhibit that has been

 2     entered in the case, 242.01.

 3                    MR. McCALL:  Thank you.  And you

 4     can blow up the license plate on the bottom

 5     left.  Can you keep going down?  Thank you.

 6  BY MR. McCALL:

 7                    Q.  Special Agent, what is significant

 8     about the 2009 Honda Odyssey plate that you see

 9     in the red notebook versus the picture that is

10     indicated on 232.01?

11                    A.  This vehicle is registered to

12     Christine Belford?

13                    Q.  Okay.  Those license plate

14     numbers, 437215, they match?

15                    A.  Yes.

16                    Q.  All right.  And 242, Exhibit 242,

17     that came out of the Vista Con bag; is that

18     correct?

19                    A.  Yes.  The bag that was found in

20     Elkton, Maryland, at the Mitchell residence.

21                    Q.  Special Agent, you reviewed the

22     Vista Con bag; is that correct?

23                    A.  I did.

24                    Q.  There were a series of documents

Gordon - direct                    3514

```
 1        contained in that bag in addition to these

 2        photographs; is that right?

 3                    A.    There were.

 4                    Q.    And who were those documents

 5        either addressed to or related to?

 6                    A.    David Matusiewicz.

 7                    Q.    I'd like to turn to page 4 of

 8        Government Exhibit 60.

 9                    MR. McCALL:  If you could enlarge

10        that.

11    BY MR. McCALL:

12                    Q.    Okay.  Let's start with the top,

13        the top portion represents what?

14                    A.    It says Dave's acct, account.

15                    Q.    Then it lists some information

16        below; is that correct?

17                    A.    Yes.  Under the word wastes,

18        W-a-s-t-e-s, wastes.  Mark Buckworth, Judge.

19        Jane Brady, Judge.  Phyllis Scully, D.A.

20                    Q.    Who is Mark Buckworth?

21                    A.    Mark Buckworth was the Judge,

22        Family Court, State of Delaware, who oversaw the

23        custody between David Matusiewicz and Christine

24        Belford.
```

```
 1                  Q.   Jane Brady?

 2                  A.   Jane Brady was the Judge, State of

 3        Delaware, who oversaw the criminal prosecution

 4        of Lenore Matusiewicz for the kidnapping of the

 5        children in 2007.

 6                  Q.   Phyllis Scully?

 7                  A.   Phyllis Scully was the D.A. or

 8        general Attorney General, as they're called, in

 9        the State of Delaware who prosecuted the case

10        regarding Lenore Matusiewicz.

11                  Q.   Page 5, please.  Okay.  We're

12        going to walk through the information on this

13        document.

14                  MR. McCALL:  If you could enlarge

15        the top portion.

16   BY MR. McCALL:

17                  Q.   Starting with the top of the

18        document, which is --

19                  A.   Sure.  15 Donegal Court, Newark,

20        Dela with the zip code, and it had the parcel

21        number, which would be something you get

22        typically from the County identifying the land,

23        parcel number.

24                  So, again, 15 Donegal Court.  It's
```

```
 1          Belford's address.  Then the second is Tim

 2          Hitchings.

 3                    Q.   All right.  And I see, if you look

 4          at the left, there's Newport, Delaware address.

 5                    A.   Right.

 6                    Q.   And what is significant about

 7          that?

 8                    A.   So Tim Hitchings, the attorney for

 9          Christine Belford, the address on the left, 100

10          East Main, is his, newer, of course,

11          chronologically speaking, his office address.

12          And then the one on the right, Bear, Delaware,

13          is his old address.

14                    Q.   All right.  And just below the

15          phone numbers for Tim Hitchings, what name is

16          listed there?

17                    A.   Christine Belford.

18                    Q.   And what is the information that's

19          contained below her name?

20                    A.   Her date of birth and Social

21          Security number, although I think the last four

22          of one of the numbers is transposed.

23                    Q.   What do you mean by transposed?

24                    A.   I believe 1564, without checking,
```

1      I think it's 15, or 1654.

2              Q.    Okay.

3              A.    I would have to double-check.

4              Q.    All right.   We'll skip the portion

5      that indicates general contractor.   We'll move

6      down to, I think the name is, it starts Jerald.

7      What does that indicate?

8              A.    Yes.   Jerald Raymond Purcell with

9      his date of birth and Social Security number,

10     with a telephone number and previous addresses.

11     Up top, 2401 Belford, and then an old address,

12     260 Christiana Road, New Castle, Delaware,

13     listing addresses that Jerald Purcell had

14     resided at.

15             Q.    As you continue to make your way

16     down this document, where it says "his," what

17     does that indicate?

18             A.    His former wife's name, Lisa

19     Purcell.

20             Q.    I'm sorry.   Based on the

21     investigation, what does that mean?

22             A.    Jerald, Jerald Purcell's previous

23     wife.

24             Q.    Okay.   And then it lists a series

 1      of information, including a divorce granted

 2      date; is that correct?

 3              A.   That's correct.  So it looks like

 4      referencing some Court information, Maryland

 5      Domestic Family, Montgomery County Circuit

 6      Court, Divorce.  Correct.

 7              Q.   And then if we go down to the

 8      bottom of the page, where we have -- there is

 9      a redaction.  What is on the bottom of the

10      page?

11              A.   At the bottom, starting on the

12      left, it says, relative?  And then circled

13      neighbor, or neighbors.  And it says, Timothy

14      James Golden, Donegal Court, Newark, Delaware,

15      and then to the right of his name is circled,

16      cop.

17              Q.   Okay.  We'll stop here for a

18      second.  Special Agent, can you describe or

19      explain the relevance of that to this case as it

20      relates to Christine Belford?

21              A.   Sure.  As we know, Christine

22      Belford lives at 15 Donegal Court.  Directly

23      next-door or immediately next-door is

24      Mr. Golden, who is actually a New Castle County

```
 1          Police Officer.

 2                      MR. McCALL:  Page 6, please.  If

 3          you can enlarge the highlighted section.

 4      BY MR. McCALL:

 5                  Q.   Okay.  Can you please, looking at

 6          the first highlighted set of words, what does

 7          that indicate?

 8                  A.   It says, "Watch him" next to the

 9          name Joe Sonal.  It's not highlighted.  It says

10          Simon Eye Associates.

11                  Q.   What is significant about Joe

12          Sonal and Simon Eye Associates?

13                  A.   Optometrists who operates their

14          own or works at Simon Eye Associates, and one of

15          the office locations.

16                  Q.   Okay.  How did that relate to

17          Christine Belford, if at all?

18                  A.   Christine Belford ended up working

19          at Simon Eye Associates.

20                  Q.   To the left of Simon Eye

21          Associates, there's another small highlight; is

22          that correct?

23                  A.   Yes.

24                  Q.   And what does it indicate?
```

1        A.   It says -- well, it says, call,

2    how.   I think it says how.   There's a lot of

3    cross-out.   But it says, how was WB let go?

4              MR. McCALL:   Okay.   If you can

5    back out, please.

6    BY MR. McCALL:

7              Q.   And then as we continue down the

8    document where it says the name Jason, it is

9    underlined.   What's that?

10             A.   Jason, it says Deschane, M.D.,

11   known to me as Jason Hann-Deschane,

12   Appoquinimink Pediatrics, which is the

13   pediatrician for the children.

14             Q.   All right.   As you continue down

15   the document?

16             A.   It says, Christine, Doctor, and

17   one of her doctors, John Kahagis.

18             Q.   Okay.

19             A.   Which may not be pronounced right.

20             Q.   Understood.   Next page.

21             All right.   What's highlighted on

22   page 7?

23             A.   David, and then contact

24   information.   Allison Burchfield, Dave's

1     patient.

2              Q.   Okay.  And can you keep going down

3     the document?  The next highlighting?

4              A.   Kiley Best, Dave's patient.

5              Q.   Underneath her name?

6              A.   Linda Morris.

7              Q.   Who is Linda Morris?

8              A.   Linda Morris is a friend of Dave

9     who we interviewed during the investigation.

10             Q.   All right.  Can you continue down?

11    Again, that's Linda Morris' name that's

12    highlighted as well?

13             A.   Correct.

14             Q.   Lisa Lloyd Washington, that's the

15    next highlighted name?

16             A.   Yes.

17             Q.   Who is that?

18             A.   Another friend of David

19    Matusiewicz.

20             Q.   Okay.  The name that is the

21    highlighted after that?

22             A.   Sandy Peterson, who you heard from

23    the other day.

24             Q.   And then can you keep -- okay.

Gordon - direct                    3522

```
 1        And that ends the document.
 2                    MR. McCALL:  Page 8, please.
 3    BY MR. McCALL:
 4                    Q.   All right.  The top of page 8,
 5        what does that indicate?
 6                    A.   That is the child abuse reporting
 7        line, as it says, and that number is the State
 8        of Delaware's.
 9                    Q.   All right.  And the next highlight
10        below that?
11                    A.   David's ad, News Journal/local.
12                    MR. McCALL:  Page 9, please.
13    BY MR. McCALL:
14                    Q.   All right.  What do we see here?
15                    A.   A phone number starting with 302,
16        and that says WB cellphone, or PH.
17                    Q.   All right.  And then below that?
18                    A.   Courtney, Dave's friend.  Works
19        for State, Dela, with a contact number.
20                    Q.   Now, we have seen those two
21        letters, WB, a couple times already.  We'll see
22        it, I think, more in the pages coming up.  But
23        who is that?  Who do you understand that to
24        relate to based on the investigation?
```

1          A.   That relates to Christine Belford.

2          Q.   Okay.  And then the bottom portion

3     that's highlighted, what is that?

4          A.   On the left, it says, verify, WB

5     and Bast Dr.

6          Q.   To the right of that?

7          A.   2009 Toyota Camry black with a

8     license plate number.

9          Q.   And the license plate, is that

10    significant in any way?

11         A.   Yes.

12         Q.   If you know.  And how?

13         A.   It came back to, I believe that

14    may have been the neighbor's.

15         Q.   Okay.

16         A.   On Donegal Court.

17              MR. McCALL:  Next page, please.

18    All right.  Could you enlarge the highlighted

19    section?

20    BY MR. McCALL:

21         Q.   Okay.  What do we see here,

22    Special Agent?

23         A.   So the name that obviously we know

24    is Kimberly Lawson.  Kimberly Lawson - Reed

 1     Smith LLP, and her office address.  Next to it

 2     on the left it says, worthless joke (our girl's

 3     Dela advocate) with a star.  Back on the left it

 4     was another star and the numbers KB circled.

 5                     MR. McCALL:  Back out, please.

 6     BY MR. McCALL:

 7                     Q.   And then the name that's

 8     highlighted below, Kimberly Lawson.

 9                     A.   Michael O'Rourke.  Michael

10     O'Rourke is the private investigator who

11     assisted the Matusiewiczes, was in contact with

12     Thomas, Lenore and Amy.

13                     MR. McCALL:  All right.  I would

14     like to compare this now, if you can back out

15     and go back to the Kimberly Lawson section.

16                     What has already been admitted

17     into evidence is one of the e-mails from Cindy

18     Bender, and it is Exhibit 424.01.  If you could

19     pull it up.

20                     Okay.  If you could go down and

21     highlight first on the left the words worthless

22     joke and Kimberly Lawson, and then that

23     sentence.

24     BY MR. McCALL:

 1                 Q.    424, again, Special Agent, that

 2      was an e-mail between what parties?

 3                 A.    If you can pull it back out for a

 4      second.  So this is an e-mail chain between

 5      Pookie's mom -- I'm sorry.  Pookie's mom is

 6      Cindy Bender, and then Bear Dog is the e-mail

 7      address for David Matusiewicz.

 8                 Q.    Okay.  And then again in the red

 9      notebook, who is being referred to as a

10      worthless joke?

11                 A.    In the red notebook, worthless

12      joke is being referred to Kimberly Lawson.

13                 Q.    Okay.  And the word "worthless,"

14      I'm not going to repeat the next word, is being

15      referred to who?

16                 A.    Christine Belford.

17                 Q.    Okay.  Can you please go to page

18      11.  Who is highlighted?

19                 A.    Betty Lou Griffith, Realtor,

20      Middletown.  Betty Lou Griffith testified here

21      the other day.  Below it says, Tom and Lee's.

22                 MR. McCALL:  All right.  Page 12,

23      please.

24      BY MR. McCALL:

1          Q.    All right, let's look at the top

2     highlights.   On the left, what does it indicate?

3          A.    CB, WB, underlined.

4          Q.    And Special Agent, CB, those are

5     the first two letters of whose name?

6          A.    C, Christine.   B, Belford.

7          Q.    And the personal information

8     that's contained on the right of the CB, WB, who

9     does that --

10          A.    It's the Social Security number

11     and date of birth of Christine.

12          MR. McCALL:   All right.   Can you

13     push this document off to the left, please.   And

14     can you pull up Exhibit 35.01.   Can you

15     highlight -- correct.   And can you blow up the

16     CB, WB, and the personal information.

17     BY MR. McCALL:

18          Q.    And, again, can you tell the

19     jurors in the course of the investigation how

20     you came to understand that Christine Belford's

21     name was associated with the letters WB and the

22     words whore bitch?

23          A.    Well, it appeared numerous times

24     in the context of talking about, you know,

```
 1        Christine Belford, David Matusiewicz's ex-wife.

 2        And we would see the term WB, and then describe

 3        something she would be doing, so we understood

 4        WB is whore bitch, I apologize.

 5                    And then --

 6               Q.   And you backed out and you looked

 7        at the death certificate.  Who is it for?

 8               A.   That is the death certificate that

 9        was found on Tom's body in the name of Christine

10        Belford.

11                    MR. McCALL:  Page 14, please.

12   BY MR. McCALL:

13               Q.   Okay.  What are we seeing on page

14        14?

15               A.   So these are -- we saw this in a

16        lot of places, but this is the contact for the

17        Dr. Phil Show, Barbara Walters, essentially

18        various news media outlets, and those are two of

19        them listed there.

20               Q.   It also lists contact information

21        for who else?

22               A.   Judge Jane Brady from the State of

23        Delaware, Superior Court, and then Gregory

24        Sleet.  Judge Sleet is a Judge on the Federal
```

```
 1        Bench here in the District of Delaware.

 2                  MR. McCALL:  Page 15, please.

 3     BY MR. McCALL:

 4             Q.   All right.  Working our way down

 5        the highlights, what does the first highlighted

 6        portion indicate?

 7             A.   Jeff Pelly, the first name

 8        highlighted.  Jeff P-e-l-l-y was the intake

 9        report line taker, if you will, from the Family

10        Youth and Children's Services, you know, manning

11        the hotline, and Laura Miles is listed as

12        director.  She -- you heard her testimony the

13        last, or a couple days.

14             Q.   Okay.  And as you continue down

15        the document?  Go ahead.

16             A.   I'm sorry.  11/20/09, and then it

17        says, 9:00 a.m., spoke to Jeff Pelly, filled him

18        in on child sexual abuse of our grandchildren.

19        And then it says, lick the lollipop, Lenore

20        Matusiewicz.  G-spot told to Amy Matusiewicz,

21        our daughter.  Juan Gonzalez, Laura, Mommy's

22        secret out.  I'm sorry.  Mommy's secret, can't

23        tell.  Get her interview.

24             Q.   Okay.  Let's go back up to lick
```

```
 1        the lollipop for a moment.  To the right, what
 2        do the words indicate in the highlighted portion
 3        where it says lick the lollipop on the far
 4        right?
 5                A.   I'm sorry.  The far right?
 6                Q.   Yes.
 7                A.   Four.  Appears to be the circled
 8        age, four, and 2006.
 9                Q.   MR. McCALL:  Can you expand it up?
10                     THE WITNESS:  And that would --
11        four would be about the age of Laura.
12    BY MR. McCALL:
13                Q.   But what's the -- I'm actually
14        more focused off the words to the right above
15        2006, if you can read it.  If you can't, it's
16        okay.  We can move on.
17                A.   We can move on.
18                Q.   All right.  Okay.
19                     MR. McCALL:  Page 16, please.
20    BY MR. McCALL:
21                Q.   What does this indicate?
22                A.   BLG, Betty Lou Griffith.  We heard
23        her testimony the other day.  She's the realtor.
24                     MR. McCALL:  Page 17, please.
```

 1    BY MR. McCALL:

 2              Q.   All right.  Okay.  Let's start

 3       with the top highlighted portion, Special Agent

 4       Gordon.

 5              A.   So in quotes it says, "visited."

 6       Quote, "visited," end quote WB on Thursday,

 7       12/2/2011, with/Mike.

 8              Q.   Okay.  And based on the

 9       investigation, when it says visited on

10       12/2/2011, what did you -- what was significant

11       that was occurring in the case during that time?

12              A.   Well, at the time Thomas and

13       Lenore Matusiewicz, who were residing in Texas

14       about that time, had come to Delaware, come to

15       the address of -- well, Thomas Matusiewicz had

16       come to the door of 15 Donegal Court with

17       Michael O'Rourke.

18              Q.   As you move down the document

19       where it says 12/11/2011, what does it say

20       next?

21              A.   Yes.  12/11/2011, WB listed home

22       with Long & Foster.  In parentheses, (Judith

23       Cook, Listing Agent).

24              Q.   And where did that information

Gordon - direct                    3531

1        come from based on the investigation?

2               A.   Betty Lou Griffith was the other

3        real estate agent.

4               Q.   And then as we continue down the

5        document, we see a series of pieces of

6        information that appear to be related to what?

7               A.   So it appears to be information

8        from, or about a house or a residence and the

9        listing.  23-year old house, the square footage,

10       2275 Sq ft, and then basement with outside

11       entrance.  Master on main.  Two bedrooms

12       upstairs.

13              Q.   And what house in this

14       investigation has the master on the main and two

15       bedrooms and the basement with the outside

16       entrance?

17              A.   15 Donegal Court.

18              Q.   Okay.

19                   MR. McCALL:  Can you back out,

20       please?  All right.  Next page, please.

21   BY MR. McCALL:

22              Q.   All right.  What are the two

23       letters at the top of the document?

24              A.   HL.

1           Q.   Below that, what is, what are the

2      letters that are circled there?

3           A.   WB/NM.

4           Q.   Now, let's stop there at the NM.

5      I want to focus on that for a moment.

6           MR. McCALL:   Can you push the HL

7      document off to the left side of the screen,

8      please, and can you pull up 64.01?

9  BY MR. McCALL:

10          Q.   And there was a document that came

11     out of the glovebox of the CRV that was driven

12     to the courthouse; is that correct?

13          A.   That is correct.

14          Q.   All right.   Can you tell the

15     jurors what we're looking at on the right with

16     the newest --

17          A.   Okay.   So on the right, again,

18     came out of the CRV, in quotes it says, "Newest

19     mark," end quote.

20          Q.   And what was significant about the

21     information that was listed below that?

22          A.    It's information it appears they

23     were gathering about Belford's husband,

24     boyfriend, and then they begin to refer to him

1     as NM, new mark.

2                Q.    Who is --

3                A.    Jerald Purcell.

4                Q.    All right.   Thank you.

5                      Okay.   As we work our way down the

6     words that are on this page, the next is Ann

7     Gaza; is that correct?

8                A.    That's correct.

9                Q.    And who is that person?

10               A.    She's a lawyer in the State of

11    Delaware who previously represented Christine

12    Belford in a -- in a Family Court matter.

13               Q.    Okay.   And the next is Tim -- you

14    read it.   I'm sorry.

15               A.    Sure.   The next is Tim H-i-t,

16    which Tim Hitchings was Belford's attorney

17    through the divorce, the custody proceedings and

18    the termination of parental rights trial.

19               Q.    Next?

20               A.    Brady.   We know Judge Brady

21    oversaw the prosecution of Lenore Matusiewicz

22    for the kidnapping.

23                      Judge Sleet.   Judge Sleet is on

24    the Federal Bench, District of Delaware, who

1    oversaw the case involving David Matusiewicz for

2    the kidnapping in 2011.

3              Q.    Buckworth?

4              A.    Judge Buckworth oversaw -- the

5    State of Delaware Judge, oversaw the custody

6    hearings between David and Christine.

7              Q.    Next?

8              A.    Scully.  Phyllis Scully would be

9    the Deputy Attorney General that prosecuted

10   Lenore in the State of Delaware kidnapping case.

11             Q.    The next name?

12             A.    Jay Belford.  Jay Belford is the

13   father of Christine Belford, or Jim Belford, I

14   apologize, is the father of Christine Belford.

15             Q.    Next?

16             A.    James Woods.  James Woods is the

17   attorney that -- who you heard testimony here

18   representing Christine in the lawsuit against

19   the Matusiewicz's.

20             Q.    Can you continue?

21             A.    Sure.  Orlov.  Dr. Marsha Orlov

22   was involved in the termination of parental

23   rights hearing.  There is also -- her husband

24   also did counseling.  He's also a doctor for

1    Christine and David early on, I guess, about the

2    time of their divorce.

3                 Lawson circled there, Kimberly

4    Lawson.  She's the guardian ad litem for the

5    three girls.

6         Q.   Next?

7         A.   Duarte.  Dimitrio Duarte was the

8    attorney who represented Lenore in the State of

9    Delaware kidnapping case.

10                Heriberto Medrano.  He represented

11   David Matusiewicz in the federal kidnapping

12   case.

13        Q.   Okay.

14        A.   Roberts, Don Roberts represented

15   David Matusiewicz in a termination of parental

16   rights trial.

17        Q.   You can continue.

18        A.   Circled Sam Romirowsky.  You heard

19   Dr. Sam Romirowsky testify the other day.  He

20   was Belford's -- the psychologist that initially

21   was hired by David in the custody hearing, and

22   then testified in a termination of parental

23   rights trial.  And then I guess Judge Buckworth

24   again.

 1          Q.   Okay.  All right.  Can you turn to

 2   page 19, please, and at the top of the document?

 3   Go ahead.

 4          A.   Monica Bocanegra, Hockessin Center

 5   For Change, 710 Yorklyn Road, Hockessin.  We

 6   know to be her address.  She testified the other

 7   day as well.  Circled, Laura's psychologist.

 8          Q.   There's a name to the top left?

 9          A.   Amy Butler.  She was an attorney

10   that was involved with the Matusiewicz family as

11   well.

12          Q.   And what is circled there below

13   her name?

14          A.   KB.

15          Q.   Next page, please.  Okay.  Page

16   20.

17          A.   This is Courtney Emerson with her

18   home address, 112 Harmony Crest Drive, Newark,

19   Delaware.  And Courtney Emerson testified the

20   other day here.

21          Q.   Page 21, please.  Okay.  What do

22   we see here?

23          A.   At the top it says Optometry Board

24   and then it lists Carl Maschauer.  Below the

 1         name it says Joe Sonal.   These are both eye

 2         doctors in the State of Delaware.   Dr. Senal I

 3         believe is still on the Optometry Board and Dr.

 4         Maschauer was on the Optometry Board, but is not

 5         currently, I believe, today.

 6                    MR. McCALL:   Can you go to 23,

 7         please.

 8    BY MR. McCALL:

 9                    Q.   And what are we looking at on

10         again 23?

11                    A.   On the left, on the left, WB

12         Stooge, underlined, and then it says James

13         Woods, Jr., E-s-q, Esquire, with his contact

14         information.   And then it says, lives at 126

15         D-e-w-b-e-r-r-y Drive, Hockessin, Delaware.   And

16         then e-mail address, lawyer in Delaware.   And

17         then it says, one van/one CAD.

18                    Q.   Now, what is significant about

19         that to this case, Special Agent?

20                    A.   Well, as Mr. Woods testified, and

21         we know he drove a minivan or was registered to

22         his family a minivan and a Cadillac.

23                    Q.   Next.   24, please.   Page 24.   And,

24         again, the top right, highlighted portion.

Gordon - direct                    3538

1           A.    So D circled, WB circled, 2012.

2           Q.    And whose personal information is

3      that?

4           A.    That is the -- that is actually

5      the date of birth and Social Security number of

6      Jerald Purcell.

7           Q.    Okay.  And at the bottom?

8           A.    Jerald Raymond Purcell with, you

9      know, 2401 Belford Drive, Wilmington, Delaware,

10     contact number.

11          Q.    Page 25, please.  And we're going

12     to look at just a series of names quickly here.

13               So you can just tick off the

14     names, and I think you've mentioned some of them

15     already.

16          A.    Sure.  Linda Morris in Newark,

17     Delaware, a friend of Dave Matusiewicz.

18               Magda Menner, a paramedic friend

19     of Dave Matusiewicz up in Northern New Jersey.

20               Sandy Peterson, also residing in

21     New Jersey, who testified the other day, friend

22     of Dave Matusiewicz.

23               And then Cindy and Joe Bender, and

24     then the word "rats" circled and off to the

```
 1        right.  Cindy Bender we heard the other day

 2        testified and then Joe Bender is her husband.

 3                  Q.   Page 26, please.  This is page 26

 4        and it appears to be contact information; is

 5        that right?

 6                  A.   It does.

 7                  Q.   For who?

 8                  A.   This is for David Matusiewicz.

 9                  Q.   And in addition to the address, it

10        also lists a phone number for -- what does it

11        say at the bottom highlighted?

12                  A.   It's Dave's collect calls and then

13        the contact number.

14                  Q.   Okay.

15                  THE COURT:  And, members of the

16        jury, this makes reference to Mr. Matusiewicz

17        being incarcerated at different facilities.  The

18        number of facilities someone is in is of no

19        significance.  Right?  He was serving time for

20        kidnapping, and people are just moved from place

21        to place.  It has nothing to do with

22        characteristics.

23        BY MR. McCALL:

24                  Q.   Page 27, please.  And, again, this
```

```
 1    is more contact information for David

 2    Matusiewicz; is that correct?

 3              A.   That's correct.  David

 4    Matusiewicz.  FDC is Federal Detention Center.

 5              Q.   Page 28.  Same thing here.  More

 6    contact information?

 7              A.   Yes.  The previous was

 8    Philadelphia.  Now it's Brooklyn.

 9              Q.   All right.  Page 29.  All right.

10              Okay.  Let's take our time through

11    page 29.  Starting at the top, what does the top

12    highlighted portion indicate?

13              A.   It says WB TEL, with a telephone

14    number.

15              Q.   Okay.

16              A.   Being Delaware, they did not list

17    the 302.

18              Q.   Fair enough.  We move down.  The

19    first highlight where the date is highlighted.

20    Just start at the left where the word is circled

21    and work your way over.

22              A.   Sure.  It says M-o-n.  It appears

23    to be Monday circled, 3/1/2010, 11:15 a.m.  WB

24    back to work, Simon Eye.
```

1              Q.    Keep going.

2              A.    Tuesday, or Tues - visited David,

3      Brkyln, Brooklyn.

4                    3/2/2010, Wednesday, Wed.  12:30.

5      WB work, NM gone, G-o-n-e. "Car NP.")

6                    3/4/2010, T-h-u-r-s, Thursday.

7      2:00 p.m.  WB work, NM gone, (car NP?)

8                    3/5/2010, Friday.  Didn't get

9      there.

10                   Monday, or MON, 3/8/2010.  WB

11     met -- oh, at 9:00 a.m.  I can't make out that

12     one word there.  JB, LB, four WK, 9:00 a.m., and

13     then on the further right, NM, not at home.

14                   Tuesday, 3/9/2010, WB at work,

15     8:27 a.m.  WB -- I can't make out the next.

16              Q.    Okay.

17              A.    Wednesday, 3/10/2010, 8:30 to

18     9:00 a.m.  WB not, and then the sign you would

19     find on the computer, at W.

20                   Thursday, 3/11, WB, the at again,

21     H, 9:00 a.m.  Move Karen tutor time.  5503

22     Stoney Batter Road, near W/WB work.

23                   3/12/10, WB at work, or the sign

24     at work.

1          Q.   Okay.  And, again, when you see

2     NM, that's a reference to what based on the

3     investigation?  What words?

4          A.   Jerald Purcell, or new mark.

5          Q.   Now, in your capacity as an FBI

6     agent, how long have you been an agent for

7     again?

8          A.   Went to the Academy in 2002, but

9     over 13 years now.

10         Q.   All right.  And how many --

11     roughly, how many times have you conducted

12     surveillance?

13         A.   More than I can count easily.

14         Q.   Can you tell the jurors, when you

15     conduct surveillance, what are you trained to

16     do?

17         A.   Every little bit of information

18     may be important, so we document and we take

19     notes, and we generally refer to it as a

20     surveillance log.

21              So we're gathering pattern of life

22     information.  If there's something specific or,

23     you know, writing down license plate numbers or

24     watching people come and go from areas of

Gordon - direct                    3543

```
 1        interest.  So we -- they're a target of our
 2        investigation for some reason, we're trying to
 3        determine what they're doing simply through
 4        surveillance and keeping a log of it.
 5                    MR. McCALL:  Can you back out,
 6        please?
 7   BY MR. McCALL:
 8             Q.    And where it said Tuesday visited
 9        David, Brkyln, one of the facilities that David
10        Matusiewicz was housed in was where?
11             A.    The Federal Detention Center in
12        Brooklyn, New York.
13                    MR. McCALL:  Next page, please,
14        which I think is -- I'm sorry.
15                    May I have one moment, your Honor?
16        I've lost my spot.
17                    THE COURT:  You may.
18                    MR. McCALL:  Okay.  Page 30.
19   BY MR. McCALL:
20             Q.    All right.  Page 30.
21             A.    Okay.
22             Q.    What is highlighted here?
23             A.    So highlighted is the word
24        "worthless," circled and that's just above help
```

1    or hindrance, Hockessin Center For Change, and

2    then at the bottom, Dr. Monica Bocanegra and in

3    between, that is the address of her office.

4                MR. McCALL:  Page 31, please.

5    BY MR. McCALL:

6                Q.    Top left?

7                A.    It says grandmother's IMP choice,

8    which I would, in the course of the

9    investigation, Grandmother's Impossible Choice,

10   and then Barbara Walters.

11               MR. McCALL:  Page 32, please,

12   bottom right, or the whole -- thank you.

13   BY MR. McCALL:

14               Q.    Focusing --

15               A.    So --

16               MR. McCALL:  Hold on one second.

17               MR. IBRAHIM:  May we see the Court

18   at sidebar?

19               THE COURT:  Yes.

20               (Sidebar conference held out of

21   the hearing of the jury as follows.)

22               MR. IBRAHIM:  A Juror needs a

23   comfort break.  I'm in a position where I see

24   it.

```
 1                    THE COURT:  That's good.  I will
 2       announce that and we'll just settle here for a
 3       minutes.  Okay?
 4                    (End of sidebar conference.)
 5                    THE COURT:  Members of the jury,
 6       it's almost 10:30.  We'll take a brief
 7       mid-morning break.  All right?
 8                    (The jury was excused for a short
 9       recess.)
10                    THE COURT:  Off the record.
11                    (Discussion held off the record.)
12                    THE COURT:  So as long as we're
13       here, is there anything else we need to discuss,
14       or we'll all just take a break.
15                    MR. IBRAHIM:  Sounds like a good
16       idea.
17                    MR. EDELIN:  A break sounds good
18       to me.
19                    THE COURT:  All right.
20                    (End of sidebar conference.)
21                    (Short recess taken.)
22                         -  -  -
23                    (Proceedings resumed after the
24       short recess.)
```

```
 1                    THE COURT:  Are counsel ready for

 2        the jury?

 3                    MR. McCALL:  We are, yes.

 4                    THE COURT:  If everyone is

 5        situated?

 6                    MR. BOSTIC:  I'm missing Ms.

 7        Chavar, your Honor.  Let me see if she is in the

 8        hallway and get her quickly.

 9                    THE COURT:  All right.

10                    MR. BOSTIC:  Here she comes.

11                    THE COURT:  All right.  We're

12        bringing in the jury.

13                       (The jury entered the courtroom

14        and took their seats in the box.)

15                    THE COURT:  All right.  Welcome

16        back.  We will continue with the direct

17        testimony.

18     BY MR. McCALL:

19                    Q.   Okay.  Special Agent Gordon, we're

20        looking at Government Exhibit 60, page 32, and

21        the bottom section of this document.

22                    Can you explain to the jurors what

23        the highlighted portion indicates?

24                    A.   Sure.  It has the name Crowell,
```

 1          C-r-o-w-e-l-l, Judge Crowell, and then the

 2          initials or letters "KB" and circled.

 3                    Q.   And, again, Judge Crowell was who

 4          in the context of this case?

 5                    A.   She was the Judge who oversaw the

 6          termination of parental rights, and the Family

 7          Court on the left, Family Court, 500 North King

 8          is the address of the courthouse.

 9                    Q.   Okay.  And just so the record is

10          clear, when you say "the termination of parental

11          rights," you mean the trial that occurred for

12          that issue?

13                    A.   The termination of parental rights

14          trial.

15                    MR. McCALL:  Page 34, please.

16     BY MR. McCALL:

17                    Q.   Okay.  And what are we looking at

18          here that is highlighted on page 4?

19                    A.   It says Lee, Christine's diary,

20          1991.

21                    Q.   And what does it say?  What's the

22          first line?

23                    A.   Mad at boy in her diary.

24                    Q.   And based on the investigation,

Gordon - direct                      3548

```
 1      what did you understand that to be a reference

 2      to?

 3                  A.   Christine Belford, you know, a

 4      teen-ager, had a diary, and the Matusiewicz

 5      family were in possession of it.

 6                  MR. IBRAHIM:  Objection.

 7   BY MR. McCALL:

 8                  Q.   Well, let me ask it this way:  Did

 9      someone receive -- did someone in this case

10      receive copies of the Belford's diary in the

11      mail?

12                  A.   Yes.

13                  Q.   And that was who?  Do you

14      remember?

15                  A.   Ms. Lawson.

16                  MR. IBRAHIM:  Judge --

17                  THE COURT:  I'm not sure that

18      deals with the objection.  I think the objection

19      was to the use of the term Matusiewicz.

20   BY MR. McCALL:

21                  Q.   That was a packet that was sent by

22      Thomas Matusiewicz?

23                  A.   That's correct.

24                  MR. IBRAHIM:  I understand it's a
```

1    misspeaking, a general term.

2                    THE COURT:   Understood.

3    Clarified.   Thank you.

4                    MR. McCALL:   You're welcome, your

5    Honor.

6    BY MR. McCALL:

7                    Q.   Page 35, please.

8                    A.   So the name Sam Romirowsky,

9    psycho, Omega Prof Center, or Ctr., 52 Omega

10   Drive, Newark, Delaware.   That is the office

11   location for doctor Samuel Romirowsky who you

12   heard from, and to the left of his name are the

13   letters KB and circled.

14                   Q.   Page 36, please.   This is contact

15   information for what parties?   Which party?

16                   A.   On the top it says Gotthold plus

17   Jason Hann-Deschane.   Dr. Gotthold and Dr.

18   Hann-Deschane, as you heard, are the

19   pediatricians for the children, and it is one of

20   the office locations listed for Appoquinimink

21   Pediatrics, which is the name they operate under

22   down in Townsend, Delaware.

23                   Q.   And then as you continue down the

24   document, it's contact information for?

1          A.   Sure.   DYFS, State of Delaware.

2     Child Report Abuse.   I'm sorry.   State of

3     Delaware, Wilmington, Delaware, and then to the

4     right, Child Report Abuse.   And then at the

5     bottom, Division of Family Services, and then

6     two lines below that, New Castle County Police

7     Department.

8          Q.   Okay.   Page 37, please.   All

9     right.   Let's start at the top and work our way

10    down the highlighted sections.

11         A.   So it says Katy Moffa farmed out

12    to, and then James Belford, in jail/prison.

13    Below that, lunatics, family doctor, and the

14    name John -- I can't pronounce it again.

15         Q.   That's the same name we saw

16    earlier?

17         A.   Yes.

18         Q.   A doctor for Christine Belford?

19         A.   It is.

20         Q.   All right.   As you continue down?

21         A.   And then at the -- it says

22    Laura/Leigh/Karen taken to, and, again, the

23    pediatrician's, you know, office, and Dr.

24    Hann-Deschane.   And there it says Dr. Jason

 1      Deschane.  And then below that, Marc Richmon,

 2      who you heard testify, the psychologist for

 3      Christine.  It says, Marc Richmon, lunatic

 4      psychologist.  And then it says lunatic on, and

 5      then lists several medications:  Xanax, Lexpro,

 6      Wellbutrin, Paxil, codeine.

 7                  Q.  Page 39, please.  Okay.  And if

 8      you can highlight --

 9                  A.  So now we're inside, this would be

10      inside the last -- the back cover, if you will,

11      of the red notebook.  So this is the, the kind

12      of hard back cover, just inside the inside

13      portion of it.  That's a photograph from a

14      newspaper cutout of Judge Sleet.

15                  Q.  How was this affixed onto the

16      notebook, Special Agent Gordon?

17                  A.  It was taped into the, into the

18      back page, if you will.

19                  Q.  All right.  And what's

20      highlighted?

21                  A.  Right above his picture are the

22      letters KB and circled.

23                  Q.  Page 41, please.  Okay.  And now

24      we're out of the notebook.  Well, we're out of

Gordon - direct                    3552

1     the pages that are in the spiral portion of the

2     notebook.  Is that correct, Special Agent?

3              A.   Yes.  So the spiral notebook, you

4     know, that metal, round, spiral Composition

5     notebook, as you can call it, and then we have

6     now gone through page by page of the bound part

7     of it, and these are pages that were stuffed

8     into the notebook.  Maybe, you know, printed-out

9     pieces of paper that were stuffed in it.

10             Q.   All right.  And, again, what are

11    we looking at on page 41 of this exhibit?

12             A.   So it says, it looks like

13    descriptions of vehicles.  Black Suburban and

14    then it says WT, two-dr.  You know, white

15    two-door Toyota, Celica/Supra.  Lights pop up in

16    front and then a license plate number.

17    Actually, that's the plate that comes back to

18    the neighbor of Christine Belford on Donegal

19    Court.

20             Q.   Okay.  Page 42, please.  What's

21    42?

22             A.   This was a loose photograph that

23    was in the notebook, and this is a photograph of

24    the Honda Odyssey, minivan registered to

 1      Christine Belford.

 2              Q.   All right.   Let's push this off to

 3      the side and let's pull something out of the

 4      Vista Con bag that was previously seized in this

 5      case.   Exhibit 242.1, page 1.

 6              And, again, the Vista Con bag is

 7      from the Mitchell residence, is that right, in

 8      Maryland?

 9              A.   Correct.   So what you are looking

10      at, like I said, on the left is an actual

11      photograph like you get from the old photomat, I

12      guess, or printout at Walmart or something.

13              On the right, they were one page

14      together.   They were apparently scanned or

15      photocopied together, and that's how that page

16      appeared with all four photographs.   And that

17      one on the right came out of the Vista Con bag,

18      which was at the -- the night before the

19      shooting incident, David, Thomas and Lenore

20      Matusiewicz stayed with the Mitchells in Elkton,

21      Maryland.

22              Q.   All right.   Can we turn to page

23      46, please.   Okay?

24              MR. McCALL:   And can you blow up

1    this e-mail?

2    BY MR. McCALL:

3                Q.   Who is this e-mail from, Special

4    Agent?

5                A.   So this is the e-mail, present

6    e-mail of David Thomas, Thomas Matusiewicz, the

7    Coreline e-mail system.  It's from David.  It's

8    dated 11/5/2010.

9                Q.   Okay.  And can you read the first

10   paragraph, where it -- just to the right of

11   message?

12               A.   Sure.  "Of course, I just spent a

13   few hours with mom and dad discussing the

14   upcoming hearing.  They told me you don't have

15   anything left to give (monetarily.  I expect you

16   to donate your eternal soul to the case

17   otherwise).  Thanks for the joke."

18               MR. McCALL:  Can you back out,

19   please?

20   BY MR. McCALL:

21               Q.   And who did you, based on the

22   investigation, understand him to be speaking to

23   in this e-mail?

24               A.   Amy Gonzalez.

1              MR. McCALL:  Page 48, please.

2      BY MR. McCALL:

3              Q.   Again, can you tell the jurors

4      what we are looking at here on page 48 of this

5      exhibit?

6              A.   e-mail from David Matusiewicz,

7      dated 11/5/2010, and then the e-mail message

8      with handwriting off to the side.

9              Q.   All right.  And what does the,

10     what does the e-mail, the unredacted portions

11     e-mail indicate?

12             A.   It says Orlov not going to be able

13     to say that Laura was abused.

14             Q.   Orlov.  Let me stop you there.

15     Who is Orlov?

16             A.   Dr. Marcia Orlov was the

17     psychologist who testified in the termination

18     of parental rights trial for David Matusiewicz.

19             Q.   When you say "for David

20     Matusiewicz," Dr. Orlov was a witness called by

21     David Matusiewicz; is that correct?

22             A.   That is correct.

23             MR. McCALL:  Page 52, please.

24     BY MR. McCALL:

1          Q.    What's 52?

2          A.    So, again, the name James Woods

3     with a P.O. Box, and then his address, 126

4     Dewberry Drive.  That was one thing, you know,

5     we confirmed that he lived in the Ramsey Ridge

6     development.  That's where Dewberry Drive is

7     located.  And then another listing, you know,

8     possibly an old address for Mr. Woods.

9                MR. McCALL:  Page 53.

10    BY MR. McCALL:

11         Q.    This is a copy of what?

12         A.    So this is another copy of the

13    government form DD214.  This is -- you know, you

14    can now read it.  There's the DD214 for Thomas

15    Stanley Matusiewicz with the service number and

16    Social Security number.

17                He retired from the Navy as a

18    petty officer, third class photographer.

19    Released from active duty where he was last

20    stationed.

21         Q.    All right.  Page 61, please.  Page

22    61 is the first page of a report; is that

23    correct?

24         A.    Yes.  A comprehensive report.

```
 1                Q.   And who is the report about?

 2                A.   Jerald Purcell.

 3                Q.   All right.  And there's 14 or

 4      15 pages that accompany this report; is that

 5      correct?

 6                A.   Yes.

 7                Q.   And just tell the jurors, what

 8      kind of information is contained in these, these

 9      comprehensive reports?

10                A.   Sure.  There are companies that we

11      as law enforcement can sign up with.  You know,

12      the FBI, you know, contracts that we have access

13      that we can go in and identify somebody using

14      the name, address, Social Security number and

15      then get all the details that have been gathered

16      by these aggregate companies.  You have to pay

17      for it and have a law enforcement use for it.

18      They also sell this to private individuals, such

19      as private investigators.  Essentially, we call

20      it, you know, maybe a trade name.  We use the

21      trade name of which company we're using.

22                     So generally a comprehensive

23      report is, you've got either by their name,

24      Social Security number, address.  You type that
```

Gordon - direct                        3558

```
 1       in.  You start typing, get a report of
 2       everything that touches that name, Social
 3       Security number.  So previous addresses, prior
 4       Court actions that are public.
 5                  So it's essentially public
 6       information gathered, but because of the Social
 7       Security number, it's limited.  You know, in
 8       some cases law enforcement the use the whole
 9       Social Security number, I believe, but private
10       investigators would only get a portion of it.
11       They wouldn't get the whole Social Security
12       number.  But in this case, this is a full report
13       on Jerald Purcell with all of the information
14       that was aggregated.
15                  Q.   Does it even include bank account
16       or financial information on a person?
17                  A.   It can.  It can.
18                  Q.   Okay.  Now, page 78, please.
19       Okay.  Another slip of paper found in the red
20       notebook.  What is page 78?
21                  A.   It's Simon Eye, 45,000, and then
22       the address, the suite number and the address on
23       Limestone Road.  It says Opt Tech.  Probably
24       Optician Tech.  And then below that, you know,
```

Gordon - direct                    3559

```
 1      contact number, and then the Social Security and

 2      date of birth of Christine.

 3                  Q.   All right.  And that's where she

 4      worked at that Simon Eye optometry practice; is

 5      that correct?

 6                  A.   Yes.

 7                  Q.   And below that, again, it's just

 8      more contact information for whom?

 9                  A.   Yes.  Jerald Purcell with his

10      Social Security number, address, date of birth,

11      and then his name again with another address.

12      Those are previous addresses that he was known

13      to have been involved in, meaning resided at or,

14      you know, stayed at.

15                  Q.   Page 79, please.  All right.  What

16      do we see here in the highlighted portion?

17                  A.   So starting at the center top,

18      James plus Susan A. Woods (WB).  And then to the

19      left, the letters KB and circled, and then his

20      address.  And that's the subdivision that I

21      referenced, and then tax information.  And then

22      it says, 4200 square foot, two-story colonial,

23      four BD, four bedroom.

24                  Q.   Okay.
```

1          A.   It appears to be again information

2     about James Woods' address, his wife, and some

3     details about the house.

4               MR. McCALL:  Can we push this

5     document off to the left, please?  Pull up

6     Government Exhibit 60, page 18.

7  BY MR. McCALL:

8          Q.   All right.  Do you see anything on

9     page 18 that is similar to page 79?

10         A.   Sure.  Two -- okay.  If you start

11    at the bottom and count up four names, you see

12    words.  On the right from the HL document that

13    was contained in the red notebook, and then on

14    the left, James Woods.

15         Q.   And Special Agent, there's two

16    letters off to the left of James Woods' name; is

17    that correct?

18         A.   There are.

19         Q.   What are those letters again?

20         A.   KB.

21         Q.   Other people in the red notebook

22    have the letters KB next to their name; is that

23    correct?

24         A.   They did.

1      Q.   Who were those people, if you

2  recall?

3      A.   Kim Lawson, Judge Sleet.   There

4  was one -- Kim Lawson, Judge Sleet.   There was

5  one on the same page as Judge Crowell, but there

6  was another name near it.

7      Q.   Okay.   How about Romirowsky?

8      A.   Yes.   Sorry.   The bottom.   If you

9  see Sam Rom.   In the book, Sam Romirowsky had KB

10  next to it as well.

11      Q.   Let's turn to Government

12  Exhibit 60, page 80.   What's this?

13      A.   So as we heard from Betty Lou

14  Griffith the other day, this is the Trend real

15  estate information printout that a realtor would

16  have access to if you were buying a house.   And

17  this was found with the red notebook.   At the

18  top it says Lee and Tom.   And this is the

19  information for 15 Donegal Court and that's a

20  picture of the residence at 15 Donegal,

21  Christine's home.

22      Q.   Can we go to page 88, please.

23  Again, there are documents inside the red

24  notebook; is that correct?

Gordon - direct                    3562

1              A.   Correct.

2              Q.   Okay.

3              A.    Inside the red notebook.   Here is

4    continuing through the Trend report, and then

5    it's a picture of the stairwell up to a, you

6    know, second floor, and then the handwritten

7    words, "kids room" with a line drawn through the

8    door.

9              Q.   Page 90, please.   What do we see

10   on 90?

11             A.    Interior picture of the house.

12   Bedroom, and it says Leigh/Karen's room.

13             Q.   92, please.

14             A.    Interior picture of the house, of

15   the bedroom.

16             Q.   94, please.

17             A.    Interior picture of the house,

18   bedroom, and handwritten, Laura's room.

19             Q.   Special Agent Gordon, which

20   witness identified the accuracy of the

21   handwriting on this document in the course of

22   the trial so far?

23             A.   The room descriptions were told to

24   us by Laura Matusiewicz, that they were

```
 1    accurate.

 2              Q.   Page 96.

 3              A.   Interior picture of the house,

 4    bedroom, and it says WB room.

 5              Q.   Page 98.  And that's a picture of

 6    the backyard; correct?

 7              A.   It is.

 8              Q.   Page 100.

 9              MR. McCALL:  Okay.  Can you blow

10    that up?

11  BY MR. McCALL:

12              Q.   And, again, we saw this e-mail in

13    another form during the testimony of Betty Lou

14    Griffith; is that correct?

15              A.   That's correct.

16              Q.   And what was the attachment that

17    came along with this particular document?

18              A.   In this one, it's an e-mail from

19    Betty Lou to A1BBQ, which is the address, e-mail

20    address utilized by Tom and Lee.  And it says, I

21    am attaching the seller's disclosure for her

22    property.  Her signature is on page 7.

23              So the seller's disclosure is if

24    you've ever sold a house, you have to disclose,
```

Gordon - direct                    3564

```
 1        you know, any problems you have or that it has
 2        this many rooms or, you know, whatever.
 3                    So when Christine Belford listed
 4        her home for sale, you know, like any other
 5        person, she would have had to make a seller's
 6        disclosure about details of the house.  So she
 7        filled that out and gave that to her real estate
 8        agent, and Betty Lou Griffith was able to obtain
 9        it and send it to Tom and Lee Matusiewicz.
10             Q.    And that's what we're scrolling
11        through right now, the seller's disclosure that
12        was in this e-mail behind the red notebook; is
13        that correct?
14             A.    Yes.  Each page is a handwritten,
15        you know, check-off notes, whatever, that the
16        seller went over, or Christine went over with
17        her real estate agent and would have filled that
18        out.
19             Q.    And can you go back to the last
20        page?
21             A.    And then the seller would sign it
22        and date it, and then a prospective buyer would
23        get this and then they would review it with the
24        real estate agent.
```

Gordon - direct                    3565

1           Q.    Okay.  Whose name is there?

2           A.    Christine Belford.

3           Q.    What's the date?

4           A.    12/4/2011.

5           Q.    How many days after, or what was,

6     what was significant about that date, Special

7     Agent Gordon?

8           A.    Well, three days prior to

9     December 4th, on December 1st, Tom Matusiewicz

10    and Lenore Matusiewicz were seen by her

11    neighborhood, and then Tom Matusiewicz was

12    accompanied by Private Investigator Michael

13    O'Rourke to her front door.

14          Q.    All right.  That finishes the

15    documents and pages from the red notebook, and

16    now I want to move to the search that was

17    conducted of the Edcouch, Texas residence.

18    Okay?

19          A.    Okay.

20          Q.    And again, just so we're orienting

21    the jurors, at the time this search occurred,

22    who was believed to be residing in that house?

23          A.    At that time, this is a day after

24    the shooting, Tom Matusiewicz is residing there.

 1          Well, was residing there, Lenore Matusiewicz,

 2      and David Matusiewicz.

 3                    Q.    All right.

 4                    MR. McCALL:   Could we pull up on

 5      the one side of Exhibit 71-01, and on the other

 6      side, Exhibit 75-B-01.

 7      BY MR. McCALL:

 8                    Q.    All right.  And now we're going to

 9      be going through the documents in terms of where

10      they were recovered in the house; is that

11      correct, Special Agent?

12                    A.    That's correct.

13                    Q.    Now, starting with Government

14      Exhibit 71 on the left and 75-B, can you just

15      reorient the jurors what they are looking at?

16                    A.    Sure.  So the left is generally

17      the diagram of the residence, the residence of

18      Tom and Lenore Matusiewicz and where David was

19      staying as well.

20                    As you look at the bottom of the

21      screen, that would be the front of the

22      residence, and to the right where it's being

23      blown up, that would be the front door.

24                    And as you walk in the front door,

Gordon - direct                    3567

1     you know, it's like a small foyer, and as you

2     look at the picture on the right, you're

3     essentially standing just inside the front door,

4     maybe a step or two to the left, and you're

5     looking at a closet that would face you.  And

6     just next to that closet out in the foyer are

7     two boxes, plastic boxes like a gray-black

8     rolling box, one on top of the other.

9              Q.   I'm using my laser pointer just to

10    be clear.  Where I'm pointing on the word

11    "foyer," that's where the boxes were found that

12    were seen in 75-B?

13             A.   Correct.

14             Q.   So right when you open the door?

15             A.   Yes.  So if you are, if you were

16    the picture-taker, you would be standing just

17    inside the front door.

18             Q.   All right.  Let's look at

19    Government Exhibit 75-C.01.  And what's this

20    again?

21             A.   So there were four of these type

22    boxes, the two that you didn't see at the front

23    door there.  They all had hanging file folders

24    in them.

Gordon - direct                    3568

```
 1                    What you are seeing is a picture
 2        of the one on top of the two at the front door
 3        with the top taken off, and then the file
 4        folders with either printed or handwritten
 5        dividers.
 6              Q.   And all of these documents were
 7        seized.  Is that correct, Special Agent?
 8              A.   They were.  All four of those
 9        plastic containers were seized.
10              Q.   And --
11              A.   Along the other things.
12              Q.   I'm sorry.  And prior to your
13        testimony today, you reviewed all of these
14        documents; is that correct?
15              A.   I did.
16              Q.   And we're about to go through a
17        series of documents for purposes of the
18        presentation this morning; is that correct?
19              A.   We are.
20                   MR. McCALL:  Could we please turn
21        to Government Exhibit 123.
22        BY MR. McCALL:
23              Q.   Okay.  The highlighted top part
24        is, it says what?
```

1          A.    "A Grandmother's Impossible

2     Choice."

3          Q.    Now, we've seen this document

4     before; is that correct?

5          A.    Yes.

6          Q.    All right.  I'm not going to go

7     through it, but I do want to go to the red flag.

8     There's a series of paragraphs marked red flag;

9     is that correct?

10         A.    There are a number.

11         Q.    Let's go to red flag No. 9, which

12    is on page 6.

13              Okay.  Now, red flag No. 9, can

14    you just summarize it, Special Agent Gordon?

15    What does it talk about in detail?

16         A.    So, you know, this refers back to

17    when the Matusiewicz family, meaning, you know,

18    David Matusiewicz, Christine Belford and the

19    children, including Katy Moffa and Lenore

20    Matusiewicz, were all located in Delaware, down

21    in Middletown.  And essentially the allegation

22    in here is that Lee met, I'm sorry, Lenore

23    Matusiewicz was poisoned when Katy Moffa gave

24    her tea.

```
 1                    Q.   Katy Moffa; right?

 2                    A.   Katy Moffa.

 3                    Q.   Okay.   Approximately in 2004, how

 4          old would Katy Moffa have been?

 5                    A.   She would have been about nine, I

 6          believe.

 7                    MR. McCALL:   Could you please go

 8          to page 23, and then can you just enlarge the

 9          highlighted section with the names?

10     BY MR. McCALL:

11                    Q.   Can you read the highlighted

12          section of page 23 of this exhibit?

13                    A.   Here is an, all caps, very short

14          list of mothers who killed their children for a

15          variety of reasons recently.

16                    Q.   And then it lists two columns of

17          names of women; is that correct?

18                    A.   It does.   Yes.   I mean, it's just

19          names of these individuals who allegedly were,

20          you know, had some -- some involvement in

21          killing kids, although like Lydia Trueblood I

22          looked up I think was in the 1800s.

23                    Q.   All right.   How about Andrea

24          Yates?
```

```
 1              A.    One of the more recent famous ones

 2      accused of killing her kids.

 3              Q.    Let's turn to Exhibit 125.  All

 4      right.  Can you tell the jurors what Exhibit 125

 5      is?

 6              A.    So this is a photocopy scan of

 7      those hanging file folders.  That's why you

 8      really don't see anything except the little top

 9      tab.

10              So, you know, as I said in the box

11      are arranged by the hanging file folders, and

12      this is the one marked sale, DCD.

13              Q.    All right.  I want to take a

14      moment and go back to the picture of the folders

15      in the box.

16              MR. McCALL:  And can you enlarge

17      it?

18              THE WITNESS:  So if you look in

19      the middle of the screen, you'll see the name.

20      Green is an easy reference right there,

21      Romirowsky.  And then if you look slightly up to

22      the right, you'll see in white with black

23      little, sale of DCD.

24              MR. McCALL:  Can you highlight
```

1       that, please?

2    BY MR. McCALL:

3               Q.   Is that the actual file folder

4       that we're looking at in Government Exhibit 125?

5               A.   It is.

6               Q.   Okay.  All right.  Sale of DCD.

7       Based on the investigation, what does DCD stand

8       for?

9               A.   Physician Center of Delaware,

10      which was David, you know, David's office that

11      he owned down in Newark.

12              Q.   Okay.  So this box of documents

13      contains information about the sale of David

14      Matusiewicz's optometry practice; is that

15      correct?

16              A.   Correct.

17              Q.   Among other things?

18              A.   Yes.

19              Q.   All right.  Let's look at

20      Exhibit 130 now.  Now, properties.  Where is

21      properties in this box of --

22              A.   Right.  So if you look, now if you

23      look in the lower third, there you go, you'll

24      see the hanging file that says Pro.  So it's

1    cuts off by a page that's sticking up, and then

2    just ahead of it, you'll see 15 Donegal Court.

3    So from there, the whole tab would read

4    properties, if you could read it on the right.

5              Q.   All right.   And then let's look at

6    Exhibit 131, please.

7              A.   So, again, 15 Donegal Court is the

8    divider, manila divider within the properties,

9    hanging folder.

10             Q.   Okay.   Now let's pull up

11   Exhibit 132.   What is Exhibit 132?

12             A.   So this is a deed for -- dated 26

13   of November 2007.   It's from a couple who are

14   selling the 15 Donegal courthouse to Christine

15   Belford.

16             Q.   Okay.   Now let's turn to

17   Exhibit 133.   What's 133?

18             A.   So an e-mail printed out, dated

19   October 8th, Levin.   "Betty Lou, Hi.   If you

20   ever decide to give up selling houses and go

21   into private investigation, Tom and I will give

22   you absolutely glowing references."

23             This is the e-mail from Tom and

24   Lee Matusiewicz using A1BBQ to Betty Lou

 1       Griffith, as we heard the other day.

 2               Q.   Exhibit 134.

 3               A.   So Juno is the A1BBQ, is a Juno

 4       service or company name, the e-mail service.

 5                    So this is from Amy Gonzalez using

 6       the AOL account to AIBB2@juno.com, October 6,

 7       2011.

 8               Q.   Okay.  Now, what's the subject

 9       line here?  It's important.  What does the

10       subject line say?

11               A.   This says, "Communication with

12       David."

13               Q.   And what's the first portion of

14       the highlighted document?

15               A.   So --

16                    MR. BOSTIC:  Objection.  May we

17       see the Court at sidebar briefly?

18                    THE COURT:  Yes.

19                    MR. BOSTIC:  May I take the

20       document down, please?

21                    (Sidebar conference held out of

22       the hearing of the jury as follows.)

23                    THE COURT:  Do I need my copy or

24       can I work from yours?

```
 1                      MR. BOSTIC:  You can look at mine.

 2      I think this is one that -- I think this is one

 3      that we started to talk about with --

 4                      THE COURT:  I will let you guys

 5      get side by side.

 6                      MR. McCALL:  Thanks.

 7                      MR. BOSTIC:  I thought this

 8      related to the FFA.

 9                      MR. McCALL:  I can redact it

10      really quickly.

11                      MR. BOSTIC:  All right.

12                      MR. McCALL:  Can I just redact it

13      right now?

14                      THE COURT:  That's fine.

15                      MR. McCALL:  Can I see your copy?

16                      (End of sidebar conference.)

17                      THE COURT:  Ladies and gentlemen,

18      as I told you, the attorneys have worked so hard

19      to go through documents in this case.  Everyone

20      every now and then, there's one we need to do a

21      little surgery on.  We're going to do that now.

22                      We ask your indulgence because with

23      this many documents to go through, we can't

24      catch everything.  All right?  So in just a
```

 1        moment, the government will deal with the

 2        objection, and then we'll proceed.

 3                        (Pause.)

 4                        MR. McCALL:  All right.  Can we

 5        pull back up Exhibit 135.

 6   BY MR. McCALL:

 7                   Q.   All right.  Now, again, the

 8        subject line of 135 says, communication with

 9        David; is that correct?

10                   A.   Correct.

11                   Q.   And can you read the first

12        highlighted portion?  This is from Amy Gonzalez;

13        is that correct?

14                   A.   This is from Amy Gonzalez, and the

15        first highlighted portion is all in capitals.

16        This is a message I got from David regarding the

17        appraisal mom got sent back to her.  Please

18        share this e-mail with mom so she knows what to

19        do.  Is she still trying to get the appraisal

20        Christine had done in October/November 2005?

21        Let me know.

22                        I told David that I thought she

23        was trying to contact the lady that did it.  He

24        is also requesting to get the info on the

```
 1    account that she had are set up when she was
 2    planning on separating from him.  Read on.
 3              Q.   Now, based on the investigation,
 4    what does the next part appear to be?
 5              A.   Putting in context then, it's
 6    David, the text of David's e-mail.
 7              Q.   Okay.  Can you start with the
 8    paragraph, "Wouldn't"?
 9              A.   "Wouldn't be surprised if the ex
10    is just suspicious of Cindy and playing games
11    with her by telling her she separated from hubby
12    number 3.  Have your friends be careful.  She
13    hasn't been in her right mind since 2005 and I
14    doubt she'll get better without someone
15    correctly diagnosing her first.  Charlotte
16    Stubbins, who knew Chris better than most,
17    stated that the that the mentally ill are
18    amazing in acting normal in some cases."
19              Q.   Can you go down to the bottom
20    highlighted portion?
21              A.   "Contacting Jerald Purcell may or
22    may not be a good idea.  If he's still in the
23    picture, she may be using him/the new guy to
24    find out if we're still checking up on her.  As
```

Gordon - direct                          3578

```
 1        if I'd give up on trying to protect Laura, Leigh

 2        and Karen regardless of what some ill-informed

 3        idiot Delaware Judge states.  Love ya."

 4                Q.   And then it says, LOVE YA, AMY."

 5        Right?

 6                A.   Yes.  All caps, LOVE YA, AMY.

 7                     THE COURT:  Mr. McCall, I think

 8        when you began that colloquy, you said 135 and

 9        it's actually 134.

10                     MR. McCALL:  Thank you.

11                     THE COURT:  That's all right.

12                     MR. McCALL:  Thank you, your

13        Honor.  Yes.  That was 134.

14        BY MR. McCALL:

15                Q.   Okay.  Now can we turn to

16        Exhibit 135?  Okay.  135, what's 135?

17                A.   So this is a manila envelope with

18        handwriting on the outside and both angles

19        there.  The easier one to read is properties.

20        James Woods, Jr., 126 Dewberry Drive.  Christine

21        Belford, 15 Donegal Lane.  It's rewritten, but

22        the number on Donegal looks like 50 at that

23        point.

24                Q.   Okay.  And can we turn to 136.
```

```
1          What is Government Exhibit 136?

2                A.   So this is a piece of paper, you

3     know, found there.  It's a printout from a Web

4     page, Google search of 126 Dewberry Drive with a

5     Google street view, map view.

6                Q.   Now, Special Agent, this document

7     is found in a box that is in the foyer of the

8     house; is that correct?

9                A.   That is correct.

10               Q.   And in the box is not only an

11    e-mail from David Matusiewicz, but documents

12    regarding the sale of his optometry practice; is

13    that correct?

14               A.   That's correct.

15               Q.   Okay.

16               MR. McCALL:  Can you please turn

17    to 137.

18    BY MR. McCALL:

19               Q.   What is 137?

20               A.   So the same thing.  Google Maps,

21    street view, and this is a picture of Donegal

22    Court.

23               Q.   What's the date?

24               A.   1/22/2012 on the lower right.
```

 1              Q.   138, please.  Exhibit 138.  What

 2       is Exhibit 138?

 3              A.   So this is the listing information

 4       for 15 Donegal Court in Newark, Delaware.  And

 5       you can see that the owner circled Christine, or

 6       Belford, Christine, 15 Donegal Court, Newark,

 7       Delaware, and then details about the house, the

 8       record date.  You know, the transfer of property

 9       record date, settlement date, that type of

10       thing.

11              Q.   Exhibit 139, please.  All right.

12       This is more information about 15 Donegal Court;

13       is that correct?

14              A.   That's correct.  The real estate

15       information.

16              MR. McCALL:  Can you please

17       enlarge the remarks section.

18              THE WITNESS:  So under the remarks

19       section, it has several descriptions, and then

20       there's actual, I don't know if you can see it

21       on yours.  Yes.  There's underlined sections

22       throughout that description.

23              Q.   Can you please just read what's

24       underlined in the remarks section, sir.

1          A.   First floor master bedroom, two

2     large bedrooms on upper level.   Two-car garage

3     with opener.   Walk-out basement.   Wonderful

4     community trail that winds through the

5     neighborhood.

6               MR. McCALL:   Can you please move

7     139 to the left and pull up Government

8     Exhibit 242, page 4.   And can you highlight the

9     bottom right picture of 242, page 4.

10              Can you move it up so we can see

11     both at the same time?

12   BY MR. McCALL:

13          Q.   All right.   Now, again, before you

14     start -- hold on.   Let us get situated.

15     Perfect.   Okay.

16              All right.   242, page 4.   Again,

17     where does that come from?

18          A.   That's the Vista Con bag from the

19     residence in Elkton.

20          Q.   Whose documents did you find in

21     the Vista Con bag?

22          A.   David Matusiewicz.

23          Q.   What's the handwriting that's on

24     242, page 4?   What does it say?

1            A.    It says, walking path alongside

2       house.

3            Q.    The underlined portion, the last

4       underlined portion in the real estate listing

5       found in the foyer in the box that has documents

6       like David Matusiewicz's sale of the optometry

7       practice, what's underlined there?

8            A.    Wonderful community trail that

9       winds through the neighborhood.

10            MR. McCALL:  All right.  Can we

11      turn to Exhibit 140.

12   BY MR. McCALL:

13            Q.    All right.  What is 140?

14            A.    Another hanging file folder with

15      the top marked "Pediatricians."

16            MR. McCALL:  141, please.

17   BY MR. McCALL:

18            Q.    What is Exhibit 141?

19            A.    So this is a letter from Amy to

20      Dr. Curt Blacklock, dated January 10, 2012.

21            Q.    Okay.  And can you read -- it

22      starts off, I am David Matusiewicz's sister; is

23      that correct?

24            A.    That's correct.

```
 1              Q.   Can you just go down to the

 2      highlighted portion in the middle of the

 3      document, read that?

 4              A.   "You or your staff members

 5      witnessed Christine Belford physically abusing

 6      Leigh in your office during the visit and

 7      informed her that you would contact Child

 8      Protective Services when she lashed back, quote,

 9      'Do you know who I am?  I am Dr. Matusiewicz's

10      wife,' end quote.

11                   "Unfortunately, the call was never

12      made to Child Protective Services.  I wish that

13      call had been mailed because maybe we would have

14      been able to prove that Christine is an unfit

15      mother back then.  We need people like yourself

16      to come forward with these accountings of

17      Christine's behavior with the children."

18              Q.   And then at the very end, what's

19      highlighted at the end?

20              A.   It says, reads, go to www.Jon --

21                   MR. BOSTIC:  Your Honor, can we

22      see the Court at sidebar, please?

23                   (Sidebar conference held out of

24      the hearing of the jury as follows.)
```

```
 1                    MR. McCALL:  I will redact that.

 2                    THE COURT:  Okay.

 3                    MR. McCALL:  What I can do rather

 4      than at sidebar, what I would propose, if you

 5      just come get my attention, I will have Ms.

 6      Nobling pull the document down.  I will talk to

 7      you.  If we can work it out like that.

 8                    THE COURT:  A sensible approach.

 9                    MR. BOSTIC:  Can we go off the

10      record?

11                    (Discussion held off the record.)

12                    (End of sidebar conference.)

13                    THE COURT:  Ladies and gentlemen,

14      we're going to do some more editing.  Counsel

15      has come up with a proposal.  If there's

16      something that they would like to discuss, I

17      have granted them leave to do that without

18      coming to sidebar, and if they can resolve the

19      issue they will go ahead and do so.  If they

20      can't, then we'll go to sidebar.  Again, just in

21      the interests of efficiency.  All right.

22                    (Pause.)

23                    THE COURT:  Let me go back to

24      Friday, ladies and gentleman of the jury.  I
```

1    talked about maybe doing a little work into the

2    early afternoon.  Would you be game for that and

3    maybe break by 3:00 o'clock?  Would that give

4    people enough of a head start?

5              I know some people are probably

6    downstate and they have beach traffic to worry

7    about, but would 3:00 o'clock work or is that

8    going to be too much of a burden?

9              A JUROR:  Can we let you know

10   after lunch?

11             THE COURT:  If there's a real

12   issue, by all means, communicate it.  You may

13   need to confer first.

14             A JUROR:  He's joking.

15             THE COURT:  All right.  Mr.

16   McCall, with that, you may proceed.

17             MR. McCALL:  Thank you, your

18   Honor.

19             I'm going to pull back up --

20   sorry.  Is this 140 or 141?

21             MR. BOSTIC:  141.

22             MR. McCALL:  Thank you.  Okay.

23   Right.  If you could back out of 141, please.

24   BY MR. McCALL:

```
 1              Q.   And who is this letter -- who is

 2    this letter from, Special Agent?

 3              A.   Amy Matusiewicz Gonzalez, R.N.,

 4    819 Sinatra Drive, her residence in Edinburgh.

 5              MR. McCALL:  All right.  Can we

 6    turn to Exhibit 142 now?  And can you enlarge

 7    the body of text?  141, page 2.  Sorry.  Excuse

 8    me.  141, page 2.

 9              THE WITNESS:  Another letter from

10    Amy.  This is to Dr. Matthew Gotthold, dated

11    January 10, 2012.

12    BY MR. McCALL:

13              Q.   Same letter that we just saw to

14    Dr. Blacklock?

15              A.   Yes.

16              Q.   Okay.

17              MR. McCALL:  And can you back out

18    and can we look to see who wrote this letter or

19    whose name is on the bottom of the letter?

20              THE WITNESS:  Amy Matusiewicz

21    Gonzalez, R.N., 819 Sinatra Drive, with contact

22    information.

23              MR. McCALL:  Now can we turn to

24    Exhibit 142?
```

Gordon - direct                3587

```
 1    BY MR. McCALL:

 2              Q.   What is 142?

 3              A.   Another hanging file folder.  This

 4    one is marked O'Rourke.  Private Investigator

 5    was Michael O'Rourke.

 6              MR. McCALL:  And 143, please.

 7    BY MR. McCALL:

 8              Q.   What is Exhibit 143?

 9              A.   So his company name is O'Rourke

10    Investigative Associates, Inc.  As the disk is

11    marked, it's Matusiewicz v. Matusiewicz,

12    surveillance, 3/9/06 to 3/11/06, and then his

13    office number.  So this is a disk --

14              Q.   Yes.  Go ahead.  Describe it.

15    Have you had an opportunity to review it?

16              A.   Yes, I have.

17              Q.   All right.  Tell the jurors,

18    what's on it?

19              A.   So this is a disk containing

20    footage or video of somebody following a car.

21    So it's shot from the angle of somebody actually

22    driving a car.  It looks down, looks at the

23    speedometer.

24              You can see the car they're behind
```

Gordon - direct                3588

 1      and then video of the children.  So, I'm sorry.

 2      The video of the car incident, at nighttime or

 3      it's dark.  And then the other video is the kids

 4      out playing.

 5                  Q.   What are the dates listed here on

 6      this DVD?

 7                  A.   3/9/06 to 3/11/06.

 8                  Q.   And based on your investigation,

 9      what was O'Rourke Investigative Associates, what

10      were they hired to do during this time?

11                  A.   Follow Christine and investigate

12      Christine Belford during the separation, the

13      divorce.

14                  MR. McCALL:  Can you back out,

15      please.  145, please.

16                  THE WITNESS:  File folder marked

17      Rodriguez.

18                  MR. McCALL:  146, please.

19      BY MR. McCALL:

20                  Q.   These are the documents that were

21      in the folder?

22                  A.   Yes.

23                  Q.   Okay.  What's 146?

24                  A.   The name Jerald Purcell with

```
 1      11/30/2011, and then address most current with
 2      Wharton Drive listed.  Then 15 Donegal Court and
 3      then 260 Christiana Road, and then phone contact
 4      numbers.
 5                      MR. McCALL:  147, please.
 6   BY MR. McCALL:
 7              Q.   Again, what's Exhibit 147?
 8              A.   As I've described before that,
 9      comprehensive report.  So in this we could see,
10      you know, the aggregate information that can be
11      found.  So subject information, you know, if
12      there's photographs.  In this case, it indicated
13      none found.  Arrest history, warrant history,
14      address summary, address details.  So
15      information about the individual.
16                      MR. McCALL:  Okay.  Can you back
17      out and just highlight the name that's in the
18      top right corner of the document, or enlarge it.
19   BY MR. McCALL:
20              Q.   And, again, who is the name for
21      this comprehensive report?
22              A.   Jerald Raymond Purcell, Sr.
23              Q.   Same type of report that was found
24      in the red notebook; right?
```

```
 1                 A.   That's correct.

 2                 MR. McCALL:  148, please.

 3    BY MR. McCALL:

 4                 Q.   Okay.

 5                 A.   A better copy of the hanging file

 6        folder marked polygraphs.

 7                 MR. McCALL:  149.  Can you enlarge

 8        that?

 9                 THE WITNESS:  So --

10    BY MR. McCALL:

11                 Q.   What does it say?

12                 A.   Polygraph results sent to, and

13        then a list of names.

14                 Q.   And then if I could just direct

15        your attention to the bottom, the bottom portion

16        of the names where it says John Walsh, what does

17        that say?

18                 A.   All right.  So we have John Walsh,

19        America's Most Wanted, Philadelphia Inquirer,

20        Prime Time, ABC, Channel 10, Channel 6, Channel

21        3, Barbara Walters.  So various news outlets.

22                 Q.   Let's --

23                 A.   Locally and nationally.

24                 Q.   Okay.  Can we turn to
```

Gordon - direct                    3591

 1      Exhibit 150.01, page 1, please.  What is this?

 2               A.   This is -- so this is the

 3      polygraph done by Arbitration Polygraph Service,

 4      or Gilberto Capuchina for -- and this page is

 5      Lenore Matusiewicz and Amy Gonzalez, the cover

 6      sheet.

 7               Q.   All right.  What I'd like to do is

 8      look at the document that's polygraph results

 9      for Lenore Matusiewicz at 150.2, page 2.

10               MR. McCALL:  And if you could push

11      that off to the left side.

12               Now, on the right side, could you

13      please pull up 638.04.

14      BY MR. McCALL:

15               Q.   Now, 638, page 4, you've seen this

16      before; right?  That's one of the DFS complaints

17      that has been discussed in this case; is that

18      correct?

19               A.   Correct.  So that's the report

20      says provided by DFS for the investigation,

21      referenced the Matusiewicz children.

22               MR. McCALL:  All right.  Can you

23      enlarge the highlighted portion of the DFS

24      report?  Okay.  And then can you enlarge

1      paragraph 3 of the polygraph results for Lenore

2      Matusiewicz.

3  BY MR. McCALL:

4           Q.   All right.  Let's start with the

5      DFS report.  What does that say?

6           A.   So the DFS report, it says, the

7      caller states that Laura's hymen was torn and

8      split and healed well.  She also indicates that

9      the child's vagina was open when she was five

10     years old.

11          Q.   And that says in 2007, the

12     sentence before; is that correct?

13          A.   That is correct.

14          Q.   What does the polygraph result

15     say?

16          A.   It says, Mrs. Matusiewicz stated

17     she observed the juvenile victim's hymen was not

18     intact as she was applying ointment for the

19     rash.

20          Q.   Let's turn to, on the left, if you

21     can pull up the polygraph results for Amy

22     Gonzalez.  That's 150, I think page 4.  And then

23     can you pull up on the right Government

24     Exhibit 40, page 2.

1          Can you highlight in Government

2     Exhibit 40, page 2, the section on Amy?  Not

3     highlight -- enlarge.  Thank you.

4          Can you enlarge paragraph 3 on the

5     polygraph report?

6     BY MR. McCALL:

7          Q.  Now, Government Exhibit 40 is the

8     letter from, or the e-mail from Amy Gonzalez to

9     David Matusiewicz's attorney; is that correct?

10         A.  That's correct.

11         Q.  Again, one month after the

12    children are reunited with their mother; is that

13    correct?

14         A.  Correct.

15         Q.  Is there any mention of the G-spot

16    in that e-mail?

17         A.  No.

18         Q.  Okay.  What does paragraph 3 now

19    in the polygraph report indicate?  What does it

20    say?

21         A.  Mrs. Gonzalez stated she

22    questioned the juvenile victim as to who told

23    her about the G-spot as the juvenile victim

24    replied, mommy.

```
 1                    MR. McCALL:  Can you back out and
 2        we'll look at the date of the polygraph.
 3                    THE WITNESS:  Okay.  It was
 4        January 8th, 2011.
 5   BY MR. McCALL:
 6            Q.   All right.  I want to turn now to
 7        the documents that were recovered in what we're
 8        referring to as the living room off to the right
 9        when you walk in the house.  Okay?
10            A.   Correct.
11            Q.   All right.
12                    MR. McCALL:  Can you pull up
13        Government Exhibit 71, page 1.
14                    THE WITNESS:  So as you come in
15        the foyer, you know, in the front door, the
16        foyer is where we just were looking at the box
17        right in front, and you then turn to your right,
18        and that would be what is referred to as a
19        living room right.
20                    MR. McCALL:  All right.  And can
21        you push that off to one side and pull up
22        77-E.1.
23   BY MR. McCALL:
24            Q.   Okay.  And, again, what are we
```

1       looking at in 77-E?

2              A.   So now if you were there, you've

3       walked in the front door.  You've turned right.

4       You've walked into the living room right, and

5       now you've turned all the way back around and

6       you're essentially facing the foyer, the foyer.

7              You could see kind of the black and

8       white on the floor there.  That's the foyer.

9       And then to the right, you know, I described it

10      as a hutch or china cabinet.  So you are now

11      standing with your back to the, kind of the

12      living room right area.  You are just inside of

13      it.

14             Q.   Okay.

15             MR. McCALL:  Your Honor, if I

16      could see the Court at sidebar before I move to

17      the next exhibit.

18             THE COURT:  All right.  Shall I

19      bring the exhibit with me?

20             MR. McCALL:  It's 682-A, page 1,

21      your Honor.

22             (Sidebar conference held out of

23      the hearing of the jury as follows.)

24             MR. McCALL:  So, Judge, this has

```
 1        not been admitted yet, but I want to compare it

 2        to something in the house.  It's an e-mail that

 3        was recovered from the e-mail search warrant

 4        done on Amy Gonzalez's e-mail account.

 5                    What it says is on November 30th,

 6        2011, 310, it's from A1BBQ account to Amy

 7        Gonzalez's account.  This is the night before

 8        they show up at Belford's house.

 9                    It says, Hello.  CNW.  Hi, Amy.

10        I'll be going with Mike to WB at 3:00 p.m.

11        tomorrow to see our grandchildren.  He'll have

12        info on Purcell at that time.  Home safe and

13        home closet, and it sets out the numbers.  Clean

14        it out to another place, not in your home.

15        Motor home keys are left of side door, so on and

16        so forth, gives the combinations.  Let you know

17        how things worked out, dad.

18                    She writes back:  Let me know how

19        it goes.  Be careful.  My temp cell.  Love ya,

20        Amy.

21                    One, it's relevant because it

22        shows her conspiratorial intent with respect

23        to --

24                    THE COURT:  Keep your voice down.
```

1              MR. McCALL:  Conspiratorial intent

2      as it relates to the stalking of Christine

3      Belford for the November 11 events.  And what I

4      want to do is compare this document to the note

5      that was left with Tom to Amy in the house.

6              THE COURT:  Which had

7      instructions.

8              MR. McCALL:  Had instructions.

9              THE COURT:  Combination.

10             MR. McCALL:  Exactly, your Honor.

11             MR. McANDREW:  Goes to the

12     foreseeability.

13             MR. McCALL:  It goes to the

14     foreseeability.

15             THE COURT:  Mr. Ibrahim?

16             MR. IBRAHIM:  Well, the problem I

17     have with this is this is from somebody who is

18     deceased.  I understand that it's a charge of a

19     co-conspirator, but there it no way for me to

20     cross-examine what he is saying to her and given

21     her response.  It is something that was just

22     said to her.

23             They already have the document of

24     the letter writer, but this becomes cumulative

Gordon - direct                    3598

1    and prejudicial to the point where he's now

2    speaking from the grave and I have no way to

3    cross-examine him.  It's a Sixth Amendment issue

4    that is continually being touched on that I

5    cannot address.

6                    THE COURT:  I think the fact that

7    he's a co-conspirator cuts against that in terms

8    of admissibility.  And I also think that the

9    content here is specific in terms of the

10   combinations.

11                   So when say you can't

12   cross-examine him, what I think is most

13   pertinent about this is that in advance of the

14   shooting, the combination information

15   purportedly is being communicated to your client

16   for the first time after the shooting.  And the

17   note that was found on the buffet was found

18   before.

19                   So I am going to overrule the

20   objection and allow the exhibit to be used.

21                   (End of sidebar conference.)

22                   THE COURT:  We'll allow a quick

23   comfort break.  Does the entire jury need to

24   retire?

Gordon - direct                3599

```
 1                    A JUROR:  Just me.  Give me one

 2        second.

 3                    THE COURT:  Thank you.  Ladies and

 4        gentlemen, stretch.

 5                    (Pause.)

 6                    THE COURT:  If you need a break,

 7        by all means, get our attention audibly and

 8        we'll do our best to respond.

 9                    Mr. McCall, proceed.

10                    MR. McCALL:  Thank you, your

11        Honor.

12                    If we could -- let's just pull

13        back up 77-E very briefly.

14    BY MR. McCALL:

15                    Q.  All right.  Again, 77-E is the

16        hutch that's in the living room; is that

17        correct?

18                    A.  Correct.

19                    Q.  Now, in the drawer below the book

20        that's, the booklet that's pictured there was

21        found what?

22                    A.  It's was a letter left by Tom

23        Matusiewicz.

24                    Q.  All right.  To whom?
```

1          A.    To Amy Gonzalez.

2                MR. McCALL:  Can we please pull up

3     on the left side Government Exhibit 207.  Right.

4     BY MR. McCALL:

5          Q.    And so what's 207?

6          A.    So 207, as you asked, what's the

7     letter, the note, envelope, that was left that

8     said, Amy, key, with some other notes that was

9     in the drawer, hutch of the china cabinet.

10                MR. McCALL:  Can you go to page 2,

11     please.

12     BY MR. McCALL:

13          Q.    And what sort of information is on

14     the bottom where it says, combination?  If you

15     can move your arrow up and enlarge that.  What

16     type of information is there?

17          A.    So there and above that one was

18     combinations to a safe.  One said closet safe.

19     So combinations, closet save/master bedroom with

20     a combination number telling you that it's left

21     and pass, you know, one time, and then right.

22     And then on the other one it says camper, and

23     then with the combination numbers.

24                MR. McCALL:  Okay.  You can back

```
 1      out, please.
 2   BY MR. McCALL:
 3            Q.   And, again, in the top portion of
 4      this document, what is it talking about with
 5      respect to Amy?
 6            A.   So it's giving Amy information
 7      that there's a storage key, the locker number,
 8      that the storage locker is under the name Jessie
 9      Bowman, which, you know, was a fictitious name
10      that Tom Matusiewicz utilized, telling her that
11      there are guns there, take them, protect them.
12      They will be your only defense.  And then, you
13      know, again, as we go down, and the combination
14      numbers.  Then there's a key, you know.
15                 So it's instructions of where
16      things are, how to get into things.
17            Q.   Okay.  And how does it finish up?
18      What does the highlighted part indicate?
19            A.   So it's signed by dad, pop-pop,
20      Tom.  And it says, hopefully, we can end this
21      B.S. now.  Up to Dave.
22                 MR. McCALL:  Okay.  Let's push
23      Government Exhibit 207 off the side, to the
24      left.
```

Gordon - direct                    3602

```
 1                    Can you please pull up government
 2      exhibit -- and I would offer it, ask to admit it
 3      at this time, 682-A.
 4                    THE COURT:  Yes.  It's admitted
 5      and it may be published to the jury.
 6                    (Government Exhibit No. 682-A was
 7      received into evidence.)
 8      BY MR. McCALL:
 9             Q.   Okay.  So this is an e-mail chain;
10      is that correct, Special Agent Gordon?
11             A.   It is.
12                    MR. McCALL:  All right.  Let's
13      first highlight the bottom half of the e-mail.
14      I need you to pull in the address, please.
15      BY MR. McCALL:
16             Q.   All right.  Now, before we talk
17      about this, was a search warrant conducted on
18      the e-mail account belonging to Amy Gonzalez?
19             A.   Yes.
20             Q.   And -- go ahead.
21             A.   We did what's called an e-mail
22      search warrant.  So I did a search warrant for
23      the e-mail account of Amy Gonzalez, which was
24      RNAIM@aim.com, or sometimes AOL.
```

```
 1                        AOL, instant messaging.  So we
 2         then served AOL with our warrant and then we get
 3         a return of all her e-mail messages.
 4                   Q.   Did you review the e-mails in
 5         preparation for this case?
 6                   A.   I did.
 7                   Q.   All right.  Did you review this
 8         e-mail?
 9                   A.   I did.
10                   Q.   Who is it from?
11                   A.   So it's from A1BBQ.  We also had
12         done an e-mail search warrant on that account as
13         well, but we got it from both sides.
14         A1BBQ@Juno.com is the e-mail address of Tom and
15         Lenore.
16                   Q.   Who is it to?
17                   A.   To RNAIM, Amy Gonzalez.
18                   Q.   What's the date?
19                   A.   November 30th, 2011.
20                   Q.   What's significant about that
21         date?  What happens the next day?
22                   A.    It is December 1st, 2011, that Tom
23         Matusiewicz goes to the door of Belford's home
24         on 15 Donegal Court with Private Investigator
```

1    Michael O'Rourke.

2            Q.   And what does the subject line

3    say?

4            A.   It says, hello.  Seeing WB

5    tomorrow.

6            Q.   Can you please read the e-mail?

7            A.   Hi, Amy.  I will be going with

8    Mike to WB at 3:00 p.m. tomorrow to see our

9    grandchildren.  He will have info on Purcell at

10   that time.

11               Home safe in home closet, 57R 34L

12   98R in all caps.  Clean it out to another place.

13   Again, in all caps, not in your home.  Motor

14   home keys are to left side of door behind metal

15   baffle safe there in rear, 18R, 78L, 18R, again

16   in all caps.  Let you know how things worked

17   out.  Dad.

18           Q.   Let's back out and see what the

19   response was.  Who is this in the response?

20   It's from who?

21           A.   The response from Amy Gonzalez.

22           Q.   To whom?

23           A.   Tom Matusiewicz.

24           Q.   Date?

```
 1                    A.    November 30th, 2011.

 2                    Q.    Subject line?

 3                    A.    Reply, or Re:  Hello.  Seeing WB

 4          tomorrow.

 5                    Q.    What does it say?

 6                    A.    Let me know how it goes.

 7                          My temp. cell number is

 8          956-570-5586.  Be careful.  Love ya, Amy.

 9                          MR. McCALL:  Okay.  Can we push --

10          can we back out of that, please?  And then can

11          you enlarge on 682-A, the section where it has

12          the combination?  Thank you.

13                          And then can you go to 207 and

14          highlight the combination?  Enlarge it.

15                          THE WITNESS:  So --

16          BY MR. McCALL:

17                    Q.    Go ahead, Special Agent.  What are

18          we seeing here?

19                    A.    So if you look first at the

20          e-mail, home safe and home closet, it's 57R 34L

21          98R.  And then if you look at the handwritten

22          message left in the living room right on the

23          china cabinet, it says, 57L, then 34, then right

24          98, and then again 57, 34, 98.
```

Gordon - direct                    3606

```
 1                  The one on the bottom, it is
 2       slightly different:  So we're still on the note
 3       that was left at the Edcouch house.  It says L30
 4       R78 L18.  And if you look on the e-mail message
 5       below not in your home, it says 18R 78L 18R.  So
 6       there is a slight difference between the first
 7       number set.
 8                  MR. McCALL:  All right.  You can
 9       back out, please.  And can you please turn to
10       Government Exhibit 71, page 1, and compare it to
11       71-A.
12  BY MR. McCALL:
13                  Q.  So that takes us out of the living
14       room; right?  And now we're going to move to the
15       living room, the left of the study area; is that
16       correct, Special Agent?
17                  A.  Correct.  So if you take yourself
18       back to the front door, you open the door, you
19       see the closet door and the plastic container.
20       Now instead of going right, now you are turning
21       left 90 degrees and you're walking into -- on
22       the diagram it's marked study, but we call it
23       the living room left area.
24                  So now you're standing still in
```

```
 1        the foyer, and if you're standing there and if
 2        you were the picture taker, you're looking at
 3        the living room left.  So that's the living
 4        room, and then the door at the end is a bedroom.
 5                    If you look --
 6             Q.   Go ahead.
 7             A.   On the bottom right there's just
 8        by the exhibit number, 76-A, there's, I will
 9        call them tubs.  There's three plastic tubs and
10        then another plastic tub on top of those black
11        roller file containers.  So they're identical in
12        make essentially to the two that were by the
13        front door.
14             Q.   All right.  Now, let's start
15        looking at the documents that you reviewed from
16        this room.  Okay?
17             A.   Yes, sir.
18                  MR. McCALL:  Exhibit 107, please.
19                  THE WITNESS:  Hanging file folder.
20        Belford, James R.
21   BY MR. McCALL:
22             Q.   Who is that?
23             A.   Christine's father.
24             Q.   108, please.  What's 108?
```

1              A.   So priority mail envelope

2        addressed to, or with the name James R. Belford

3        on it.

4              Q.   Who is the name in the middle?

5              A.   Mr. Tom Matusiewicz.

6              MR. McCALL:   Okay.   Can you turn

7        to page 3 of this exhibit, please?

8    BY MR. McCALL:

9              Q.   What is this?

10             A.   So O'Rourke Investigator

11       Associates.   Michael O'Rourke, Private

12       Investigator, he prepared a report.   He calls it

13       a comprehensive report, I guess, about James R.

14       Belford.

15             Q.   And, again, the report had the

16       same sort of information about -- go ahead H?

17             A.   Address, you know, contact, you

18       know, that type of thing.   Information on James

19       Belford.

20             Q.   What's the date of this report?

21             A.   January 12th, 2012.

22             Q.   Can we turn to Exhibit 109,

23       please.   What's 109?

24             A.   Hanging file folder, Bocanegra,

1       Monica.

2                   MR. McCALL:  110, please.  Can you

3       enlarge that?

4       BY MR. McCALL:

5                   Q.   And so what are we looking at in

6       Exhibit 110?

7                   A.   So this is a letter dated

8       November 14th, 2011, to Dr. Monica Bocanegra,

9       signed, Sincerely, Lenore Lee Matusiewicz.

10                  Q.   And, again, this is one of the

11      letters we reviewed yesterday with Dr.

12      Bocanegra?

13                  A.   That's correct.

14                  MR. McCALL:  Exhibit 111, please.

15      BY MR. McCALL:

16                  Q.   Okay.  What's this?

17                  A.   This is the hanging file folder

18      marked complaint.

19                  MR. McCALL:  115, please.  All

20      right.  Can you blow this up?

21      BY MR. McCALL:

22                  Q.   Now, who is this e-mail from?

23                  A.   David Matusiewicz.

24                  Q.   Who is it to?

1           A.    RNAIM, Amy Gonzalez.

2           Q.    What's the date?

3           A.    October 27, 2010.

4           Q.    Subject?

5           A.    Letter to Crowell.

6           Q.    And can you please read the

7      highlighted portions of the e-mail?

8           A.    "In July of 2007, my daughter,

9      Laura Emily, told members of my family and me

10     that her mother, Christine Belford, was forcing

11     her to play certain sex games with her and that

12     if Laura ever told anyone about these games,

13     that her mother would go to jail.  Please do not

14     allow one moment's wrong decision to cause my

15     children to suffer.  Obviously, Christine cannot

16     be expected to confess to the abuses of her

17     daughter, but Laura will never forget what her

18     mother did to her.  Should you have need to

19     discuss my statements herein, I am available at

20     your convenience."

21           Q.    And then it says, "Sincerely."

22     Right?

23           A.    Yes.

24           Q.    And what does it say?  The

 1     sentences that begin, "Please."

 2               A.   "Please let me know what you think

 3     of sending this to Crowell in advance of the

 4     hearing and let me know what you'd reword.

 5     Also, assuming Don's not checking his e-mail,

 6     please forward this to him for me.  Thank you."

 7               MR. McCALL:  Exhibit 117, please.

 8               THE WITNESS:  It's a hanging file

 9     folder, Judge Barbara Crowell.

10               MR. McCALL:  118, please.  Okay.

11     Actually, can we start on page 118 --

12     Exhibit 118, page 7.

13               Can you enlarge the envelope?  All

14     right.

15  BY MR. McCALL:

16               Q.   What is this?

17               A.   So it's an envelope from the

18     Chambers or the Office of the Honorable Barbara

19     Crowell, Family Court, State of Delaware here in

20     Wilmington, Delaware, and it's addressed to

21     Thomas Matusiewicz, Box 8, Edcouch, Texas.

22               Q.   And if you can, can you make out

23     the date, approximately?  If you can.  It seems

24     to be cut off.

1          A.   Yes.  It's cut off.  January 7th.

2          Q.   Can't tell the year?

3          A.   Yes.

4          Q.   I understand.

5               All right.  Let's go to page 1 now

6    of this exhibit.  All right.  What's the date at

7    the top of this letter?

8          A.   The date is January 5, 2012, and

9    it's signed by the secretary to Judge Crowell.

10         Q.   All right.  What does the letter

11   indicate?

12         A.   Basically, it rejects his petition

13   for visitation.  It says, however, your petition

14   for visitation was dismissed on November 16,

15   2011, and because of ex parte communication, any

16   correspondence sent directly to Judge Crowell

17   cannot be read or reviewed.  So -- and then they

18   even close the documents that he had sent to

19   them.

20         Q.   All right.  And, again, his

21   petition for visitation that's discussed in this

22   letter, that was dismissed on November 16th,

23   2011; is that correct?

24         A.   Correct.

1          Q.    Two or three weeks before he shows

2     up at the door of Christine Belford; is that

3     correct?

4          A.    Yes.  About 14, 15 days.

5          Q.    And then if you could just quickly

6     scroll through the documents that were sent back

7     and included in this envelope.  That's a picture

8     of?

9          A.    That's a picture of Tom

10    Matusiewicz and Laura Matusiewicz.  Those were

11    taken at Dr. Bocanegra's office.

12         Q.    Okay.  Keep going.  Thank you.  A

13    note?

14         A.    There's a note that was in there.

15         Q.    You can go back.

16         A.    Judge Crowell, there is no proof

17    by Court/basis that visitation of grandparent be

18    terminated.

19         Q.    What else does he say?

20         A.    No one in the judicial system

21    desires to hear the truth.  Tom Matusiewicz,

22    Grandparent.

23         Q.    Next page.  And then this is a

24    document that Thomas Matusiewicz included to

 1       Judge Crowell; is that correct?

 2               A.   Yes.   Essentially asking to look

 3       at the matter more.   You know, address it.

 4               MR. McCALL:   Okay.   If you go to

 5       the next page.   Keep going.   Okay.   Can you blow

 6       that up, please?

 7   BY MR. McCALL:

 8               Q.   All right.   What are we looking at

 9       here on page 6 of Exhibit 118?

10               A.   So this is Family Court, State of

11       Delaware by Judge Crowell.   It's an order

12       dismissing petition for visitation, denying his

13       request for visitation.

14               Q.   What is the date?

15               A.   November 16, 2011.

16               MR. McCALL:   All right.   Can we

17       turn to Exhibit 121, please.

18               MR. BOSTIC:   Counsel, may we have

19       a moment?

20               MR. McCALL:   One moment, your

21       Honor.

22               THE COURT:   All right.

23               (Pause while counsel conferred.)

24               MR. McCALL:   Can we please pull up

```
 1        Exhibit 121?  All right.  And can you enlarge

 2        the header of the e-mail so we can see the from

 3        and to and subject lines.

 4    BY MR. McCALL:

 5                Q.   What is the name on the top left

 6        corner of the document?

 7                A.   Amy Gonzalez, the paper printout

 8        of the e-mail.

 9                Q.   From?

10                A.   David Matusiewicz.

11                Q.   Sent date?

12                A.   January 2nd, 2011.

13                Q.   To Amy Gonzalez's e-mail; is that

14        right?

15                A.   Correct.

16                Q.   Subject line indicates re, re, re,

17        ray, motion filings?

18                A.   Yes.  Multiple replies.

19                MR. McCALL:  Can you back out and

20        pull up the top text?  The whole first thing,

21        yes.

22    BY MR. McCALL:

23                Q.   All right.  It says, Hello,

24        Dennis, before it was enlarged?
```

1              A.    Yes.

2              Q.    Okay.  Go ahead and if you can

3       read down to the end of the highlighted portion,

4       please.

5              A.    When questioned by me and members

6       of my family, Laura stated that her mommy had

7       been teaching her where her G-spot was,

8       inserting things and fingers into my daughter's

9       vagina and demonstrating to her how she liked to

10      be pleased sexually.

11             Q.    Can you read the next line,

12      please?  Next sentence.

13             A.    I decided to take my daughters

14      away from the situation rather than trust the

15      Delaware Courts, who had consistently failed me

16      and my children miserably.

17             MR. McCALL:  Can you please push

18      this off to the left side, and can you pull up

19      on the right side another of the DFS reports

20      from Laura Miles, Exhibit 636, page 5.

21             And can you highlight the

22      paragraph, when, the third from the bottom?

23  BY MR. McCALL:

24             Q.    Now, 636, page 5, is one of the

 1          documents that came into Laura Miles in the

 2          course of the reports or the reporting from the

 3          Matusiewicz family?

 4                    A.    One of the letters, correct.

 5                    Q.    And this specifically was one of

 6          the letters sent by David Matusiewicz; is that

 7          correct?

 8                    A.    That's correct.

 9                    MR. McCALL:   And can you enlarge

10          on 121, the highlighted section.

11    BY MR. McCALL:

12                    Q.    Can you read the top section,

13          which is the e-mail from David Matusiewicz?

14          Well, excuse me.   That talks about specifically

15          when questioned by him and members of his

16          family, that Laura talked to him about, among

17          other things, inserting things and fingers into

18          her private area; is that correct?

19                    A.    That's correct.

20                    Q.    And in the letter that was

21          received by Director Miles, there's no mention

22          of that; is that correct?

23                    A.    No.

24                    MR. McCALL:   122, please.   Okay.

 1    BY MR. McCALL:

 2            Q.    Exhibit 122, what's that, Special

 3    Agent Gordon?

 4            A.    It's a piece of paper that was

 5    found in the room and it lists -- it's titled

 6    "Characters," and on the left side it lists

 7    under the name, or heading character a bunch of

 8    names.  On the right side it says real name, and

 9    then names known through the investigation.

10            Q.    Okay.  So on the right are names

11    that you just indicated; right?  You've come to

12    know through the course of the investigation; is

13    that correct?

14            A.    That's correct.

15            Q.    And like, for example, Amy

16    Matusiewicz Gonzalez, she's one of the

17    defendants?

18            A.    She is.

19            Q.    What's her character name?

20            A.    Beth James Cortez.

21            Q.    Okay.  Well, let's talk about

22    Christine Belford.  First of all, what's her

23    name in this document?

24            A.    Her name as they have listed,

```
 1        Christine Belford Moffa Matusiewicz Belford.

 2        And then her character name is Cathy Mars Sling

 3        James Mars.

 4              Q.   All right.  I want to push that

 5        off to the left and pull up Government

 6        Exhibit 502, page 1.

 7                   MR. McCALL:  And can you blow up

 8        the top portion where it's highlighted?

 9   BY MR. McCALL:

10              Q.   Okay.  Now, Special Agent,

11        Government Exhibit 502, page 1, that was

12        provided to you by Kim Lawson in the course of

13        this investigation; is that correct?

14              A.   Correct.  When we interviewed Kim

15        Lawson, she had provided many of the materials

16        that were sent to her.

17              Q.   And this was a Web shot or a

18        screen shot I should say of the Grandmother's

19        Impossible Choice Web page when she first came

20        across it?

21              A.   That's correct.

22              Q.   Okay.  What's significant about

23        the names when she first saw this Web page that

24        recounted these abuse allegations?
```

1          A.    Well, the names were not their

2    real names.   It was some other names.

3          Q.    And how does that relate to the

4    document that we were just looking at that you

5    found in the house, which is Exhibit 122?

6          A.    Right.   From the document from the

7    house, it's essentially a key to the

8    Grandmother's Impossible Choice, you know, early

9    on using those other names.

10          So when it says, when Kathy

11   brought her daughters home, if you look at Cathy

12   Mars Sling James Mars, it's Christine Belford

13   Moffa.

14          If you go down to the next bullet

15   point, it took several months before Emily, one

16   of the children, told her Aunt Beth that mommy

17   was molesting her in the bathtub.   But if you

18   look at Emily, look at the character name Emily

19   James and then to the right is Laura

20   Matusiewicz.

21          If you look at Aunt Beth, if you

22   look at aunt Beth on the left, it's Beth James

23   Cortez, and then Amy Matusiewicz Gonzalez.

24          And then Rachel, if you look up

```
 1        again on the character side on the left, Rachel

 2        James.  Real name, Karen Matusiewicz.

 3                    MR. McCALL:  Can we please turn to

 4        Government Exhibit 152.

 5   BY MR. McCALL:

 6             Q.   What is Government Exhibit 152?

 7             A.   It's a letter dated April 4, 2011,

 8        from Family Court.  Again, the secretary to

 9        Judge Crowell signs the letter, and it's

10        addressed to Amy Gonzalez at her residence at

11        819 Sinatra Drive.

12                    And essentially it advises Ms.

13        Gonzalez that they received the letters and

14        pictures, they're being returned, and that

15        you -- the Judges are not permitted to receive

16        such correspondence.

17                    MR. McCALL:  Exhibit 153, please.

18        BY MR. McCALL:

19             Q.   Again, this is in the living room

20        left; is that correct?

21             A.   That's correct.

22             Q.   All right.  What is the top part

23        where it says Box 6?

24             A.   Yes.
```

1          Q.    If you can read the letter?

2          A.    Box 6, Edcouch Texas, dated May

3      17, 2012.

4               "Dear Mr. Roberts, as you can see,

5      we still cannot afford an attorney.  Knowing how

6      litigious the Christine personality is, I've

7      written to you directly.  We have been informed

8      that Christine has stated that Tom and I are

9      stalking the children."

10         Q.    Keep going, please.

11         A.    Highlighted or not?

12         Q.    The whole document.

13         A.    "As usual, Christine is mistaken.

14     One, when we sent her a letter around

15     Thanksgiving to ask whether or not she wanted

16     the heirloom afghan that she said her favorite

17     Aunt Emmy crocheted for her, and the DVD that

18     Katy's first grade made of Katy's class.

19               "Because we received no reply, Mike

20     O'Rourke stopped at her house to bring the

21     afghan to her.  Her new boyfriend, who

22     introduced himself as, quote, Frank, 'the

23     babysitter,' end quote, said that she didn't

24     want it, so Tom and mike left.

1          "Two, I sent Chris a letter

2     reminding her of the connection of several

3     members of our family to cancer, telling her

4     that Amy had been diagnosed with pre-cancerous

5     condition, with a pre-cancerous condition and

6     that it might be prudent to have Laura tested.

7     I've attached a copy of the letter because the

8     reason for it truly was weird, especially after

9     Amy's diagnosis.

10          "Three, I sent a letter to

11     Christine after reading the letter she had sent

12     to David, reminding her that she had kidnapped

13     Laura, Leigh and Karen, and had never been

14     prosecuted for it, and asking her what else she

15     had forgotten.  Even David Mitchell called

16     police January 2nd, 2006, to have them find her

17     to make sure everyone was okay.  Please let me

18     know if this is considered stalking.

19          "One other thing.  When we do

20     searches using Google on our computer,

21     Christine's address at Donegal Court is printed

22     in the upper left corner of our copies.  Is

23     Christine hacking into our computer?  How do we

24     find out?  Who is stalking whom?

 1                   "Sincerely, Lenore Matusiewicz."

 2                   MR. McCALL:   Government

 3        Exhibit 155.

 4                   THE COURT:   Mr. McCall, you can

 5        pick whatever time you want to break in terms of

 6        your rhythm between now and 12:30.   You can go

 7        to 12:30 or you can pause.   I will leave it to

 8        you.

 9                   MR. McCALL:   Judge, I will go ten

10        more minutes.

11                   THE COURT:   All right.

12                   MR. McCALL:   Thank you.

13        BY MR. McCALL:

14              Q.   All right.   Government

15        Exhibit 155.

16              A.   So this is a letter to Judge

17        Crowell listing her address, 500 North King

18        Street, and it's from Amy Gonzalez, 819 Sinatra

19        Drive, dated November 2nd, 2011.

20              Q.   All right.   And let's turn just to

21        paragraph 4.   That's going to be on the next

22        page, I believe.   Okay.

23                   Can you read paragraph 4 in the

24        letter to Judge Crowell from Amy Gonzalez?

1                    A.    "What Christine was actually

2          afraid of, according to the phone transcript,

3          was David's contacting Dr. Blacklock regarding

4          his knowledge of the child abuse by Christine

5          that was witnessed in his office by his staff.

6                         "When Christine pulled Leigh by her

7          arm, the technician stated that if she ever saw

8          that again, that she would contact Child

9          Protective Services.

10                        "Christine replied to the

11         technician, quote, 'Do you have any idea who I

12         am?  I'm Dr. Matusiewicz's wife,' unquote.

13         Unfortunately, the technician backed off and

14         apologized instead of calling DSF about

15         incident.  (Christine was livid when the same

16         scenario occurred at Newark Pediatric Associates

17         and when Dr. Gotthold from Appoquinimink

18         Pediatrics threatened Christine with DFS)," end

19         parentheses.

20                    Q.    Dr. Gotthold testified in this

21         case; is that correct?

22                    A.    He did.

23                         MR. McCALL:   Can we turn to the

24         last paragraph of this document?

1    BY MR. McCALL:

2              Q.    Okay.  Can you read the last

3    paragraph?

4              A.    "The decision of the Courts

5    whether or not to allow visitation with my

6    nieces and their father's family affects

7    everyone in this case, especially my nieces and

8    my five-year-old daughter.  My brother and I

9    always looked forward to raising our children

10   together.

11                   "I pray that you realize that this

12   family is going to continue to tell the truth of

13   the facts in this case until our last breath is

14   taken from us.  Even though the wrong decision

15   was made by my brother and mother, we will

16   continue to fight to make it right for the

17   girls' sakes.  Wouldn't you?"

18                   MR. McCALL:  Exhibit 156, please.

19   BY MR. McCALL:

20             Q.    This is a letter dated when?

21             A.    November 17, 2011.

22             Q.    And who is it sent to?

23             A.    Again, from Judge Crowell to Amy

24   Gonzalez, or Judge Crowell's secretary to Amy

```
 1        Gonzalez.

 2                    Q.   And this is like the last letter

 3        you summarized to Thomas Matusiewicz; is that

 4        correct?

 5                    A.   Yes.

 6                    Q.   From Judge Crowell?

 7                    A.   Yes.   Returning the documents, and

 8        please don't, please don't contact us in the

 9        future.

10                    MR. McCALL:   Can you go to the

11        next page, please, and keep going.   Okay.

12        BY MR. McCALL:

13                    Q.   Exhibit 160.   This is the Hidalgo

14        County Sheriff's Incident Report; is that

15        correct?

16                    A.   Correct.

17                    Q.   And this is what was testified to

18        buy Dr. Bocanegra; is that right?

19                    A.   That's correct.

20                    MR. McCALL:   And can you just go

21        to page 3 very quickly?

22        BY MR. McCALL:

23                    Q.   And those are the allegations that

24        have been previously discussed; is that correct?
```

```
 1              A.   Right.  It was Officer Venegra's

 2      complaint.  Some time in the year 2004, Lenore

 3      alleges she was poisoned by Chris drinking a

 4      glass of tea.

 5              Q.   And there's also a comment that

 6      Lenore told the officer that Christine Belford

 7      was what?

 8              A.   Yes.  It says she was told by

 9      Chris she was connected to a Mafia family.

10              MR. McCALL:  163, please.

11              THE WITNESS:  So this was a sticky

12      or little note.  Entire opinion.  It is greater

13      than 50 pages.

14              MR. McCALL:  Next page, please.

15  BY MR. McCALL:

16              Q.   Okay.  Now, this is a portion of

17      the termination of parental rights hearing; is

18      that correct?

19              A.   That's correct.

20              MR. McCALL:  And can you enlarge

21      the top portion?

22  BY MR. McCALL:

23              Q.   This is -- again, this is found in

24      the living room that's off to the left of the
```

1     study?

2               A.   Correct.

3               Q.   Just what's underlined -- when you

4     found the TPR order in the house, what is

5     underlined there?

6               A.   Right.  So printed-out piece of

7     paper.  It was underlined as we found it.

8               Laura is adamant about not wanting

9     to see any of her father's relatives (his

10    parents and sister) and Leigh, the autistic

11    child.  Sorry.

12              And Leigh, the autistic child,

13    screams when she is shown a picture of her

14    paternal grandmother, whom she last saw over

15    two-and-a-half years ago.  And then parental

16    grandfather is underlined.  Laura said that she

17    had enough and she is not interested in seeing

18    him again.

19              MR. McCALL:  Can you back out,

20    please?  And can you enlarge, please?  And can

21    you --

22              MR. BOSTIC:  Judge, may we see the

23    Court at sidebar, please?

24              (Sidebar conference held out of

 1           the hearing of the jury as follows.)

 2                     MR. BOSTIC:  And I didn't get a

 3           chance to speak to Mr. McCall about this, but it

 4           seems that we're really delving into the right

 5           order at this point.

 6                     I realize there are some things

 7           you want to get out, but I would like to have a

 8           chance to consult with co-counsel and suggest to

 9           the Court maybe this is a good time to take a

10           break because I really want to cut this close

11           because I think it's really drilling down.  It's

12           in already.  The Court does not want to overly

13           highlight it.

14                     THE COURT:  At the moment I intend

15           the government to be focusing on the fact that

16           certain portions of the findings were

17           highlighted.  I will note that as I skim down

18           the document, the word "credible" is underlined.

19           That may be a little bit problematic in terms

20           of -- so, at a minimum, why don't we do this.

21           Why don't we take lunch right now.  The jurors'

22           lunches are here.  That's why I broke in when I

23           did.

24                     Counsel can confer and we'll see

```
 1        where we agree.  If we need to make rulings, I

 2        will make rulings.

 3                      MR. McCALL:  Very good.

 4                      MR. McANDREW:  I'm going to step

 5        out to get some other witnesses ready.

 6                      THE COURT:  All counsel except

 7        for our solo practitioners have the right to

 8        exit.

 9                      MR. McANDREW:  I just wanted to

10        alert the Court.

11                      THE COURT:  I appreciate the

12        courtesy.

13                      (End of sidebar conference.)

14                      THE COURT:  We'll break now,

15        members of the jury, just so would can do a

16        little more scrutiny on our own part.  It may

17        save us some more time.  You'll be pleased to

18        know we are moving quickly.  So your lunch is

19        here.  You'll be pleased to know that.

20                      (The jury was excused for a

21        luncheon recesses.)

22                      THE COURT:  You may step down,

23        Special Agent.

24                      (Witness excused.)
```

1              Counsel, be seated just for a

2      second.

3              Not to add to your lunchtime woes,

4      I do notice that the government has filed a

5      motion with respect to discovery and production

6      of statements from the defense.  Is that

7      correct?

8              MR. WEEDE:  That's correct, your

9      Honor.

10             THE COURT:  I will ask everyone to

11     take a look at that over the lunch break and see

12     if agreement can be reached, or by the end of

13     the day.  Just making note that it's out there,

14     and maybe we can just somehow avoid a ruling,

15     but if not, I will rule.

16             All right.  Anything else you need

17     of me, counsel?

18             MR. WEEDE:  Not from the

19     government, your Honor.

20             THE COURT:  Defense?

21             MR. BOSTIC:  No, your Honor.

22             MS. CHAVAR:  No, your Honor.

23             MR. EDELIN:  No, your Honor.

24             MR. IBRAHIM:  No, your Honor.

```
 1                       THE COURT:  All right.  I will see
 2          everybody in an hour.
 3                       (Luncheon recess taken.)
 4                            -   -   -
 5                       (The following occurred in the
 6          conference room beginning at 1:30 p.m.)
 7                       THE COURT:  I understand we have a
 8          development.
 9                       MR. EDELIN:  Always something in
10          this case, your Honor.  And I will let Jeremy
11          set the stage.  He actually got the call.  There
12          is a voicemail from one of the Kulas, and you've
13          heard the name Melinda Kula saying that Lenore's
14          mother, David and Amy's grandmother, has passed
15          out or fallen out, has had a stroke, is on her
16          deathbed, can they come see her.
17                       So, number one, I wanted to make
18          everybody aware of the phone call that we have.
19                       Number two, I guess the issue
20          becomes, should I or am I obligated to tell my
21          client?  Are they obligated to tell their
22          clients?
23                       THE COURT:  Well --
24                       MR. EDELIN:  This is new to me, so
```

1     I'm bringing it to everybody.

2                     THE COURT:  All right.  Well,

3     regardless of whether we tell the clients, let's

4     talk about the issue of visiting, because it

5     seems to me the Marshals would have to weigh in

6     on the issue ever visiting, and I would think

7     that absent an order from the Court, it would be

8     unlikely that she would be allowed to visit.

9                     MR. IBRAHIM:  Correct.

10                    THE COURT:  So it would need to be

11    a somewhat extraordinary circumstance that way.

12                    I will direct counsel not to

13    inform his client until the end of the day

14    today, all right, if then.  And I will take the

15    heat for that, because I believe that at the

16    present time nothing practical could be

17    accomplished by way of having her visit, and we

18    do not need her distracted during the afternoon

19    proceedings.  All right?

20                    So to the extent that there's

21    blame to be assigned, the blame must be assigned

22    to me as the Court.

23                    With respect to the next step, do

24    you have any proposals?

1              MR. EDELIN:  I do not yet.

2              THE COURT:  All right.

3              MR. EDELIN:  We got this ten

4     minutes ago, five minutes ago, and so I would

5     like the Court to hear the message.

6              MR. IBRAHIM:  12:04.

7              MR. EDELIN:  And the government.

8              THE COURT:  By all means.

9              MR. EDELIN:  If you want it to be

10    transcribed as it's being played, I will leave

11    that to the Court.

12              THE COURT:  Why don't we start

13    just by listening to the message.  Then we'll

14    decide whether we need to do it.

15              (Discussion held off the record.)

16              THE COURT:  Let's go on the

17    record.

18              Mr. Ibrahim, who was the recipient

19    of the message and who is stressed that he's

20    merely the conduit of the information, has

21    played the voicemail for all counsel.  It is

22    from a relative whose name has been mentioned

23    during testimony in the case who says it was

24    actually yesterday morning that the collapse

1      occurred, and it was described as a collapse and

2      then later described as a stroke.

3                     The victim of the stroke, if there

4      indeed was a stroke, is 97 years old, but there

5      has been a request that members of the family be

6      permitted to come and visit her.

7                     Is there any need beyond that,

8      counsel, to transcribe specifically the message?

9                     MR. BOSTIC:  I don't believe so,

10     your Honor.

11                    MR. EDELIN:  I don't have a need.

12                    MR. McCALL:  No, your Honor.

13                    MR. IBRAHIM:  No.

14                    THE COURT:  All right.  Let's go

15     off the record again.

16                    (Discussion held off the record.)

17                    THE COURT:  Let's go back on the

18     record again.

19                    I have directed that we continue

20     this afternoon and am willing to take the

21     responsibility for that.  The question I have

22     is:  Does anybody wish to make any statement

23     about that for the record, because I would

24     invite them to do so if they would like.

1              MR. IBRAHIM:  No, your Honor.

2              MR. BOSTIC:  No, your Honor.

3              MR. EDELIN:  No, your Honor.

4              THE COURT:  All right.  Then what

5    I would propose is that we ask one of the

6    Marshals to join us because I would like to

7    understand what their protocols are just so we

8    have more information before we go to the next

9    step.  All right?

10             So, Mr. Kleinwaks, could you go

11   into the courtroom and see if Deputy Marshal

12   Barbara Fahey is available, and if so, ask if

13   she could join us.

14             For the record, Mr. Kleinwaks is

15   my law clerk.  Let's go off the record and talk.

16             (Discussion held off the record.)

17             THE COURT:  We will go on the

18   record now.

19             While we've been off the record,

20   we've just been discussing the human reaction of

21   the participants in the case and their concern

22   for the individuals involved and the

23   professional obligations that they have with

24   respect to the situation.

 1                    (Deputy Marshal Fahey entered the

 2       conference room.)

 3                    THE COURT:  I see our Marshal

 4       looking on anxiously.  Worry not.

 5                    What we have is a situation in

 6       which an elderly relative of Lenore Matusiewicz,

 7       and I assume therefore by extension other of the

 8       defendants, who is 97 years old, apparently

 9       collapsed yesterday and is in a hospital in New

10       Jersey.

11                    So a call just came in about ten

12       minutes ago reporting this turn of events, and

13       we were discussing that and the impact it has on

14       the trial.

15                    My understanding is that

16       ordinarily, the U.S. Marshals do not take people

17       in custody on hospital visits.

18                    DEPUTY MARSHAL FAHEY:  That's

19       correct.

20                    THE COURT:  And that there's no

21       protocol for doing that?

22                    DEPUTY MARSHAL FAHEY:  Not to my

23       knowledge.

24                    THE COURT:  All right.  I just

Gordon - direct                          3639

```
 1      wanted to confirm that my understanding was

 2      correct.

 3                      DEPUTY MARSHAL FAHEY:  Mm-hmm.

 4                      THE COURT:  And we will, among

 5      ourselves, discuss the best way to proceed.

 6                      DEPUTY MARSHAL FAHEY:  Okay.

 7                      THE COURT:  But while you're here,

 8      would you please convey to your team how

 9      grateful I am for their quiet professionalism

10      throughout the trial?  It's noted and

11      appreciated.  I will follow up with them after

12      the trial is over.  If you have a chance to put

13      out an e-mail now.

14                      DEPUTY MARSHAL FAHEY:  I will.

15      Thank you.

16                      THE COURT:  Sure.

17                      (Deputy Marshal Fahey left the

18      conference room.)

19                      THE COURT:  In our discussion off

20      the record, defense counsel has appropriately

21      opined that there's no alternative to their

22      telling their clients by the end of the day, and

23      I agree with that and I think that it's

24      necessary that we do that.  However, given the
```

 1    fact that there's nothing practical we could

 2    accomplish today, I will maintain my initial

 3    position, which is I will ask counsel, and

 4    indeed order counsel so that there's no question

 5    but that this was the Court's decision and not

 6    counsel's decision, not to mention this until

 7    the end of the day.

 8              I would then give you time to

 9    confer with your clients in the courtroom before

10    they are escorted back into detention so that we

11    can discuss practical methods of dealing with

12    the situation, and at that point we will decide

13    who the appropriate emissary is to call backs,

14    Ms. Kula, or the hospital, because as I

15    understand it, the hospital information was

16    given and it might be that the Judge should be

17    the one to make that call.

18              So let's all think about those

19    things.  Let's go back in, see if we can make

20    good use of the afternoon.

21              MR. IBRAHIM:  What I was going to

22    suggest, Judge, is, if I could take a moment,

23    actually return the call and just simply ask her

24    to get a doctor's letter that could be sent to

1      me that I could provide to the Court, because

2      that may have contact information the Court can

3      use.

4                    THE COURT:   Right.  By all means,

5      do that.

6                    MR. IBRAHIM:   At least we'll have

7      something to determine.

8                    THE COURT:   Let's do that as

9      quickly --

10                    MR. BOSTIC:   Your Honor, I want to

11     add, can we get the doctor's name and telephone

12     number, because the doctor may not be available

13     to prepare a letter and then to get it to you.

14     Then we're into tomorrow.  But if the Court has

15     a name...

16                    THE COURT:   Well, let me suggest

17     we do that on the break, Mr. Ibrahim, only

18     because we've kept the jury waiting 15 minutes.

19     I've been religious about starting as quickly as

20     we can.

21                    Thank you, counsel, for your

22     candor and cooperation.

23                    (Conference in the conference room

24     concluded.)

```
 1                    (Proceedings resumed in the

 2          courtroom as follows.)

 3                    THE COURT:  We'll be just a

 4          minute, Special Agent.

 5                    THE WITNESS:  All right.

 6                    MR. McCALL:  Judge, while we're

 7          here, I know we left on a matter that had to do

 8          with the next government exhibit.  I redacted

 9          and spoke to Mr. Bostic.  I redacted the portion

10          that --

11                    THE COURT:  Right.

12                    MR. McCALL:  -- that you

13          mentioned, that the Court had mentioned.

14                    THE COURT:  All right.

15                    MR. McCALL:  It's only two pages

16          of the entire order in any event.

17                    THE COURT:  All right.  You can

18          bring the jury in.

19                    (The jury entered the courtroom

20          and took their seats in the box.)

21                    THE COURT:  Please be seated,

22          ladies and gentlemen of the jury.  The delayed

23          start is all my responsibility.  I had a matter

24          of court administration I had to deal with, and
```

```
 1        for the first time since the trial began

 2        actually took a walk at lunchtime because

 3        Mr. Kleinwaks said I needed some Vitamin D.  So

 4        lo and behold, I returned to something I needed

 5        to address.  Sorry to keep you waiting.  The

 6        fault is the Court's.

 7                    And Mr. McCall, you may proceed.

 8                    MR. McCALL:  Thank you, your

 9        Honor.

10   BY MR. McCALL:

11                    Q.   We were talking about Government

12        Exhibit 163.

13                    MR. McCALL:  Judge, I think the

14        publish button is off.

15                    THE COURT:  You are correct, sir.

16                    MR. McCALL:  Thank you, your

17        Honor.

18                    THE COURT:  That should be coming

19        up now.  It takes a couple seconds to cycle up.

20   BY MR. McCALL:

21                    Q.   Okay.  And, again, this is a page

22        from the TPR order that was found in the office

23        area, the living room left in the Edcouch house;

24        is that correct?
```

 1                    A.    That is correct.

 2                    Q.    And portions of the order had been

 3      underlined; is that right?

 4                    A.    That's correct.

 5                    Q.    All right.  And we've already

 6      looked at the first page.  Turn to the second

 7      page.  Just the top part above paragraph 6.

 8                    MR. McCALL:  Can you highlight

 9      that, please?

10    BY MR. McCALL:

11                    Q.    Okay.  And can you read the

12      sentence in the line that's underlined in this

13      exhibit?

14                    A.    This factor favors granting the

15      TPR and weighs heavily in that direction,

16      because of the father's unwillingness to be

17      convinced that no sexual abuse occurred coupled

18      with his lack of trust in any authority system

19      and his past disrespect of Court Orders.

20                    Q.    Okay.  Can we turn to Government

21      Exhibit 166, please.

22                    Okay.  Again, what are we looking

23      at here in Government Exhibit 166, Special Agent

24      Gordon?

1            A.    So the envelope, return address

2      from Matusiewicz, Box 6, Edcouch, Texas, to

3      David Matusiewicz with his inmate registration

4      number and federal institution.

5            Q.    And can we turn to the next page

6      of this exhibit.  And you can keep going.  Keep

7      going.

8            Okay.  This is the table of

9      contents to a book that was inside that package;

10     is that correct?

11           A.    That's correct.

12           Q.    Can you -- I'm sorry.  Before you

13     blow that part up, can you blow the top part up,

14     which is -- keep going.  Yes.  The name of the

15     book is at the top.

16           A.    Right.

17           Q.    Of the enlargement.  And what does

18     it indicate?

19           A.    It's the "Essential Underground

20     Handbook," and then the table of contents page.

21           Q.    Okay.

22                 MR. McCALL:  And can you back out?

23     BY MR. McCALL:

24           Q.    And so what are some of the

1      chapter headings entitled in this book?

2                A.   So you see mail drops and then

3      highlighted second identity, and under that,

4      second passports, highlighted fake identity

5      documents, escaping the USA.

6                Q.   Next page?

7                A.   So again other headings.  This one

8      under private investigation, security and

9      surveillance, performing background checks, how

10     to use pretext to gain information.

11               Q.   And let's go look at that

12     particular chapter, How to use pretext to gain

13     information.

14                    Can you turn to page 14 of this

15     exhibit?  All right.  And, Special Agent, this

16     is the header for pretext; is that correct?

17               A.   That's correct.

18               Q.   Can you please read what this

19     paragraph indicates, these two paragraphs?

20               A.   Sure.  "Pretext is a technique

21     that investigations use in order to obtain

22     information.  It is much frowned upon in some

23     circles, but it remains one of the most useful

24     techniques for a skilled investigator.  Ethical

1    considerations aside, some uses of pretext are

2    legal and others illegal, and yet others exist

3    in a gray area, somewhere between the two.

4              "If you plan on using pretext,

5    then you need to make sure you understand which

6    uses of pretext could be considered illegal so

7    that you can safely avoid them."

8              Keep going?

9         Q.   Yes, please.

10        A.   "You may not be comfortable with

11   using deception to gain information.  This is an

12   entirely personal ethical standpoint on which I

13   will make no comment -- I am not trying to be a

14   moral guide here.  Suffice it to say that you

15   must make a decision for yourself whether the

16   benefits you are hoping to gain from using

17   deception outweigh any negative factors that may

18   be involved.

19              "One important point that I hope

20   you will come away with after reading this

21   section though is that you, if you are

22   approached by an inquisitive stranger asking

23   questions about a person or situation you are or

24   have been acquainted with, things may not always

Gordon - direct                    3648

```
 1        be as they appear.  You should be on your guard

 2        in such situations, and stay aware that someone

 3        may be using pretext to gain information from

 4        you."

 5                   Q.   All right.

 6                   MR. McCALL:  Can you back out,

 7        please?

 8   BY MR. McCALL:

 9                   Q.   And then it talks about different

10        types of pretextual ways to gain that type of

11        information; is that correct?

12                   A.   Correct.

13                   Q.   One is listed below; is that

14        right?

15                   A.   Right.  Under telephone pretext.

16        Right.

17                   MR. McCALL:  Go to the next page.

18   BY MR. McCALL:

19                   Q.   What's listed there in the heading

20        sections?

21                   A.   "Employers, landlords, neighbors

22        and former spouses."

23                   Q.   Can you read the highlighted

24        section for former spouses?
```

1     A. "Former spouses can be good

2 sources of information, as they know the subject

3 most intimately.  But, they also can be very

4 bitter and under emotional stress.  Therefore,

5 the information you gather from former spouses

6 should be verified in other ways."

7     Q. Now, in this case, Special Agent

8 Gordon, Christine Belford -- who did she marry

9 after David Matusiewicz?

10     A. That was Jerald Purcell.

11     Q. And at some point they divorced as

12 well?

13     A. They did.

14     Q. Okay.  Without getting into the

15 specifics of any conversation, what happened

16 with Mr. Purcell as it relates to this

17 particular paragraph?

18     A. Well, there were, on one side, a

19 review of all the evidence.  We had seen that

20 there was consideration to reach out by the

21 Matusiewicz family to contact Jerald Purcell,

22 and Jerald Purcell received a phone call.

23     Q. And who did he receive a phone

24 call from?

```
 1                 A.   Tom Matusiewicz.

 2                 MR. McCALL:  Exhibit 167, please.

 3    BY MR. McCALL:

 4                 Q.   What's Exhibit 167, Special Agent

 5       Gordon?

 6                 A.   This is an itemization list

 7       headed, red file, mom's outgoing letters.  And

 8       then on the left you see item 1 and then there's

 9       item 2, item 3.

10                 MR. McCALL:  Can you scroll down,

11       please.

12                 THE WITNESS:  And basically an

13       itemized list of different pieces of

14       information.

15    BY MR. McCALL:

16                 Q.   Okay.  And can you just tick

17       through the exhibit, please, to get a sense of

18       it's length?

19                 A.   There's another dozen or so,

20       another dozen or so, and then it's marked blue

21       file.  It goes on to another heading.  That

22       first one is approximately 56 different items.

23                 MR. McCALL:  Can you please turn

24       to Government Exhibit 168.
```

```
 1    BY MR. McCALL:

 2              Q.   What is this?

 3              A.   This is a folder marked, or

 4         written, Cindy (Etherton) Bender.

 5              MR. McCALL:  Okay.  Can we push

 6         the folder over and go to 169 very quickly.

 7    BY MR. McCALL:

 8              Q.   And, again, you can start ticking

 9         through them.  In this folder, what was found?

10              A.   So these are paper copies of the

11         e-mails containing the photographs of the kids,

12         and these were the e-mails between Cindy Bender

13         and Amy e-mail account.

14              Q.   And some of these photographs were

15         also found where?

16              A.   Various places.  The CRV that was

17         across the street from the courthouse.

18              MR. McCALL:  Can we please turn to

19         Government Exhibit 176.

20    BY MR. McCALL:

21              Q.   All right.  And what's 176?

22              A.   This is a hanging file folder

23         marked Laura, Leigh, Karen, info, 2009-present.

24              MR. McCALL:  And then can you pull
```

 1          up Exhibit 177.

 2     BY MR. McCALL:

 3               Q.   All right.   Special Agent Gordon,

 4     can you please start with the top of this

 5     e-mail?   Who is this e-mail from?

 6               A.   So this is from David Matusiewicz.

 7               Q.   What -- go ahead.

 8               A.   Dated 6/21/2011.

 9               Q.   And the subject line contains a

10     series of Re's?

11               A.   Indicating reply, and the message

12     header, school info for the girls.

13               Q.   And can you read the e-mail,

14     please?

15               A.   "Karen in kindergarten at Red Clay

16     Consolidated School District, North Star

17     Elementary, 1340 Little Baltimore Road,

18     Hockessin, Delaware, zip code and telephone

19     number.   (Looks like Laura is in third grade in

20     the same school).   Karen's teacher is Janicki.

21     Laura's is Spinelli from the last marking period

22     ending 2011.   Leigh is still at Brennen, and her

23     teacher is Lisa Miller as of June 34d, 2010.

24     Leigh and Laura have been to St. John the

 1        Beloved for their religious education.  Leigh

 2        sauce Mrs. DeFlaviis and Laura saw Mrs. Hunter.

 3                      "Letters with our allegations

 4        of abuse should go to each of these people so

 5        that possible Laura will open up to one of them

 6        and, God forbid, Chris is still sexually

 7        molesting them, maybe Leigh or Karen will open

 8        up about Mommy's little secret to one of their

 9        teachers."

10                Q.   What does the handwriting in this

11        e-mail indicate?

12                A.   It says, Brennen's School of

13        Autism, 144 Brennen Drive, Newark, Delaware.

14        Her teacher is Lisa Miller.

15                      MR. McCALL:  And back out, please.

16        And then can you enlarge the handwriting that's

17        at the bottom of this document?

18     BY MR. McCALL:

19                Q.   And who are some of the people

20        that are listed at the bottom of this document,

21        Special Agent Gordon?

22                A.   Sure.  So by name, Lisa Miller,

23        teacher at the Brennen School.  Ms. Janicki,

24        North Star.  Ms. DeFlaviis.  It says Leigh, Ms.

1      DeFlaviis.  And Laura, Mrs. Hunter, teacher at

2      St. John the Beloved.

3               Q.   What, if anything, was the

4      significance of Lisa Miller in this case?

5               A.   As we heard from the principal at

6      the Dewey School, Lisa Miller, I'm sorry.  We

7      heard from the principal or director, Mr. Dewey,

8      at the Brennen School.  Lisa Miller was a

9      teacher at the Brennen School and had an

10     envelope addressed to her with a letter.

11              Q.   And how about Mrs. DeFlaviis?

12              A.   Mrs. DeFlaviis was a teacher at

13     the Brennen School and, I'm sorry, at St. John

14     the Beloved.  She also had an envelope addressed

15     to her with the letter, and that's when we heard

16     from the director, Mrs. Berlingieri, about that

17     letter.

18              MR. McCALL:  Exhibit 178.

19   BY MR. McCALL:

20              Q.   What is 178, very briefly?  I

21     think you've seen this before today.

22              A.   Yes.  It's approximately a 14-page

23     document printed out.  It's titled, "Our story

24     in a nutshell," and then it's numbered.  And it

 1       essentially goes paragraph by paragraph through

 2       the issues that, you know, the Matusiewicz's had

 3       with Christine Belford, talking about their

 4       therapy, talking about her mental state, talking

 5       about how she was with the kids, that type of

 6       thing.

 7                    MR. McCALL:  Could you please turn

 8       to page 12 of this exhibit?

 9   BY MR. McCALL:

10                    Q.   Now, this is the end of the

11       document, page 12 of 14; correct?

12                    A.   Correct.

13                    Q.   And so the highlighted section,

14       what is the -- what is the subject of this last

15       part of the letter?

16                    A.   Suggestions for letters.  It would

17       be better to rewrite this in your own words.

18                    Q.   And then what does it go on to do,

19       Special Agent Gordon?

20                    A.   Well, it talks about, you know,

21       child abuse and, you know, people that can

22       report at this time, you know, or be involved in

23       it.  You know, Child Protective Services,

24       doctors, lawyers, and judges, when they make

Gordon - direct                3656

```
 1      mistakes, as far as putting a child in the wrong

 2      home.  You know, which parent as far as custody.

 3              Q.   Well, let me ask you:  Is this an

 4      actual suggestion for a letter for people?

 5              A.   Absolutely.

 6              Q.   And can you just read the first

 7      line?

 8              A.   "Every day we see, hear about and

 9      read accounts of the horrible tragedies that

10      occur when workers from Child Protective

11      Services, doctors, lawyers and judges place

12      innocent children in the wrong homes."

13              Q.   Okay.  And it just goes on to

14      articulate, like I said, a suggestion for a

15      letter; is that right?

16              A.   That's correct.

17              MR. McCALL:  Can we please look at

18      180.

19   BY MR. McCALL:

20              Q.   Okay.  What's the date on this

21      document?

22              A.   This is September 17th, 2009.

23              Q.   Who is this -- this is a letter to

24      who?
```

1          A.   This is I believe to be Amy

2     Gonzalez.  It says, "Hey, Amy."

3               MR. BOSTIC:  Your Honor, may I see

4     counsel, please?

5               THE COURT:  You may.

6               (Pause while counsel conferred.)

7               THE COURT:  Are we ready to go?

8               MR. BOSTIC:  Yes, your Honor.

9               THE COURT:  All right.

10    BY MR. McCALL:

11         Q.   All right.  The letter is to Amy;

12    is that correct?

13         A.   Correct.

14         Q.   And you've reviewed it before; is

15    that right?

16         A.   I have.

17         Q.   All right.  Who is it from?

18         A.   David.

19         Q.   Now, I want to -- in September of

20    2009, where is David Matusiewicz located?

21         A.   In September?  Well, the kids were

22    recovered in March.  He is taken into custody.

23    In September he's in federal custody.

24         Q.   Okay.  And he's writing this

1    letter from federal custody; is that correct?

2              A.    That's correct.

3              Q.    Let's start with the highlighted,

4    let's drop down to the highlighted section.

5                    All right.  Go ahead.  Can you

6    please read the highlighted section into the

7    record?

8              A.    Sure.  "Clearly, Jane was making

9    an example of mom as I expect Sleet will in my

10   case, so to send a message to others not to take

11   the law into your own hands even when the legal

12   system continuously fails you.  Malik also said

13   that Child Protective Services probably won't

14   get involved at this time with our case since

15   they will view Chris and the girls as, quote,

16   'trying to put their lives back together,' end

17   quote, after a harrowing experience at the hands

18   of a lunatic father and his mother, the

19   accomplice."

20             Q.    Let me stop you there.  Malik, who

21   is that a reference to?

22             A.    That was one of the attorneys

23   retained by David Matusiewicz.

24             Q.    Okay.  Keep going.

1              A.    "No, he says.  Laura would have to

2        say" --

3                    MR. McCALL:  Next page, please.

4                    THE WITNESS:  "Laura would have to

5        say something to someone at school or to an

6        adult or play mate she trusts for any action to

7        be taken by DFS, which leads plea to my idea.  I

8        want to run this by you first before acting.

9        (We should have done this two years ago at

10       Laura's first stories.  Coulda, woulda,

11       shoulda).

12                    "What if someone we know and trust

13       were to call (as a concerned parent) to Child

14       Protective Services and make an anonymous

15       report?  Of course, I don't want to see Laura

16       injured further.  Lord knows she's living at

17       home in a house with her mother, who abused her.

18       And as her only remaining parent who, quote,

19       'will go to jail if Laura tells anybody what

20       Mommy did,' end quote.

21                    "My poor angel.  She has got to be

22       so confused.  Clearly, the hoarding food idea is

23       her small mind attempting to control anything

24       that she can in a world that has turned upside

 1    down for her.

 2                    "Okay.  Again, our friend (male or

 3    female?)  Calls DFS and says (mispronouncing

 4    Matusiewicz?), tell Laura's story to her new

 5    friend.  Six months or so in and out of a new

 6    school system, about enough time where Laura is

 7    beginning to trust some of her new friends, but

 8    probably not adults who could get her mommy in

 9    trouble).  Disturb our caller enough that he/she

10    felt that he/she had to call.

11                    "It was stated while her/his her

12    daughter was playing with Laura that sometimes

13    Laura wears extra under pants (or dresses a doll

14    or toy at school with two outfits question

15    mark).  Some DFS people may put two and two

16    together.  The caller doesn't know what to make

17    of Laura's story, but it disturbed her little

18    girl.  Now he/she thought he/she should call

19    just in case."

20                    MR. McCALL:  Next page, please.

21                    THE WITNESS:  "Of course, the

22    caller would not want to leave his/her number.

23    I'm not sure what that -- right after his/her,

24    I'm not sure.  Something number (call from a pay

1    phone?)   In case this turns out to be nothing,

2    but he/she feels DFS should follow up.   If no

3    action taken by DFS in 10 to 20 days, place

4    another call anonymously.

5              "Again, remember, we don't want to

6    do anything that would place Laura in harm's

7    way.   She has been through enough.   Call and ask

8    Courtney Emerson her idea on this as well,

9    please?   I feel that we have to 'help' Laura to

10   tell her story and that if she's afraid that she

11   could lose her only remaining parent, she may be

12   reluctant to do so on her own.   The only way it

13   might happen is if something 'slips out' while

14   Laura plays with her new friend.

15             "Please don't run this by Ed or

16   Dimitri.   I'm not quite sure how they would

17   react to this, but I'm certain they would try to

18   dissuade us.   I'm hoping that Ed turns out to be

19   more of a bulldog than Dimitri is."

20        Q.   Whose Ed and Dimitri, Special

21   Agent Gordon?

22        A.   They're both Medrano and Duarte,

23   which were the attorneys.

24        Q.   For who?

1          A.   David -- Dimitri Duarte was

2    Lenore's attorney.  Heriberto Medrano was

3    David's attorney from the kidnapping case.

4          Q.   I think --

5               MR. McCALL:  Can you back out,

6    please?  Go to the next page.  Okay.  And then

7    we'll skip down.

8    BY MR. McCALL:

9          Q.   And you can pick it up in the

10   highlighted portion.

11         A.   "I thought I'd better run this by

12   you.  Also, please remember that all of our

13   calls are recorded, so mention nothing of this

14   idea on the phone, or if you do, speak

15   'Me-Uh-Sense.'  Remember when mom taught us?"

16         Q.   Keep going.

17         A.   "Don't think anyone here speaks

18   that language, but mom and I used it often when

19   discussing certain Christmas plans in front of

20   Laura.

21              "As always, I value your input and

22   will take no action on this until we have both

23   prayed for guidance.  I know you want Laura,

24   Leigh and Karen (and Mom) to be safe as much as

```
 1        I do.
 2                   "Thanks again for all your help.
 3        You're a great babysitter and I love you dearly.
 4        Love in litigation, Dave."
 5                   Q.   All right.  Let's turn to
 6        Exhibit 181, please.  Actually, I'm sorry.
 7        Before we do that, can you go back to the first
 8        page?  I want to look at the date.  And the date
 9        here is what?
10                   A.   September 17, 2009.
11                   Q.   And when is the first, if you
12        recall, about when the first report is made to
13        the Division of Family Services?
14                   A.   It's, you know, late that fall,
15        November, December.
16                   Q.   And is there an anonymous call
17        made at some point?
18                   A.   Yes, there is an anonymous call
19        made.
20                   Q.   By who?
21                   A.   Courtney Emerson.
22                   Q.   All right.  Can we please go to
23        Exhibit 181.  And, again, the date of this
24        letter?
```

```
 1                    A.    This is March 15, 2010.

 2                    Q.    It's addressed to?

 3                    A.    It says, hey, kiddo.

 4                    Q.    All right.  And the context of

 5         this letter, which person is receiving this?

 6                    A.    This would be Amy Gonzalez.

 7                    Q.    And who is this letter from?

 8                    A.    David Matusiewicz.

 9                    Q.    And can we go to page 2, please.

10         All right.  Can you read the enlarged, and can

11         you read the highlighted portion?

12                    A.    "Thanks for acting as a go-between

13         for mail.  I don't think mom received anything I

14         sent her directly from STC or -- FDC for Philly.

15         She's pushing for the multiple personality

16         disorder idea, which I agree is likely, but I --

17         I sent -- I spent, sorry.  I spent 2006 and most

18         of 2007 trying to get my ex to restart her meds

19         and seek treatment for the changes she went

20         through.  I'm done trying to diagnose her mental

21         illness."

22                    MR. McCALL:  Exhibit 182, please.

23         BY MR. McCALL:

24                    Q.    What is the date of this letter?
```

```
 1                    A.    This is March 21st, 2011.

 2                    Q.    Who is the letter addressed to?

 3                    A.    This is Mrs. Lenore Matusiewicz.

 4                    Q.    And who is the letter from?

 5                    A.    This is Deputy Attorney General

 6      Janice Tigani.

 7                    Q.    And the Re, the subject line?

 8                    A.    Letter to Attorney General Biden.

 9                    Q.    And can you read the highlighted

10      portion, please?

11                    A.    "The sexual abuse allegations that

12      you reference everybody investigated by the

13      Division of Family Services and law enforcement

14      agencies, including interviews of your

15      granddaughters through the Child Advocacy

16      Center.  The investigations determined that no

17      sexual abuse occurred at the hands of your

18      former daughter-in-law.

19                          "Further, the Family Court of the

20      State of Delaware has conducted hearings between

21      your former daughter-in-law and son resolving

22      visitation and custody matters in favor of your

23      former daughter-in-law.

24                          "Lastly, as a result of your own
```

1        criminal prosecution and/or the Family Court

2        proceedings, there is a no contact order between

3        you and your grandchildren."

4                    MR. McCALL:   Okay.   Can we turn to

5        Government Exhibit 183.

6    BY MR. McCALL:

7                    Q.   What is 183?

8                    A.   It's a file folder marked media

9        letters, reports.

10                   Q.   And can we turn to 184?   And this

11       is what?   What is 184, Special Agent Gordon?

12                   A.   It's a letter to the school nurse

13       at North Star Elementary School.   This is Mrs.

14       Bugbee, who we heard from.

15                   Q.   Okay.   Can we turn to 185, please.

16       What's Government Exhibit 185?

17                   A.   It's another letter.   It says

18       online to Jane Velez Mitchell, Nancy Grace.

19                   Q.   And, again, it's just a recounting

20       of what we've been talking about the last couple

21       weeks?

22                   A.   Issues with Christine Belford,

23       allegations about the children.

24                   MR. McCALL:   187, please.

 1    BY MR. McCALL:

 2             Q.   Okay.   What is 187?

 3             A.   So this is a letter by Lenore

 4    Matusiewicz.   The 660 Baylor Boulevard is the

 5    address of the Women's Correctional Institution

 6    in Delaware.

 7                  MR. McCALL:   Okay.   Can you back

 8    out, please?   And can you just scroll one page

 9    at a time until you get to page 4.   All right.

10    BY MR. McCALL:

11             Q.   So the paragraph, the paragraph

12    that's marked No. 12, can you please read what's

13    highlighted?

14             A.   Sure.   "No. 12.   How many two,

15    three, four, five-year-olds are taught by mommy

16    while they are all in the bathtubs together what

17    a 'G-spot' is and what to do with it (La, Le and

18    Kar?)   Did she 'teach' her first daughter the

19    same way?   K was overheard in the shower saying,

20    ooh, ooh, that's the spot.   That's the spot.

21             Q.   What does the next line say?

22             A.   Did she have an itch?

23             Q.   Special Agent Gordon, in all the

24    documents that you've reviewed in this case,

```
 1      have you found any other claim that Katy Moffa

 2      was using language like we're seeing in this

 3      paragraph?

 4              A.    No.   In the documents we reviewed,

 5      it was never about Katy Moffa.

 6                   MR. McCALL:   Exhibit 190, please.

 7      All right.   Can you blow up the top part?   All

 8      right.

 9  BY MR. McCALL:

10              Q.    And who is, or what is 190?

11              A.    So another letter.   This one is

12      addressed to Dave, again, from Lenore

13      Matusiewicz, dated February 11, 2010.

14              Q.    Can you read the first, it says,

15      Dave, and then what does it say next?

16              A.    Dave, hope you're sitting down

17      when you read this because you're not going to

18      like it.

19              Q.    And then can you read the next

20      paragraph, please?

21              A.    "First of all, when I first met

22      Chris (that I can remember -- when you were

23      working on those bushes and stuff outside your

24      office, something said she's going to use him.)
```

```
 1    My answer was, he's a big boy now, and he has to

 2    take care of himself.  I'm sure I never told

 3    you.  You probably have laughed it off as a

 4    mother's worry and you may have been right to do

 5    it at the time, but" --

 6              Q.  Keep going.

 7              A.  "Now, dad said that you said that

 8    I had met Courtney."  It's cut off there.

 9              Q.  Hold on one second.

10              A.  "Now, dad said that you said that

11    I met Courtney before, but I don't remember her.

12    She and dad came for a visit and she sat in the

13    chair around the table to my left.  When I

14    looked at her profile, I saw Chris.  Too

15    unnerved, I looked away.  Then I looked at her

16    again.  I saw Chris again.  If it's a sign or

17    just my projection or what, I don't know, but

18    this time, I'm making sure you know everything I

19    know."

20              Q.  Okay.  And then it goes on to say,

21    it talks about two items that were left out of a

22    Grandmother's Impossible Choice; is that

23    correct?

24              A.  That's correct.
```

1          Q.   And they discuss more issues with

2     Laura Matusiewicz; is that right?

3              A.   Correct.

4                   MR. McCALL:  Can you turn to page

5     3?  And you can scroll one at a time actually,

6     if you would.  Right.  Okay.  Can you enlarge

7     the highlighted part?

8     BY MR. McCALL:

9              Q.   Just so we're clear, these three

10    pages of handwriting, single-spaced; is that

11    correct?

12             A.   It is.

13             Q.   All right.  Can you read the

14    highlighted portion?

15             A.   "Anybody I've told my story to

16    have been ultra sympathetic.  Some have offered

17    to beat Christine up.  A few said that they had

18    'people' who would get rid of her if that's what

19    I want, but it's not.  I want her to get help

20    and be happy, preferably away from Laura, Leigh

21    and Karen, possibly with supervised visitation

22    at Laura, Leigh and Karen's house.  Guess that's

23    all.  Love ya.  Stay strong for your girls.

24    Mom."

                         Gordon - direct                    3671

 1                    Q.    All right.  I want to turn now --
 2         we're going to leave this room.  We're going to
 3         go into the southwest corner bedroom.  All
 4         right?
 5                    MR. McCALL:  Can you pull up
 6         Government Exhibit 79101 and 791D01.  I think
 7         it's D01.
 8    BY MR. McCALL:
 9                    Q.    Can you tell us what we're looking
10         at in 71 and 79-D?
11                    A.    To orient you, you start at the
12         front door.  You walk in, make a left through
13         what we called the study or living room left,
14         and there's a, first, a bedroom on the left
15         corner.  And then as you walk back a little bit,
16         there's a bedroom on the back corner, top corner
17         as it's drawn, and that's the southwest bedroom.
18         And that's the red box.
19                    Q.    Now, in this bedroom, there's a
20         collection of silver found; is that correct?
21                    A.    Yes.  There were pieces of silver
22         marked Dave's silver.
23                    Q.    And it was men's clothing found in
24         this room as well?

```
 1              A.   Correct.

 2              Q.   Let's look at Exhibit 90.   All

 3     right.   Again, this is a letter in Exhibit 90;

 4     is that correct?

 5              A.   Correct.

 6              Q.   And who is the letter addressed

 7     to?

 8              A.   It says, "Hi, Amy."

 9              Q.   And what's the date of the letter?

10              A.   12/27/09.

11              Q.   And who is this letter from?

12              A.   This is from Dave Matusiewicz.

13              Q.   Okay.   Again, you've seen this

14     letter before; is that correct?

15              A.   I have.

16              Q.   All right.   Now, 12/27/09 is the

17     date.   And can you read, if you will, the

18     highlighted portion of this particular letter?

19              A.   "Ask Ed next time you talk with

20     him if it would be appropriate (or advisable) to

21     sue DYFS plus/or the State of Delaware to

22     require them to evaluate the girls for sexual

23     abuse.   I'm done playing Mr. Nice Guy.

24                   "Lastly, if nothing changes during
```

```
 1          January (a typically low month for Chris),

 2     please begin making complaints anonymously and

 3     repeatedly to DYFS.  Ask Linda Morris, Courtney,

 4     Christine (the good Christine) and anyone you

 5     trust to help.  Also, make sure Melinda's

 6     website is up and has a true story on it and is

 7     well publicized.  Sorry I can't help much from

 8     in here."

 9               Q.   When the letter references the

10     good Christine based on the investigation, who

11     is that referring to?

12               A.   Christine Cocove, a friend of Amy

13     Gonzalez.

14               Q.   And Melinda, who is Melinda?

15               A.   Melinda Kula.  We talked about the

16     Kula residence in New Jersey on Standish, and

17     that would be the Kulas, which are the relatives

18     of the Matusiewiczes.

19               MR. McCALL:  Can we turn to

20     Exhibit 93.

21     BY MR. McCALL:

22               Q.   All right.  Exhibit 93, it's

23     addressed to?

24               A.   "Hi, Dave."  Dave Matusiewicz.
```

Gordon - direct                    3674

1              Q.   Date?

2              A.   12/11.  2011 I believe that is.

3              Q.   Okay.  Again, what's significant

4    about that date?

5              A.   So this is about ten days after

6    Tom had shown up at the front door of Belford's

7    house with a private investigator.

8              Q.   Okay.  Can you please read the

9    first page of this letter?

10             A.   Okay.  "Mom and I just got back

11   from traveling up north to see our

12   granddaughters.  Didn't happen this trip.  Visit

13   was grandma, age 90 (did happen) and see Carl

14   Stubbins (did happen).

15                  "Mom, although a 4,500 mile,

16   two-week trip, did surprisingly well.  Thank God

17   and the weather cooperated as well (warm and

18   sunny).

19                  "Dave, mom wanted me to bring the

20   afghan blanket and some DVDs of family photos to

21   WB.  I contacted Mike O'Rourke, who agreed to

22   accompany me to WB house, which we did on

23   Tuesday, December 1st.

24                  "Mike took photos of afghan,

```
 1        suggested we make copies of all the girls'
 2        photos on DVDs just so WB can't accuse us of any
 3        wrongdoing 'just in case' as we all know she
 4        would do in a heartbeat.
 5                     "WB pulled into the development
 6        with new mark, Frank the babysitter, at her
 7        side, No. 4 hubby in tow.  Mom and I were at
 8        that time waiting for Mike in order to (always)
 9        have a third party as witness.  Mom stayed in
10        our car, away from residence, and Mike and I
11        drove up."
12               Q.   Next page.
13                     MR. EDELIN:  Your Honor, before we
14        go to the next page, may we see you?
15                     THE COURT:  You may.
16                     (Sidebar conference held out of
17        the hearing of the jury as follows.)
18                     THE COURT:  Okay.
19                     MR. EDELIN:  I just wanted the
20        Court to be aware that as you were going through
21        this letter, my client wrote me a note saying,
22        mom had a stroke either last night or yesterday.
23                     THE COURT:  All right.
24                     MR. EDELIN:  I didn't say anything
```

1    to her, and the note is on the piece of paper.

2                     MR. IBRAHIM:  Of course, I didn't

3    say anything.

4                     THE COURT:  I'm sure of that,

5    counsel.  I think why don't you just whisper to

6    her, I advised the Judge and he will try to make

7    time for us to speak after court.  How about

8    that?  Is that acceptable to everybody?

9                     MR. BOSTIC:  Yes, your Honor.

10                    MR. McCALL:  Yes.

11                    THE COURT:  All right.  Why don't

12   we do that.

13                    (End of sidebar conference.)

14                    MR. McCALL:  Judge, may I proceed?

15                    THE COURT:  Just give me one

16   seconds.

17                    (Pause.)

18                    THE COURT:  Okay, Mr. McCall.

19   BY MR. McCALL:

20          Q.  You can continue reading the

21   letter.

22          A.  "To the house.  "We (mike and I

23   tried) previously to have someone come up to the

24   door.  The girls' three book bags were just

Gordon - direct                    3677

1    inside the door.  Mike left his business card to

2    contact him to give WB her items (in exchange

3    for ski unit and mattress, nothing less.  Even

4    swap.

5                   "We gave them about 15 minutes and

6    then went back.  WB ran across the street to the

7    neighbor's house (I believe she is this week a

8    reddish blonde hag as opposed to a usual

9    black-haired hag.)

10                   "Mike and I went up to the door,

11   and after numerous tries in knocking on the

12   door, had it opened by Mogwomp, alias, Frank the

13   babysitter.  He came out on the front steps,

14   folded his arms across his chest like the cigar

15   store Indian he portrayed, and drove, and gave

16   me a long death stare or death wish stare.  I

17   was petrified/ha-ha.  No, not really.  Just

18   kidding.

19                   "I told him to have WB contact us

20   for the items that I brought so that we may talk

21   about their return in exchange for ski unit and

22   mattress that is rightfully yours.

23                   "Mike and I left without incident.

24   We must have -- we have not heard anything

```
1    further from him."

2              Q.   All right.  Exhibit 97, please.

3    Next page.

4                   And what is 97, Special Agent

5    Gordon?

6              A.   So that was a -- that was a card,

7    and then on the inside of it is the writing.

8    It's addressed to Dave and it's from Amy.

9              Q.   And can you start, read just the

10   highlighted portion that starts with, "Dad"?

11             A.   "Dad said that he spoke with the

12   receptionist at doctor Blacklock's office and

13   she couldn't find any record of the doctor

14   seeing the girls.  That doesn't mean sending,

15   that doesn't mean sending our letters to jolt

16   his memory will hurt.  I am mailing mine to him

17   and Dr. Gotthold out in the a.m.

18                  "Continue to pray and have faith.

19   Love and miss you, Amy."

20                  MR. McCALL:  Exhibit 101, please.

21   BY MR. McCALL:

22             Q.   And, again, this is a letter

23   addressed to who?  To whom?

24             A.   This is addressed to Dave, signed
```

 1     by dad, and the return address, Lee and Tom

 2     Matusiewicz, Edcouch Texas, dated 12/14/202010.

 3                    MR. McCALL:  Okay.  You can just

 4     scroll through the page pages of this.

 5     BY MR. McCALL:

 6                    Q.   This is, again, some of the same

 7     documents that we've seen in the course of this

 8     case?

 9                    A.   Yes.  They call it Lenore's

10     affidavit, and it essentially repeats many of

11     the things we talked about, the allegations,

12     Christine's state of mind.

13                    MR. McCALL:  Okay.  Can we turn to

14     Exhibit 192.  And if you could enlarge the top

15     portion.

16     BY MR. McCALL:

17                    Q.   The date is December 15th, 2009.

18     Who is this letter addressed to?

19                    A.   This is Judge Vincent Poppiti.

20                    Q.   And who is it from?

21                    MR. McCALL:  You can back out.

22                    THE WITNESS:  Yes.  Sorry.  One

23     second.  This is from David.

24     BY MR. McCALL:

1          Q.   Okay.  And can you please read the

2    highlighted portion of this letter?

3          A.   "This coupled with the apparent

4    anger from which my ex-wife still suffers,

5    triggered in her desire to hurt me in the only

6    other way she saw available, she began sexually

7    molesting my daughter, Laura Emily.  Whether my

8    then six-year old daughter embarrassedly

9    divulged to my family and I that her mother was

10   playing certain sex games with her and that she

11   had to wear two pairs of underwear when she had

12   visitation with her mother.

13              "I took the only steps I could see

14   at the time to protect my children while

15   avoiding the incarceration from my ex-wife, who

16   I still believes suffers from mental illness."

17         Q.   And so what was he purporting to

18   the sexual abuse claim in this letter that he

19   had written to Judge Poppiti?

20         A.   That Christine Belford suffered

21   some type of mental illness.

22         Q.   And that she was, she was abusing

23   Laura to get back at him; is that correct?

24         A.   Correct.

 1                    MR. McCALL:  193, please.  Can you

 2       blow up the, excuse me.  Enlarge the top

 3       portion.

 4    BY MR. McCALL:

 5            Q.   All right.  And this is an e-mail;

 6       is that correct?

 7            A.   It is an e-mail.  It's from Doug

 8       Millar, Doug Millar007@Gmail.com.

 9            Q.   And can you tell the jurors who

10       exactly Doug Millar is?

11            A.   He's kind of like an online

12       Internet radio personality who talks about these

13       type of things in the country.

14                    MR. McCALL:  Can we turn to

15       paragraph 5, please.  And you can go back one

16       page.  Can you just enlarge the top portion of

17       paragraph 5?

18    BY MR. McCALL:

19            Q.   And this is just a summary of Tom

20       and Lenore Watusiewicz's disturbing comments, as

21       my guests tonight?

22            A.   That's correct.

23            Q.   Can you describe, when he says his

24       guests tonight, what does he do?

1          A.   It's like an online radio show

2     broadcast on the Internet, you know, and he

3     brings these people on, you know.  In this case,

4     Tom and Lenore Matusiewicz, to talk about the

5     issue that they want to put out.

6          Q.   Okay.

7          A.   Or put forward.

8               MR. McCALL:  All right.

9     Exhibit 194, please.

10    BY MR. McCALL:

11         Q.   Again, we are in the southwest

12    corner bedroom?

13         A.   Correct.

14         Q.   The bedroom with silver on it that

15    had whose name on it?

16         A.   It had Dave's name on it.

17         Q.   What is this, 194?

18         A.   So, again, this is a printout, a

19    piece of paper, Google or street view of 15

20    Donegal Court, Newark, Delaware.  And

21    handwritten it says, video cameras with an arrow

22    with two lines down to the one side of the

23    garage.  The other one kind of disappears into

24    the tree if you look closely.  And then it says

Gordon - direct                    3683

```
1     plus one in back.  So it's pointing out the

2     video cameras.

3               Q.   All right.  I want to turn now to

4     documents that are found in the southeast corner

5     bedroom.

6               MR. McCALL:  Judge, may I have a

7     moment just to consult with counsel on

8     something?

9               THE COURT:  You may.

10              (Pause while counsel conferred.)

11              THE COURT:  Ladies and gentlemen,

12    stretch, if you'd like.

13              MR. McCALL:  Judge, I'm sorry.

14    Can we see you at sidebar very briefly?

15              THE COURT:  All right.

16              (Sidebar conference held out of

17    the hearing of the jury as follows.)

18              MR. EDELIN:  It's about the neck

19    brace picture.

20              THE COURT:  I was wondering when

21    you were going to get to that.

22              MR. McCALL:  It's not in here.

23              MR. EDELIN:  The picture?  You may

24    have given it to me.
```

```
 1                    MR. McCALL:  Your Honor, at this
 2      point we're going to go back into this bedroom.
 3                    THE COURT:  Showing the neck brace
 4      there and then apparently trying to show Mrs.
 5      Matusiewicz wearing the neck brace and tying it
 6      in by some other piece of evidence you are about
 7      to show me.
 8                    MR. McCALL:  Right, which I don't
 9      have, but it's the photograph that I think --
10                    THE COURT:  Where I believe Mr.
11      Bostic was edited out.
12                    MR. McCALL:  He was edited out,
13      and Agent Gordon recovered the picture off of
14      the Internet from a hearing that occurred in
15      this case.  It was David Matusiewicz's violation
16      of supervised release hearing which Mr., Agent
17      Gordon attended, saw Lenore Matusiewicz in a
18      neck brace.
19                    THE COURT:  What was the date of
20      the hearing?
21                    MR. McCALL:  February 2013.
22                    THE COURT:  And what was the date
23      that the neck brace was seen on?
24                    MR. McCALL:  February 13th.  I
```

Gordon - direct                    3685

```
 1      don't think it's the same neck brace, but the

 2      fact that --

 3                      MR. EDELIN:  I would ask that he

 4      lower his voice.

 5                      MR. McCALL:  I'm sorry.  I

 6      apologize.  The fact that there's a neck brace

 7      here in this room with women's clothing and then

 8      Lenore Matusiewicz is seen very shortly in time

 9      wearing the neck brace ties her to this room and

10      the documents inside the room.

11                      THE COURT:  All right.  And is

12      there any problem from Mr. Bostic about his

13      picture, hearing the evidence?

14                      MR. BOSTIC:  I think my picture is

15      cropped out.  I thought it was a good picture of

16      me on the other hand.

17                      No.  I think it needs to be

18      cropped out.

19                      THE COURT:  All right.  But you're

20      showing the date, I take it, or what are you

21      showing to link it in?

22                      MR. McCALL:  I'm just going to

23      have his testimony that this is a picture from a

24      court hearing in February of 2013.
```

1            THE COURT:  I will allow it as

2     circumstantial evidence that perhaps whatever

3     was found in that room belongs to Lenore

4     Matusiewicz.

5            MR. McCALL:  What I would ask, if

6     I can just lead him through that a little bit so

7     he does not start talking the supervised release

8     hearing or anything like that.

9            THE COURT:  That would be

10    Mr. Edelin's call.

11            MR. EDELIN:  That's fine.  And

12    obviously, my objection, my original objection

13    stands.  It's being overruled.

14            THE COURT:  Yes.  It's being

15    overruled.  Preserved for the record.

16            MR. EDELIN:  Yes, sir.

17            THE COURT:  All right.  I think we

18    have that sorted out.  May I see the photo?

19            MR. McCALL:  Yes, your Honor.

20            THE COURT:  Just for a precaution.

21    I'm looking at what the government has

22    identified as Exhibit 726.  It shows the

23    defendant, Lenore Matusiewicz, with a microphone

24    from 6 ABC in front of her wearing a neck brace.

1        I understand Agent Gordon will provide us with a

2        time frame for the photograph and link it to the

3        date of the search.  Correct?

4                        MR. McCALL:  Yes, your Honor.

5                        THE COURT:  On that basis, the

6        objection is overruled.  You may proceed.

7                        (End of sidebar conference.)

8                        MR. McCALL:  All right.  If we

9        could pull up Government Exhibit 71, page 1, and

10       compare it to Government Exhibit 80-A.1.

11   BY MR. McCALL:

12               Q.   And, again, what is the room that

13       we're looking at in Government Exhibit 80-A,

14       Special Agent Gordon?

15               A.   So now we're in the southeast

16       corner of the bedroom.  As you look at the

17       diagram, it's on the lower left where the red

18       box is going.  And this is a picture taken, if

19       you were just standing just inside the door of

20       that bedroom.

21                        MR. McCALL:  Okay.  Can we pull up

22       on the right side Government Exhibit 80-E.

23   BY MR. McCALL:

24               Q.   Now, Special Agent Gordon, let me

 1       stop you there.

 2                   What is just above the green crate

 3       that we see here, the item that's white?

 4            A.   So you see a cervical neck collar

 5       right next to the lamp, between the milk crate

 6       and the lamp.

 7                   MR. McCALL:  Thank you.  You can

 8       back out of that, please.  And then on the left

 9       side, can you please pull up Government

10       Exhibit 726.

11  BY MR. McCALL:

12            Q.   Okay.  Who is the person in

13       Government Exhibit 726?

14            A.   Lenore Matusiewicz.

15            Q.   Now, photograph 80-E, that was

16       taken on February 12th, the day after the

17       shooting in this case; is that correct?

18            A.   Yes.  It was taken during the

19       search of the Edcouch residence.  Correct.

20            Q.   And the photograph that's

21       Government Exhibit 726, you pulled that off of

22       the Internet; is that correct?

23            A.   Correct.  I went on the Internet,

24       pulled off the stories, you know, about the

Gordon - direct                     3689

```
 1     incident after the shooting, and this is a

 2     photograph from that period after the shooting.

 3                  Q.   All right.

 4                  A.   I believe that's David Henry,

 5     Channel 6 News reporter.

 6                  Q.   All right.  And that's a, that's a

 7     photograph from a court hearing that occurred in

 8     this case in the weeks after February 11, 2013?

 9                  A.   Correct.

10                  Q.   And that's a hearing that you

11     attended?

12                  A.   Correct.

13                  Q.   What is Lenore Matusiewicz wearing

14     in this photograph?

15                  A.   A cervical neck collar.

16                  MR. McCALL:  All right.  Can we

17     pull up Exhibit 196, please.  Can you enlarge

18     the top portion?

19  BY MR. McCALL:

20                  Q.   Okay.  This is an e-mail from --

21                  A.   This is from David Matusiewicz,

22     dated March 21st, 2011, and it's to the A1BBQ

23     account, Tom and Lenore Matusiewicz.  The

24     subject is, "Two cents."
```

Gordon - direct                3690

1           Q.   And what does it say next?

2           A.   Thought you all might enjoy Mags

3      take on the appeal.

4           Q.   All right.  And then I see the

5      name Magda Menner?

6           A.   Correct.

7           Q.   Again, who is Magda Menner?

8           A.   Magda Menner is reportedly a

9      friend of David Matusiewicz.  She lives in Upper

10     New Jersey, was interviewed by the FBI.

11          Q.   All right.  And can you just set

12     this up and explain the context of the

13     highlighted portion of this e-mail that you are

14     about to read?

15          A.   So this e-mail, in this e-mail,

16     David is forwarding it over to the A1BBQ

17     account, and he's commenting essentially that I

18     guess they've given information to Magda Menner

19     about their allegations, and this is Magda

20     Menner's e-mail detailing, you know, her

21     comments or her opinion about the, about the

22     information.

23          Q.   Okay.  Can you please read this

24     e-mail into the record?

1              A.    "You want my input on the bullet

2       points, here it is.

3                    "One, utilizing Amy's testimony,

4       that she knew of Laura's child abuse by your

5       ex-wife and didn't report it.  Brilliant.  Let's

6       get the sworn testimony of an R.N. that she

7       contributed to child neglect by not reporting it

8       and get her license pulled by the Texas Board of

9       Nursing.  There are medical records that can

10      substantiate the abuse claim -- right?  Of any

11      child?"

12                   THE COURT:  Members of the jury,

13      let me -- your screen over there is not working.

14      Let's see what happens if I do this.  It's not

15      on my end.

16                   While we're dealing with

17      technology, let me deal with the evidence, all

18      right, because I previously made a ruling about

19      this exhibit.

20                   What you are reading or have just

21      had read to you, members of the jury, is an

22      e-mail from a third party, someone who was not

23      here in court, who is not subject to

24      cross-examination.  By definition, that's

1      hearsay because it's an out-of-court statement.

2      So you may not consider the substance of what

3      that person is saying in the e-mail in terms of

4      their opinion, which, by the way, may or may not

5      be relevant, but it does bear upon the feedback

6      that was brought to the attention of one or more

7      of the defendants at the time, and for that

8      purpose you may consider it only for the notice

9      that it gives or the information it conveyed,

10     not for the opinion or the substance of the

11     opinion being communicated.

12                  I think we're live now.  Thank you

13     and thank you for cuing us on the glitch.

14                  MR. McCALL:  Can you pull up 197,

15     page 1, please.

16   BY MR. McCALL:

17                  Q.   Okay.  All right.  And this is

18     another package of polygraph results and

19     letters; is that correct?

20                  A.   That's correct.

21                  Q.   And then if you can just begin to

22     scroll quickly through 197 to give the jurors a

23     sense, again, what are we seeing in the

24     documents in this package?

 1              A.    Copies of the polygraph that's

 2       administered and reported by Mr. Capuchina.

 3                    MR. McCALL:  Keep going.  And if

 4       you could go to, actually, just go to page 19.

 5  BY MR. McCALL:

 6              Q.    All right.  Now, pages 19 to 38,

 7       what are those, Special Agent Gordon?  Can you

 8       summarize them?

 9              A.    As we go through, these are the

10       letters that are sent to the different

11       commissioners, Delaware authorities, with kind

12       of all the same language.  And as you can go

13       through, you see it's just the address or

14       salutation that changes.  Dear Commissioner, and

15       then it's Mayo, Kenny.

16              Q.    Okay.  And these are like the

17       cover letters for all the commissioners of the

18       Family Court for the State of Delaware?

19              A.    Correct.

20              Q.    For the polygraphs?

21              A.    Directing them to the website,

22       JonBenet's True Case History.

23              Q.    And it also has judges as well?

24              A.    That's correct.  If you keep

 1    going, it has judges, different Delaware

 2    authorities.

 3                Q.    And these are judges that have

 4    nothing to do, nothing to do with Matusiewicz's

 5    either termination of parental rights hearing;

 6    is that correct?

 7                A.    Correct.

 8                Q.    Or the petition for visitation and

 9    what have you that either Amy Gonzalez or Thomas

10    Matusiewicz were involved in?

11                A.    That's correct.  Everything I

12    reviewed, this is probably the only place I see

13    these Judges names or Commissioners' names.

14                MR. McCALL:  Now, can we turn to

15    Exhibit 211, please.

16    BY MR. McCALL:

17                Q.    All right.  Now, this is the --

18    what is Exhibit 211, Special Agent Gordon?

19                A.    Well, we're still in the southeast

20    corner bedroom.  I talked about the milk crate.

21    How I described it, it was the off-colored green

22    crate that was sitting on a desk, and from that

23    came this yellow pad of paper.  It was a smaller

24    pad of paper.  You know, not as big as an

```
 1     eight-and-a-half by eleven, maybe five-by-eight.

 2     And this was a copy of the original little pad.

 3               Q.   And why was this, why was this pad

 4     important to the investigation?

 5               A.   You know, the first two pages were

 6     pretty significant just based on reading it, and

 7     these are, before we even got the evidence up

 8     here, agents and officers in Hidalgo County had

 9     taken photos of this, so we had seen this pretty

10     early.

11               Q.   Let's turn to page 3 first of this

12     exhibit.  Okay.  And if you could read the part

13     where it begins, Dr. Monica Bocanegra.

14               A.   6/21/2011, Dr. Monica Bocanegra,

15     Dr.  Samuel Romirowsky, Timothy Hitchings and

16     Judge Barbara Crowell weren't there each time to

17     console Laura when she woke from her worst

18     nightmare.  Mommy was in a big hotel and she

19     turns as if on camera and says, 'I'm coming to

20     get you, Laura, and this time you'll have to

21     come with me.'

22                    "Grandma and daddy couldn't be

23     there to console her when her nightmare came

24     true.
```

1                    "Dr. Bocanegra and Romirowsky took

2       oaths that state that, first of all, they should

3       do no harm.  Mommy, Christine Belford Purcell

4       has custody of Laura, Leigh and Karen as well as

5       Catherine Moffa.

6                    "Laura has gained a lot of weight.

7       Leigh is autistic and is losing language, and

8       Karen has started gaining weight like Laura.  Is

9       anyone there now to console my, crossed out, our

10      girls?  More information is on www.JonBenets

11      True Case History.Com."

12            Q.   Now, Agent Gordon, what's the date

13      that's listed at the top of this particular page

14      in this notebook?

15            A.   6/21/2011.

16            Q.   How was that -- do you recall how

17      that date was significant in the termination of

18      parental rights hearing, sir?

19            A.   Sure.  As I said earlier, the

20      termination of parental rights trial wasn't a

21      trial with all the days in a row like we are

22      here.  It was spread out over a significant

23      period of time, and on June 23rd, 2011, there

24      was another court day in that, in that trial

 1      process.

 2                      MR. McCALL:  And can we go back to

 3      page 2.

 4      BY MR. McCALL:

 5              Q.   And so the page that precedes the

 6      comments about Dr. Bocanegra and Romirowsky,

 7      this page discusses Christine Belford; is that

 8      correct?

 9              A.   Correct.

10                      MR. McCALL:  Okay.  Can we please

11      enlarge where it says, "I and mom"?

12      BY MR. McCALL:

13              Q.   And what does that say?

14              A.   So it says, "Mom, I had been told

15      she should have, quote, 'killed the bitch,' end

16      quote when she had the chance."

17              Q.   Keep going.

18              A.   "By a good friend but couldn't do

19      it.  Kidnapping to get them to safety was a

20      quote 'second choice.'"

21              Q.   Okay.  Can we go to Exhibit 210,

22      please.  This is again another note, Special

23      Agent Gordon, that was found in the southeast

24      corner bedroom; is that correct?

1          A.    That's correct.

2          Q.    All right.  Can you please read

3    the highlighted portion of this note?

4          A.    "Thank God.  Hallelujah.  Saints

5    be praised.  You've finally admitted to an

6    authority figure that you hate me so much that

7    you want to see me dead.  Too bad you didn't

8    admit that back in '97 or '98 when we first met

9    and in '04 when you poisoned me.  It would have

10   saved a lot of time, energy and pain on both our

11   parts."

12         Q.    All right.  All right.  That

13   concludes the documents that law enforcement

14   recovered from the Edcouch residence; is that

15   correct?

16         A.    That's correct.

17              MR. McCALL:  Judge, I would offer

18   at this time Government Exhibit 748, which is a

19   stipulation between all the parties in this

20   case.

21              THE COURT:  All right.  And

22   hearing no objection, do you want to publish it

23   to the jury now?

24              MR. McCALL:  I would.  Does the

1       Court want the witness to read it into the

2       record?

3                       THE COURT:  How long is the

4       stipulation?

5                       MR. McCALL:  It's one paragraph,

6       your Honor.

7                       THE COURT:  You may read it in,

8       Mr. McCall.

9                       MR. McCALL:  Thank you, your

10      Honor.

11                      Government Exhibit 748 is a

12      stipulation.  It indicates all the parties in

13      the case, including the government and the

14      defendants, David Matusiewicz, Lenore

15      Matusiewicz and Amy Gonzalez, hereby agree to

16      the following stipulation of facts.

17                      One, an investigator hired by the

18      Federal Public Defender's Office seized a series

19      of documents from the residence located at 26925

20      FM 1015, Edcouch, Texas, in December 2013.

21      Those documents are marked Government Exhibits

22      220 to 234.  The parties agree those exhibits

23      are admissible into evidence, and it has

24      everybody's signatures.

```
 1                      And I'm actually going to go ahead

 2         and date it right now, your Honor.

 3                      (Government Exhibit No. 748 was

 4         admitted into evidence.)

 5                      THE COURT:  That's fine.

 6                      Again, members of the jury, this

 7         saves time when we get an agreement like that

 8         from counsel, and I thank all counsel for their

 9         cooperation.

10    BY MR. McCALL:

11                 Q.   All right.  Special Agent Gordon,

12         you've reviewed the documents that were

13         retrieved from the Edcouch residence by the

14         investigator from the Federal Public Defender's

15         Office; is that correct?

16                 A.   I have.

17                 Q.   Okay.  Let's start with

18         Exhibit 223.  All right.

19                      MR. McCALL:  Can you enlarge the

20         top left portion?

21    BY MR. McCALL:

22                 Q.   All right.  Can you just summarize

23         for the jurors what we're looking at in

24         Exhibit 223?
```

 1          A.   So these are a list of dates,

 2     month, day, year, and then a comment next to

 3     each.   These appear to be somebody reviewed the

 4     diary of Christine Belford and made notes.

 5          Q.   What are the years that are

 6     indicated here?

 7          A.   It starts out, you know, in 1986

 8     all the way through 1988.

 9          Q.   Let's turn to Exhibit 225.   What

10     is Exhibit 225?

11          A.   This is a correspondence from the

12     Texas Optometry Board to David Matusiewicz,

13     addressed to him.

14          Q.   What's the date?

15          A.   This is November, it's either 13

16     or 18.   November 13, 2012.

17          Q.   Okay.   And the bottom part of the

18     highlighted section, what does that indicate?

19          A.   So do you want me to read it or

20     summarize?

21          Q.   You can summarize it, if you can.

22          A.   Okay.   So it's essentially the

23     Texas Optometry Board telling David Matusiewicz

24     that they are not going to grant him a license

1   to practice in the state of Texas.

2           Q.   Unless he meets one of these three

3   criteria; is that correct?

4           A.   Exactly.

5           Q.   All right.  And the three

6   criteria.  Number one indicates the applicant is

7   licensed in good standing as a therapeutic

8   optometrist in another state; is that correct?

9           A.   That's correct.

10          Q.   And was he, was he in good

11  standing and licensed in any other state in

12  November of 2012?

13          A.   I know from Delaware, by this

14  time, he had been revoked.

15          Q.   And number 5 indicates the

16  applicant's license has never been suspended or

17  revoked; is that correct?

18          A.   That's correct.

19          Q.   Okay.  And what was the status of

20  David Matusiewicz's license at this time in

21  Delaware?

22          A.   In Delaware it had been revoked.

23          Q.   So that left -- that left No. 5;

24  is that correct?

1          A.    Correct.

2          Q.    And what does the "according to"

3    portion of this document indicate?

4          A.    According to the information

5    provided in your letter, confirmed on the

6    website for the State of Delaware, you do not

7    meet requirements in Subsection 1 and 5, and

8    then it said, it is difficult to tell from the

9    information you provided with your application,

10   but you also may not meet qualification in

11   subsection three, which essentially he had to be

12   practicing a certain number of years, I think

13   it's five of the last seven years as it reads.

14         Q.    And, again, based on the

15   investigation, had he been practicing five

16   of the last seven years as a full-time

17   optometrist?

18         A.    If you go back, you know, seven

19   years, that would put him, you know, basically

20   he had kidnapped the kids, been incarcerated, so

21   he wasn't practicing from 2007 on to current.

22         Q.    Now, let's turn to Government

23   Exhibit 228.  What's the date of this letter?

24         A.    August 12th, 2010.

1          Q.    And who is it to?

2          A.    Lenore Matusiewicz.

3          Q.    Okay.  And Fran?

4          A.    Fran is another name that we see

5     in reference to Lenore.  There's, for example,

6     the YouTube comments, Señora Fran.  I believe

7     it's Lenore F. or Lenore Frances Matusiewicz.

8          Q.    And what does the highlighted

9     section of this letter indicate, Special Agent

10    Gordon?

11         A.    "As to notifying the Moffas and

12    Purcells, I think it would be prudent to wade

13    through in the form of Orlov's report.

14    Otherwise, we appear to be fabricating a story

15    to further our own agenda.  That's only my two

16    cents, though.  I trust you to make a judgment

17    call here based upon what you know of Chris,

18    Chris' past behavior.  She will forever more

19    be pulling out Romirowsky's report stating

20    she's perfectly sound of mind and I'm the

21    lunatic."

22         Q.    Now, let's turn to Exhibit 229.

23               All right.  Exhibit 229.  What is

24    229, Special Agent Gordon?

```
 1                    A.    You call this a journal or diary.

 2        It's of Lenore Matusiewicz.  If you look at the

 3        date, 4/24/10, and right next to it, frame of

 4        reference, Cortez, Correctional Officer, 8:00

 5        to 4:00 today.  Her journal at this point in

 6        time at least while she's incarcerated.

 7                    Q.    This is part of a much larger

 8        journal?

 9                    A.    Yes.  It's in a book.

10                    Q.    All right.  And the highlighted

11        entry is from what day?  What date?

12                    A.    In this case, it's 4/24/10, SAT,

13        Saturday.

14                    Q.    Can you please read the

15        highlighted portion?

16                    A.    "Told Tom, don't push, quote,

17        'lick the lollipop,' end quote, unless Amy is

18        absolutely sure Laura told her mommy did it."

19                    Q.    Let's go to Exhibit 230, please.

20        Okay.  What's the entry for this date?

21                    A.    It's 4/5/10.  It says, Tom --

22                    Q.    Hold on one second.

23                    A.    I'm sorry.

24                    MR. McCALL:  Let's blow it up.
```

1      Enlarge it, please.

2   BY MR. McCALL:

3              Q.   Now, before you read it,

4   April 5th, 2010.  How was that significant as it

5   related to Laura Matusiewicz and Monica

6   Bocanegra?

7              A.   As far as --

8              Q.   What was happening in the course

9   of their therapy sessions around this time?

10             A.   So at this point Laura and Dr.

11  Bocanegra had worked out that maybe Tom

12  Matusiewicz could visit for a session.

13             Q.   Special Agent Gordon, can you

14  please read the highlighted portion of this

15  document?

16             A.   "Tom, Laura, Chris have an

17  appointment today with Laura's psychiatrist.

18  Tom has to be extra good and remember not to

19  call Christine the, quote, 'whore bitch,' end

20  quote, and don't touch her.'

21             MR. McCALL:  Exhibit 233, please.

22  BY MR. McCALL:

23             Q.   This is another order dismissing

24  the petition for visitation; is that correct?

Gordon - direct                    3707

```
 1                    A.    Correct.

 2                    Q.    This is for Tom Matusiewicz?

 3                    A.    That's correct.

 4                    Q.    Dated November 16th, 2011; is that

 5       correct?

 6                    A.    Correct.

 7                    Q.    234.  All right.  Now, this is the

 8       final document that we're going to look at that

 9       was seized by the investigator hired by the

10       Federal Public Defender's Office.

11                          What's the date of this e-mail,

12       Special Agent Gordon?

13                    A.    October 18, 2011.

14                    Q.    Who is this e-mail from?

15                    A.    This is from Amy Gonzalez at the

16       AOL account to A1BBQ@juno.com.

17                    Q.    Okay.  What does the subject line

18       say?

19                    A.    "Message to Don from Dave."

20                    Q.    Now, who is Don?

21                    A.    I believe that to be Don Roberts,

22       the attorney representing Dave for the

23       termination of parental rights trial.

24                    Q.    All right.  And now before we get
```

1    into the body of the e-mail, again, can you just

2    explain the context of what's happening here in

3    this e-mail for the jurors?

4              A.   So this is an e-mail that was

5    originally sent to, it was originally sent to

6    Don from Dave, and then Amy is forwarding it

7    onto the A1BBQ account.

8              Q.   We see, do not respond.  This is

9    a message from Don to Dave.  Love ya, Amy?

10             A.   Yes.  If you look at all the caps,

11   capitalized, correct.

12             Q.   In the message from Dave

13   Matusiewicz, let's just focus on the highlighted

14   portion.  What does that say?

15             A.   "The only people Laura ever spoke

16   with concerning her molestation were my mother

17   sand sister."

18             MR. McCALL:  Could you please push

19   this off to the left.  And can you pull up

20   Exhibit 121.01?

21   BY MR. McCALL:

22             Q.   All right.  And, again, our frame

23   of reference, Exhibit 121 was a document pulled

24   from the Edcouch house; is that correct?

Gordon - direct                    3709

```
 1                 A.    That's correct.

 2                 Q.    And this is an e-mail from Dave

 3        Matusiewicz; is that correct?

 4                 A.    That's correct.

 5                       MR. McCALL:  Now, can you slide

 6        that down so we can see the date of the e-mail?

 7        Thank you.

 8     BY MR. McCALL:

 9                 Q.    And so this is an e-mail from

10        David to Amy, January 2011.

11                       MR. McCALL:  All right.  Can

12        you please enlarge them both so we can compare

13        them?

14                       MR. IBRAHIM:  Judge, I'm going to

15        object to that characterization that this was an

16        e-mail from David to Amy.  It actually was an

17        e-mail from someone else just going through Amy,

18        through.

19                       THE COURT:  That objection is

20        noted.  The jury can read the heading and the

21        attachment.

22     BY MR. McCALL:

23                 Q.    Okay.  So in the October 2011

24        e-mail, what does David Matusiewicz say as it
```

1    relates to the disclosure of molestation?

2            A.   So the October 1st, the one on the

3    left, the only people Laura ever spoke with

4    concerning her molestation were my mother and

5    sister.

6            Q.   And then what does it say in the

7    January 2011 e-mail?

8            A.   Right.  The January e-mail to the

9    right:  "When questioned by me and members of

10   my family, Laura stated that her mommy had been

11   teaching her where the G-spot was, inserting

12   things and fingers into my daughter's vagina."

13           Q.   Okay.

14           A.   "And demonstrating to her how she

15   liked to be pleasured sexually."

16           Q.   All right.  Let's move on to

17   Government Exhibit 276.

18               Now, there is also a search done

19   of, I think you mentioned it earlier, Amy

20   Gonzalez's house; is that correct?

21           A.   That's correct, in August 2013.

22           Q.   And a series of documents were

23   taken from that house; correct?

24           A.   Yes.

```
 1                Q.   All right.  I want to show you
 2      Exhibit -- I'm sorry.  276 is what?
 3                A.   So this is an FBI diagram sketch
 4      not to scale of the first floor or the lower
 5      level of Amy Gonzalez's residence on Sinatra
 6      Drive.
 7                     MR. McCALL:  Exhibit 277, A
 8      through C, please.
 9   BY MR. McCALL:
10                Q.   This is one of the rooms in the
11      house?
12                A.   Correct.  We're in one of the
13      rooms and this is a closet inside the room.
14                     MR. McCALL:  Okay.  Can you show
15      rooms B and C?
16   BY MR. McCALL:
17                Q.   Again, this is room C in the
18      diagram?
19                A.   Correct.
20                Q.   All right.
21                     MR. McCALL:  278, please.
22   BY MR. McCALL:
23                Q.   What is 278?
24                A.   A letter to Dr. Monica Bocanegra
```

1          from Tom Matusiewicz.

2                    Q.    Okay.   So this is found in Amy

3          Gonzalez's house.   Again, we've seen this letter

4          before?

5                    A.    Yes.

6                    MR. McCALL:   All right.   Let me

7          skip to 287, please.

8     BY MR. McCALL:

9                    Q.    All right.   287.   You've seen this

10         exhibit; correct, Special Agent Gordon?

11                   A.    I have.

12                   Q.    It's approximately 83 pages long;

13         is that correct?

14                   A.    Approximately, correct.

15                   Q.    And tell the jurors what this is.

16                   A.    So in the search we had found

17         basically Certified Mail receipts, mail receipts

18         just listing out all these different entities

19         where it appears that documents were sent.

20                   Q.    And so --

21                   A.    News services.   So a lot of news

22         services.   I think we saw Harpo Studios.   And

23         then you get into other Delaware authorities.

24         You know, Judge Poppiti there at the end, and

1      then again more receipts.  Delaware Family

2      Court.

3                  Q.   I think we saw Prime Time; is that

4      correct?

5                  A.   Correct.  And then here's one for

6      James Woods, return address from Lenore.

7                       This is James Woods, Family Court,

8      New Castle County.

9                  Q.   All right.

10                 A.   Numerous.

11                 Q.   Can we turn to Exhibit 288-A and

12     B.  Okay.  What is 288-A?

13                 A.   So this is another photograph in

14     the closet, and in this case, the safe on the

15     floor.

16                 Q.   What is 288-B?

17                 A.   So from there, so this is looking

18     down on top after it was opened.  And these are

19     identifications, credit card or debit card,

20     Thomas S Matusiewicz, Blue Cross/Blue Shield

21     card in the name of Thomas Matusiewicz.

22                 Q.   Okay.  This is in the safe in Amy

23     Gonzalez's house; is that correct?

24                 A.   Correct.

```
 1                  MR. McCALL:  289, please.  Can you

 2       highlight the top portion of this document?  I'm

 3       sorry.  Enlarge.

 4    BY MR. McCALL:

 5            Q.   Now, this was a document found in

 6       the safe; is that correct?

 7            A.   Correct.

 8            Q.   All right.  Can you please read

 9       the handwriting on this document?

10            A.   It says, quote, "Photo of mom,

11       also known as Mother Teresa.  Who says God

12       doesn't have a sense of humor?  He, quote,

13       'married us,' didn't he?"

14                  MR. McCALL:  If we go to the next

15       page, please.

16    BY MR. McCALL:

17            Q.   All right.  It says, "Always

18       remember" on the left.  And can you read the

19       handwriting on the bottom?

20            A.   "Amy, you are half your Mother

21       Teresa, half dad, Atilla the Hun, which means

22       always say please and thank you before you beat

23       the living shit out of someone.  Take no B.S."

24                  MR. McCALL:  Next page, please.
```

 1    BY MR. McCALL:

 2              Q.    And this would be -- what is it?

 3              A.    The envelope where it was found

 4    with it.

 5              MR. McCALL:  Next page, please.

 6    And you can go to the next page.  Okay.

 7    BY MR. McCALL:

 8              Q.    Again, this is in the safe; is

 9    that correct?

10              A.    It is.

11              Q.    Can you please read the enlarged

12    section of this exhibit?

13              A.    "I will be putting half my postal

14    pension, 288, for David's 'stash, other half for

15    Walt Disney World vacation in either late 2012

16    or 2013.

17              THE COURT:  Mr. McCall, we're

18    ready for our afternoon break.

19              MR. McCALL:  Your Honor, that's

20    fine.

21              THE COURT:  Ladies and gentlemen,

22    we'll stand in recess.

23              (The jury was excused for a short

24    recess.)

```
 1                    THE COURT:  As they're departing,
 2      why don't you have counsel move to sidebar just
 3      to save time.
 4                    (Sidebar conference held off the
 5      record.)
 6                    THE COURT:  All right.  Why don't
 7      you put that on the record.  I have no problem
 8      with that amendment.
 9                    MR. McCALL:  No, Judge.
10                    THE COURT:  I will short-circuit
11      it.  Mr. Bostic noted that the language in the
12      stipulation was more in a traditional law
13      enforcement mode using the verb, quote,
14      "seized," unquote.  We will change that to
15      "recovered"?
16                    MR. BOSTIC:  Recovered.
17                    THE COURT:  Recovered.  And the
18      government agrees, for which I thank them.
19      We'll go back off the record.
20                    (Discussion held off the record.)
21                    THE COURT:  Why don't we go back
22      on the record.
23                    MR. EDELIN:  Are you also going to
24      speak with about scheduling?  We're at 3:30 now.
```

```
1      Are you expecting cross today?  I'm just trying
2      to -- and I don't know how much longer.
3                     MR. McCALL:  I'm trying to get
4      this done today.
5                     THE COURT:  Trying to get the
6      direct done?
7                     MR. McCALL:  Yes.
8                     THE COURT:  All right.  Good.  Why
9      don't we push through then even if we have to
10     sit until quarter to 5:00 to try to finish the
11     direct.  All right?  And that will -- I always
12     found as a lawyer, if I had to overnight to
13     organize my cross, it was always quicker.
14                    MR. IBRAHIM:  Definitely.  It's
15     going to save having to go through books.
16                    MR. McCALL:  Yes.
17                    THE COURT:  It absolutely will.
18                    MR. McCALL:  I just need to go
19     back.  My brain is a little --
20                    THE COURT:  It has been a long
21     day.
22                    MR. McCALL:  It has been a long
23     day.
24                    MR. McANDREW:  We can tender the
```

```
 1      witness in the morning.
 2                  MR. McCALL:  I think I have enough
 3      to do for another hour.
 4                  THE COURT:  Well, if not, and the
 5      worst case scenario would be that I call a
 6      recess anyway.
 7                  MR. McCALL:  Yes.  I just don't --
 8                  THE COURT:  Just say, members of
 9      the jury, because it is the case agent and so
10      much material has been covered, I think it makes
11      more sense to recess now just to give defense
12      counsel time overnight to organize, and I speak
13      as someone who has practiced law and do it that
14      way.  All right?
15                  So I will take you off the hook
16      for timing.
17                  MR. McCALL:  I just -- I'm going
18      to push to get it done.
19                  THE COURT:  But if you get done
20      early --
21                  MR. McCALL:  I can't remember if
22      I'm going to finish early.
23                  THE COURT:  If you were to finish
24      early, you're not going to pay a price.
```

1              MR. McCALL:  Yes.

2              THE COURT:  I try to be the

3     lightning rod in terms of anything that's going

4     on logistically in the courtroom.  I do that as

5     one of the services I can provide.

6                   While we're back on the record, we

7     will talk about the fact I'm going to make a

8     request first of the Marshals that there be time

9     for the defendants in the case to meet with

10    counsel about the family development; and,

11    second, I will send an e-mail to counsel for the

12    Bureau of Prisons at the Federal Detention

13    Center in Philadelphia, advising her that it

14    would be of assistance to the Court if some

15    means of communication were arranged so as to

16    minimize disruption of the trial.

17                   Anything further?

18              MR. McCALL:  No, your Honor.

19              MR. EDELIN:  Can we have five

20    minutes before the jury comes out?  I don't know

21    if we ever got a chance to try to call.

22              THE COURT:  Counsel, whatever time

23    you need, that's fine.

24              MR. EDELIN:  Thank you.

```
 1                    (Short recess taken.)

 2                         -  -  -

 3                    (Proceedings resumed after the

 4        short recess.)

 5                    THE COURT:  Counsel, we'll bring

 6        in the jury.

 7                    MR. McCALL:  Judge, I just have

 8        one very brief issue.

 9                    THE COURT:  Please.  Everyone be

10        seated.

11                    Mr. McCall?

12                    MR. McCALL:  Judge, I skipped over

13        these.  I'm sorry.  Exhibits 281 and 282 for the

14        government are just the front of Composition

15        notebooks that belong to Christine Belford from

16        her childhood.  I'm not getting into them.

17                    THE COURT:  All right.

18                    MR. McCALL:  I was going to show

19        the front of the book to show they're in Amy

20        Gonzalez's house.

21                    THE COURT:  Right.  Understand.

22                    MR. McCALL:  Okay.

23                    THE COURT:  I think we've allowed

24        the reference to the to the existence of the
```

```
 1      diary.  We allowed into evidence that it was
 2      transmitted to other people.  We just have not
 3      gotten into contents.
 4                     MR. McCALL:  Thank you, your
 5      Honor.
 6                     THE COURT:  If all counsel are
 7      ready, I would ask to please bring in the
 8      jury.
 9                     (The jury entered the courtroom
10      and took their seats in the box.)
11                     THE COURT:  All right.  Get back
12      to work.  Thank you.
13                     Mr. McCall, go ahead.
14                     MR. McCALL:  Thank you, your
15      Honor.
16      BY MR. McCALL:
17              Q.  Special Agent, before the break we
18      were reviewing one of the documents that was
19      recovered from a safe in Amy Gonzalez's house?
20              Do you recall that?
21              A.  I do.
22              Q.  All right.  And we're looking at
23      the highlighted portion, which is the last page
24      of the document that you've been reviewing with
```

1      the jurors; is that correct?

2                  A.    Correct.

3                  Q.    Now, it indicates that -- again,

4      let's do it this way.  Can you just read again,

5      just to reorient the jurors, the highlighted

6      portion?

7                  A.    Sure.  It says, "I will be putting

8      half my postal pension, 288, for David's, quote

9      'stash,' end quote.  Other half for Walt Disney

10     World vacation in either late 2012 or 2013."

11                 Q.    The last time there was a Walt

12     Disney World trip as it relates to David

13     Matusiewicz, what happened?

14                 A.    The girls were taken to Central

15     America, kidnapped by David and Lenore.

16                 MR. McCALL:  Can we please turn to

17     Exhibit 290.

18     BY MR. McCALL:

19                 Q.    And so what's 290?

20                 A.    So another interior picture or

21     photograph from the search, and No. 11 is FBI

22     markings where we took the documents from that

23     three drawer cabinet there.

24                 Q.    All right.  Let's look at

1      Government Exhibit 291, please.  Can you tell

2      us, this is a letter; is that correct?

3              A.   Correct.  Dated 2/26/2010, and

4      addressed to Amy.  "Hi, Amy."

5              Q.   And who wrote the letter?

6              A.   This is Tom.

7              Q.   Okay.  Can you please -- can you

8      just please read the highlighted portion?

9              A.   "I attended mom's graduation on

10     the 23rd/same day WB, whore bitch, got papers

11     served."

12             Q.   What's the next word?

13             A.   "Yeah."

14             Q.   Can you please turn to

15     Exhibit 292.  And, again, this is another series

16     of what, Special Agent Gordon?

17             A.   Again, we found in the house in

18     that closet just numerous certified mail, return

19     receipt.  You know, U.S. Postal Service receipts

20     for various entities within the State of

21     Delaware, news, that type of thing.  Barbara

22     Walters.  And this, the return, Amy Gonzalez

23     with the Sinatra Drive address.

24                  MR. McCALL:  Can you go back to

```
1        that last one?
2    BY MR. McCALL:
3               Q.   And what Judge is on that
4        document?
5               A.   That is the Honorable judge Diane
6        Clarke Streett, who we heard from her legal
7        assistant the other day.
8               Q.   Now, can you please turn to
9        Exhibit 294.  Again, this is a letter to
10       whom?
11              A.   This is to Amy, and also addressed
12       is her husband, Juan, in this copy.
13              Q.   And who is it from?
14              A.   Thomas.  Thomas Matusiewicz.
15              Q.   And the date?
16              MR. McCALL:  Can you back out so
17       we can see the date?
18              THE WITNESS:  7/24, Saturday.
19   BY MR. McCALL:
20              Q.   Okay.  What does the highlighted
21       portion say?
22              A.   "I'm pretty well packed up with
23       the shit house and will leave Friday and early
24       to beat some of the heat."
```

```
 1                    Q.    Okay.   Please turn to page 2.   All
 2          right?
 3                          First of all, whose name is at the
 4          bottom?
 5                    A.    This says "Dad."
 6                    Q.    All right.   Can you start at the
 7          top and read the highlighted portion?
 8                    A.    "We have been on the defensive
 9          from the get-go.   Now we are on the offensive
10          and going for the jugular to start.
11                          "mom made some beautiful
12          pillowcases for our four girls.   I am still
13          cking, checking (always) on the WB's whereabouts
14          and her new mark.   I will see all the girls
15          again as we are all share.   She cannot keep them
16          at all costs.   We all shall.   She cannot keep
17          them at all costs.
18                          "You only -- you only have to look
19          at mini me Kate to see just how your Honor
20          pardon, fucked up they will become.   Even Laura
21          said mommy lies.   She cannot and will not have
22          our girls into her old age.   Ain't going to
23          happen."
24                          MR. McCALL:   295, please.
```

```
 1    BY MR. McCALL:

 2              Q.   This is another letter to Amy

 3        Gonzalez; is that correct?

 4              A.   Yes.   This one is "Hi, Amy," dated

 5        7/13/2010.   Below that it says, "Our Karen's

 6        b'day."

 7              Q.   The first highlighted portion?

 8              A.   "I sent you previously a copy of

 9        the letter from WB to forward to Duarte.   Let

10        him earn his keep.   Mom has no money and dad

11        gives up no money.   No way, no how, never."

12              Q.   Okay.   Hold on.

13                   All right.   Let's turn to the

14        second highlighted portion.   Go ahead.

15              A.   "We must drink to WB's final day

16        as well when we meet again."

17              Q.   Page 2, please read the

18        highlighted portion.

19              A.   "Do get yourself armed, dear, so

20        you will be ready for the, 'welfare riots soon

21        to come,' when people lose everything... they

22        lose it.   Dad."

23              MR. McCALL:   297, please.

24    BY MR. McCALL:
```

1              Q.    Who is that a birth certificate

2      for in 297?

3              A.    This is Laura Matusiewicz's birth

4      certificate.

5              Q.    Okay.  Exhibit 300, please.  And,

6      again, 300 is another series of what?

7              A.    Series of receipts.

8              Q.    Okay.

9              A.    From the U.S. Postal Service.

10             Q.    All right.  Let's turn to

11     Exhibit 309.  This is the last of five or so

12     exhibits from the house.

13             All right.  Again, we have seen

14     this exhibit before; correct, Special Agent

15     Gordon?

16             A.    Yes.  This is the letter from

17     Christine Belford to Dave Matusiewicz,

18     November 21st, 2011, providing information about

19     the children.

20             MR. McCALL:  Could we go to

21     Exhibit -- and let's circle back, if we can, to

22     Exhibit 281, please.

23     BY MR. McCALL:

24             Q.    Okay.  And can you tell the

```
 1        jurors, this is in Amy Gonzalez's house; is that

 2        correct?

 3                   A.    That's correct.

 4                   Q.    This is the front of what book?

 5                   A.    This is the photocopy of the front

 6        of the Composition book, Christine Belford

 7        diaries journal.

 8                   Q.    From what part of her life?

 9                   A.    From her young teenage, you know,

10        late grade school, high school years.

11                   MR. McCALL:   Exhibit 282, please.

12        BY MR. McCALL:

13                   Q.    And, again, what's Exhibit 282?

14                   A.    A scan of a separate similar book

15        that was maintained by Christine.

16                   Q.    Now, computers were also seized

17        from Amy Gonzalez's house; is that correct?

18                   A.    That's correct.

19                   Q.    Can you describe the two types of

20        computers that were taken?

21                   A.    From Amy Gonzalez's house there

22        was -- there were two computers.  One was a

23        Gateway desktop, so that was in the office area

24        of the house, and then there was a laptop that
```

```
 1        was also a Gateway, but a Gateway laptop that

 2        was in the main area of the house.

 3                    MR. McCALL:  Judge, we're going to

 4        just show the computers to Special Agent Gordon.

 5                    THE COURT:  Understood.

 6                    MR. McCALL:  For the record, AUSA

 7        McAndrew has just handed Special Agent Gordon

 8        two sets of computers.

 9                    MR. McANDREW:  I will set them

10        down by the table.

11   BY MR. McCALL:

12                    Q.  Special Agent, do you recognize

13        the Gateway tower that's in front of you?

14                    A.  Yes.  This is the Gateway tower or

15        desktop computer that we seized.  This was from

16        the office area of the residence.

17                    And then the second computer is

18        the Gateway laptop, and this was in the kitchen

19        area that was seized during the search when we

20        were down in Edinburg.

21                    Q.  Okay.  And the laptop is

22        Exhibit 317, and the tower is 312; is that

23        correct?

24                    A.  Yes.  The desktop tower part 312,
```

1    and the laptop 317.

2              Q.   Very well.  There was another

3    computer that was also seized from the Edcouch

4    residence going back to the prior search; is

5    that correct?

6              A.   That's correct.  So during the

7    original, during the search of the Edcouch

8    residence just after the February 11th shooting

9    date at the courthouse, Hidalgo County did

10   the search, and in this case, this is the Mac

11   Book Apple laptop that was seized during that

12   search.

13             Q.   What exhibit number is that?

14             A.   And that is Exhibit 212.

15             Q.   Thank you.

16             Okay.  I want to turn back briefly

17   to the Vista Con bag that has been discussed

18   early in your testimony.  Okay?

19             MR. McCALL:  Could we please pull

20   up Exhibit 242, page 9.  And that's the first

21   page, that's the surveillance photos from that

22   bag; is that correct?

23             A.   That's correct.

24             Q.   Okay.  Page 9, please.  All right.

 1     This was something that wasn't covered earlier

 2     by Detective Goda who seized the bag.  This is a

 3     court document for what case?

 4             A.    This is in the District of

 5     Delaware, the Federal District of Delaware, the

 6     United States District Court.  It's U.S. versus

 7     David Matusiewicz.

 8             Q.    Okay.  And we'll move through this

 9     quickly.

10                   Page 15.  242, page 15.  Okay.

11     That's a legal redacted letter from who?

12             A.    That would be Roberts Law LLC, but

13     the attorney Donald R. Roberts, Esquire.

14             Q.    And he represented David

15     Matusiewicz in the termination of parental

16     rights trial?

17             A.    That's correct.

18             Q.    Page 17, please.  This is an

19     e-mail with David Matusiewicz's e-mail address;

20     is that correct?

21             A.    Yes.  This is to David Matusiewicz

22     using eyeballs 20/20 at Gmail.com, and it's from

23     Chris Klaris, who is part of the Texas

24     Optometry, I forget their technical term, but

1          Board or licensing authority.

2                    Q.   Page 18.  I'm sorry.  Page 18.

3          And, again, another court document for the case

4          of United States of America versus David

5          Matusiewicz; is that correct?

6                    A.   That's correct.

7                    Q.   Page 19.  What's page 19?

8                    A.   So this is an e-mail.  True Links

9          is the federal BOP session for e-mail for

10         inmates and this is from Amy Matusiewicz.

11                   Q.   Okay.  And whose name is at the

12         top of this document?

13                   A.   David Matusiewicz.

14                   Q.   Page 23.  That's another

15         photograph that was inside the Vista Con bag; is

16         that correct?

17                   A.   That is correct.

18                   Q.   Page 25.  Okay.  Again, these are

19         all names that we've already discussed in this

20         case that are listed on page 25; is that

21         correct?

22                   A.   That's correct.

23                   Q.   And could you please read the

24         handwriting in the bottom portion of this

1    document?

2                MR. McCALL:  Could you enlarge

3    that?  Hold on.

4                THE WITNESS:  "If you give God

5    everything you have, he will provide everything

6    you need.  Those who fear God do not fear the

7    government as they want us to."

8  BY MR. McCALL:

9                Q.  Page 26.  Again, this is a letter

10   addressed to who?

11               A.  This is to Dave Matusiewicz at the

12   address from Edcouch, Texas.

13               Q.  Page 27.  This is a letter

14   addressed to whom?

15               A.  This is to Amy Matusiewicz at the

16   Sinatra Drive address and it's from the FCI,

17   David Matusiewicz.

18               Q.  Page 30.  That's a check.  Can you

19   please let us know who is named at the top left

20   corner of this check?

21               A.  Yes.  That's David Matusiewicz

22   using the 819 Sinatra Drive address, where he

23   did reside for a period.  It's to the Delaware

24   Victims Compensation.  It's made out to the

1    Delaware victims Compensation Fund.

2              Q.   Page 32.  And, again, this is

3    another envelope that's addressed to which

4    person?

5              A.   This is to David Matusiewicz from

6    the Office of Disciplinary Counsel, Carvel State

7    Office Building.

8              Q.   Okay.  Let's turn now to -- that

9    finishes up the remainder of some of the

10   documents that were recovered from the Vista Con

11   bag; is that correct?

12             A.   That's correct.

13             Q.   Let's turn now briefly to some of

14   the evidence that you are able to recover off of

15   the Internet.  Okay?

16             A.   Sure.

17             MR. McCALL:  Can we pull up

18   Government Exhibit 320?  And can you enlarge --

19   all right.

20   BY MR. McCALL:

21             Q.   Can you just explain very briefly

22   to the jurors, this is a business certification

23   record; is that correct?

24             A.   It is.  When we subpoena or

1        conduct a search warrant with, you know, an

2        online provider, e-mail account, something of

3        that matter, or even a bank, we ask for bank

4        records, they usually provide a certificate of

5        authenticity that they certify this is a

6        business record kept in their normal course of

7        business.

8                Q.   All right.  If we go to the next

9        page.

10                      MR. McCALL:  All right.  And can

11        you enlarge that?

12    BY MR. McCALL:

13                Q.   And can you explain now to the

14        jurors what you were obtaining when you receive

15        these documents?

16                A.   So Google, which now essentially

17        runs YouTube or owns YouTube, we had to go to

18        them to ask them who was the user name Voice For

19        the Voiceless.  And so when we, you know,

20        conducted subpoenas, search warrants to ask for

21        that type of thing, this is what we're asking.

22        In this case, we're asking for that user name.

23                      And then they come back and tell us

24        what the sign-up date is.  In this case,

1       January 27, 2011.  The IP address of the

2       Internet location, if you will of the person

3       that signed up, and then the e-mail used to sign

4       up that Voice For the Voiceless user name for

5       YouTube.

6              Q.   Again, what was the significance

7       of the Voice For the Voiceless account?

8              A.   Right.  So when you went online

9       and saw the YouTube video of the, of Christine

10      Belford and her children out in the front yard,

11      it was posted by Voice For the Voiceless.  So we

12      wanted to find out who was actually utilizing or

13      had used that user name.  So that's why, once we

14      found the items on YouTube, then we went to them

15      and started to ask for the results.

16             Q.   All right.  Now, it was the IP

17      address that was significant; is that right?

18             A.   Yes.

19             MR. McCALL:  Can we turn to

20      Exhibit 321.  All right.  And if you can enlarge

21      the middle.

22   BY MR. McCALL:

23             Q.   Okay.  What does the middle

24      indicate?

```
 1                  A.   Sure.  If you look -- I'm not sure
 2         it's in the middle there, but on the top, if you
 3         look at the IP address, commercial IP address,
 4         67.7I, what we asked for was where did that IP
 5         address come back to?  And in turn, we get back
 6         that it's the Knapp Medical Center in Westlaco,
 7         Texas.
 8                  Q.   Who works there?
 9                  A.   Amy Gonzalez.
10                  MR. McCALL:  322, please.
11         BY MR. McCALL:
12                  Q.   And what are we looking at here in
13         322?
14                  A.   So, like Google, this is a
15         business record declaration from Yahoo! saying
16         that the information we requested was something
17         they kept in the normal course of business, and
18         they certify that it's true and accurate.
19                  MR. McCALL:  Go to the second
20         page, please.  And what's the information?  Can
21         you enlarge that?
22                  THE WITNESS:  So, again, what
23         we're trying to find out is now we know the
24         user, or, I'm sorry, the e-mail address that was
```

```
 1      used for the registration of the Voice For the

 2      Voiceless on YouTube.

 3                   We asked then Yahoo!, since it was

 4      a YMail Yahoo! account, who did Children's

 5      Advocate and YMail belong to.  And we find the

 6      registration IP address, when the account was

 7      created, January 27, 2011, and then the full

 8      name, you know.  In this case, Pancho Lucas,

 9      which we believe is fictitious.

10           Q.   All right.  Exhibit 324, please.

11      And, again, another certification of business

12      records; is that correct?

13           A.   Exactly.

14           Q.   All right.  And this was in the

15      course of the investigation into the

16      Grandmother's Impossible Choice Web page; is

17      that right?

18           A.   Yes.  So putting YouTube aside,

19      now we're looking at the website JonBenet's True

20      Case History.Com.  Within the website was the

21      page Grandmother's Impossible Choice.  So we

22      were trying to find who was behind putting up

23      the JonBenet's True Case History website.

24                   MR. McCALL:  Can we please turn to
```

 1     the second page of the exhibit.  And can you

 2     enlarge that?  I think you need to capture more

 3     of the middle.

 4                 THE WITNESS:  You have to go down

 5     a little bit more.  Yes.

 6                 MR. McCALL:  Perfect.

 7                 THE WITNESS:  So when we go and we

 8     ask for, you know, what's involved in the

 9     website, we get back the organization, the

10     registration information.  In this case, we find

11     that it's Melinda Kula of 107 Standish Place,

12     New Jersey.

13                 Q.   Who is Melinda Kula in relation to

14     the defendants?

15                 A.   So Melinda Kula is the

16     sister-in-law of Thomas and Lenore Matusiewicz.

17                 Q.   And then Government Exhibit 326.

18     And then just to close the loop, 326 are -- is

19     what?

20                 A.   These are screen shots.  So

21     originally, when I went, I went on the Web,

22     found the website, it hadn't been active for a

23     moment in time.  I was able to get the cache or

24     the history of a website being up.  You know,

Gordon - direct                    3740

```
 1        found the website address, and thence once I
 2        grabbed that, that's how I do the other part of
 3        the investigation.  But here I took screen shots
 4        from a computer and just captured it as it was
 5        on a computer.
 6                    MR. McCALL:  Okay.  If you go to
 7        the second page, please.
 8   BY MR. McCALL:
 9             Q.   So the top was like the first
10        half, and this is page 2, the bottom half?
11             A.   Correct.
12             Q.   As you would scroll down the Web
13        page?
14             A.   Correct.
15             Q.   All right.  Page 3.  Page 4?
16             A.   And then it goes on and on.  So as
17        you scroll down the page, which you can't do on
18        paper per se, I take a shot, print it out, take
19        a shot, save it.
20             Q.   All right.  And is that the last
21        page?
22                    All right.  Let's turn now to
23        several e-mails that you recovered from the
24        RNAIM@aol.com account.
```

1              A.    Okay.

2              Q.    You mentioned earlier you

3      conducted a search warrant on this account?

4              A.    That's right.

5              Q.    336, please.

6                    MR. McCALL:  Can you go to page 5

7      of this exhibit, actually?  You can back out.

8      Okay.

9      BY MR. McCALL:

10             Q.    And, again, this is an e-mail on

11     January 23rd, 2011; is that correct?

12             A.    That's correct.

13             Q.    And it's from the YouTube service;

14     is that right?

15             A.    That's correct.

16             Q.    To what account?

17             A.    It says 22 Gonzalez sent the

18     e-mail, but the e-mail is RNAIM@aol.com.

19             Q.    All right.  And that's Amy

20     Gonzalez's e-mail?

21             A.    That's correct.

22             Q.    What does the highlighted portion

23     say?

24             A.    "Congratulations.  You've created

```
 1        a YouTube account."

 2                    MR. McCALL:  Can you go to page 7

 3        of this e-mail -- of this exhibit.  I'm sorry.

 4     BY MR. McCALL:

 5                    Q.   All right.  Now, starting with the

 6        bottom e-mail, it's from the AIBB2@juno.com

 7        account; is that correct?

 8                    A.   Correct.  So it is under original

 9        message from A1BBQ to RNE.

10                    Q.   And if you look at the very bottom

11        of that e-mail, what name is listed?

12                    A.   It says "Dad."

13                    Q.   And it's to the Amy Gonzalez

14        e-mail account; is that correct?

15                    A.   That's correct.

16                    Q.   And the date is June 21st, 2011?

17                    A.   Correct.

18                    Q.   And then can you please read the

19        first two paragraphs of this e-mail?

20                    A.   "Hi, Amy.  Please e-mail this to

21        David.  Dave requested from his latest e-mail

22        that we contact Laura/Leigh and Karen's school

23        teachers, advising them of Christine Purcell's

24        sexual molestation to them."
```

1          Q.   All right.  And then just to

2     summarize it, it goes on to list all the school

3     information that we've been talking about?

4          A.   That's correct.

5          Q.   All right.  And then the e-mail

6     above.  Go ahead.

7          A.   So then the next e-mail in the

8     chain is, it's from the RNAIM account to A1BBQ

9     with the comment, "I forwarded this to David.

10    Love ya, Amy."

11         Q.   We turn to page 10 of this

12    exhibit.

13              MR. McCALL:  And can you enlarge

14    that?

15    BY MR. McCALL:

16         Q.   Okay.  Special Agent, what's the

17    subject line here?

18         A.   So looking at the top one, it's

19    subject reply, "Tati Halloween."

20         Q.   It's from?

21         A.   It is from Amy Gonzalez.

22         Q.   What is the date?

23         A.   11/1/2012.

24         Q.   And who is it to?

1          A.   David Matusiewicz.

2          Q.   Okay.  And actually, can we go

3    down to the e-mail below?

4          A.   So that was the reply.

5          Q.   Right.

6          A.   And below that is David

7    Matusiewicz using the eyeball account wrote,

8    starting with "Too cute."

9          Q.   Go ahead.

10          A.   "Too cute.  Maybe next year.

11    Prepare yourself to be managing four by this

12    time in 2013.  Love you."

13          Q.   All right.  Now, I think that's

14    the second time this afternoon we've heard a

15    reference to managing four, something like that.

16    How many children if you take David Thomas

17    Matusiewicz's biological kids and you combine

18    them with Amy Gonzalez's?

19          A.   Amy Gonzalez had one biological

20    child and Christine and David had three.

21          Q.   Okay.  And in 2012, David

22    Matusiewicz's parental rights had been

23    terminated; correct?

24          A.   Yes.  They had been terminated

```
1      August 2011.

2                 Q.    Almost a year at there point?

3                 A.    Correct.

4                 MR. McCALL:    Can you go back to

5         that, please?

6      BY MR. McCALL:

7                 Q.    And what's Amy's response?

8                 A.    So, again, going to the top, which

9         is her response to the earlier message:  "I'm

10        praying for it."

11                Q.    Okay.  We've talked about 682-A

12        already.  How about 682-B?  Let's look at

13        Government Exhibit 682-B.  682-B.  This is from?

14                A.    This is from the A1BBQ@Juno.com

15        account to RNAIM@AIM.com.  It's dated 12/2/2011.

16        It's subject line:  "Good morning."

17                Q.    Go ahead.  Can you read it?

18                A.    It says, "Had a great day

19        yesterday watching WB run out of her house

20        across street to neighbors.  'This week she is a

21        reddish belong hag and got a chance to meet

22        Frank, her new mark, too.  WB is most definitely

23        scapping (sic) the bottom of the barrel on this

24        one quote.  Have a great day.  Dad."
```

1          Q.   682-C, last one.  Okay.  Again,

2     this is from dad; is that correct?

3          A.   That's correct.

4          Q.   To Amy Gonzalez?

5          A.   To Amy, dated December 3rd, 2011,

6     titled, "A request from mom and me."

7          Q.   Go ahead.  You can read it.

8          A.   "Hello once more.  Mom would like

9     to know from the Delaware Bureau of Vital

10    Statistics the marriage date of William Moffa,

11    Jr. to WB to see if she was pregnant with Katie

12    at the time, her style.  I tried several e-mail

13    sites.  However, they all wanted money to do

14    so.

15              Do you already belong to a look-up

16    service, and if so, would you please look this

17    up for us and e-mail results.  Thank you again,

18    Amy.  Dad."

19          Q.   All right.  Now, I wanted to turn,

20    Special Agent, to an interview that you

21    conducted, okay, with Amy Gonzalez.

22          A.   Okay.

23          Q.   All right.  Can you tell the

24    jurors when that interview occurred.

 1              A.   In August of 2013 we arrested Amy

 2      Gonzalez as related to this case.   We traveled

 3      down to Edinburg, Texas, McAllen, Texas, and we

 4      arrested her that morning at the FBI resident

 5      agency in McAllen, Texas.

 6              Q.   All right.   Now, when you arrested

 7      her, did you ask her if she was willing to speak

 8      with you?

 9              A.   Yes.   Because she was under

10      arrest, we offered her what, you know, is

11      frequently called her Miranda rights, or

12      advisive rights.   I went over that with her.

13      The FBI being very heavy on documents, we

14      actually have her sign a form saying she's

15      willing to talk to us.   She consented that that,

16      signed the form, and she agreed to sit down and

17      talk with us.

18              Q.   All right.   Now, when she was

19      talking to you, did she understand everything

20      that you were saying?

21              A.   She did.

22              Q.   Okay.   And did you talk to Amy

23      Gonzalez about any of the documents that we've

24      recovered in this case that the jury has now

1        seen?

2              A.   Yes.  We had -- so the search in

3        Texas had taken place.  I'm sorry.  The search

4        at Tom and Lenore's house in Edcouch had taken

5        place back in February, so between February and

6        August I had reviewed a fair amount of evidence

7        in the case, and I had brought some notes and

8        some copies of things to show her if she agreed

9        to the interview, which she did.

10             Q.   Okay.  And specifically did you

11       talk to her about the note that we've reviewed

12       that was found in the drawer in the hutch that

13       was addressed to Amy from her father?

14             A.   We did.  She had indicated that

15       she had been by the house after Tom and Lenore

16       had left for Delaware, or Tom, Lenore and David

17       had left for Delaware, and we asked her about

18       it.  And she was aware of the note.

19                  And when we asked her about, you

20       know, essentially the seriousness of the note,

21       she had responded that her father had left her

22       notes like that in the past, and that that was

23       not uncommon with what she put out to us.

24             Q.   I want to turn now to some of the

```
 1    security video that you obtained in the course

 2    of the investigation as it related to the

 3    traveling or the trip that David Matusiewicz,

 4    Thomas Matusiewicz and Lenore Matusiewicz took

 5    from Texas to Delaware prior to the shooting in

 6    this case.  Okay?

 7              A.   Sure.

 8              Q.   All right.  Now, I believe we

 9    heard earlier from the Walmart, a Walmart

10    employee who talked about the security system at

11    one of their facilities?

12              A.   That's correct.

13              Q.   All right.  Can you set that up

14    for us?

15              A.   Sure.  So after the shooting

16    incident had occurred, working with the State

17    Police, we had receipts, you know, in the days

18    preceding the shooting from the Matusiewiczes.

19    We used those receipts to check dates and times,

20    and essentially that led us to the Walmart, that

21    there was a -- there was the possibility that

22    they had been there, and that we sent an agent

23    to Walmart to engage their security department

24    to see if we could get footage of them, you
```

Gordon - direct                    3750

1    know, in or around their facility, which we did.

2            Q.   All right.  And that's the, I

3    think the White Marsh Walmart in Maryland?

4            A.   That is the one right down the

5    road in Maryland.

6            Q.   All right.  Now, before we turn to

7    that video, let's put up Exhibit 244-A, page 1.

8    Okay.  What's that again?

9            A.   So this is the Honda Civic.  In

10   this picture, it's parked over at the Elkton,

11   Maryland.  I shouldn't say that.  I'm not sure

12   if that was Elkton.  That may be actually at the

13   tow or the DSP yard.

14           Q.   Okay?

15           A.   But that's the Honda with the

16   South Dakota license plate.

17           Q.   I think when we scroll through,

18   you'll realize the location.

19           A.   Yes.  That's in the driveway at

20   Elkton, Maryland.

21           Q.   C, please.

22           A.   That's the trunk opened up with

23   its contents.

24           Q.   Okay?

```
 1                    MR. McCALL:  Can you go to D,

 2       please, and E?

 3                    THE WITNESS:  Still in the trunk.

 4                    MR. McCALL:  F?

 5                    THE WITNESS:  And as things are

 6       removed from the trunk, it gets placed on the

 7       driveway.

 8                    MR. McCALL:  G, H.  Keep scrolling

 9       through.  And that's the contents out; is that

10       correct?

11                    THE WITNESS:  That's correct.

12    BY MR. McCALL:

13                    Q.   Okay.  Now let's turn to

14       Government Exhibit 340, which is the security

15       video from the Walmart, and let's look at clip

16       3.  Right?  Okay.

17                    Now, before we start playing clip

18       three, can you explain to the jurors, again,

19       what we're looking at here in clip 3?

20                    A.   So clip 3 is one of four clips

21       that we reviewed that shows who we identify as

22       David, Thomas and Lenore Matusiewicz in and

23       around a Walmart facility.

24                    So in clip 3 here, this is an
```

1     exterior shot from the building looking out to

2     the Walmart parking lot.

3              Q.   All right.  Now, Special Agent

4     Gordon, can you tell the jurors -- just set it

5     up.  What are they going to see here

6     momentarily?

7              A.   So what you will see is if you

8     look on the upper left, you'll see a white,

9     white car, SUV, followed by another

10    lighter-colored car.  That will be the Honda CRV

11    followed by the Honda Civic.  They'll come

12    towards you in the frame, and if you look on the

13    right just past the area of the grass, there's

14    what appears to be a Chevy Suburban, gray in

15    color, and the Honda CRV will park on our side

16    of it as we look, and the Honda Civic will park

17    on the other side.

18             Q.   All right.  They're going to be

19    coming down, if you look at the big screen, this

20    way; is that correct?

21             A.   That's correct.

22             Q.   All right.

23             MR. McCALL:  Can you hit play,

24    please?

```
 1                    (Video played.)

 2     BY MR. McCALL:

 3              Q.   What are we seeing there?

 4              A.   So that's the Honda CRV parking

 5      and then the Honda Civic parking.  And --

 6              Q.   What are we going to see here in a

 7      moment?

 8              A.   In a moment, you'll see the

 9      occupants of the vehicles.  Tom -- I'm sorry,

10      David and Lenore in the CRV.  David and Lenore

11      will walk to the rear of their vehicle and then

12      Thomas on the other side of the Suburban will

13      appear walking from the side of his vehicle.

14              Q.   Who is that?

15              A.   That is David Matusiewicz.  And

16      Lenore will be in a red jacket/coat.  That's

17      Lenore.  And then you'll see Tom at the top of

18      that group coming in the picture now, past --

19      putting a coat on.

20              Q.   What's happening now?

21              A.   David appears to walk over to Tom.

22      They interact in some way.  And then Lenore is

23      heading towards the front of the store, and then

24      David follows.  And Tom stands at the rear of
```

```
 1          his vehicle.  He had parked head in, so he's
 2          standing at the rear bumper area, if you will.
 3                   Q.   Okay.  Now, what happens in the
 4          next six minutes or so as David and Lenore leave
 5          the screen?
 6                   A.   David and Lenore leave the screen.
 7          On the other video angles, I can see them go
 8          into the store.  They go in.  There is a
 9          McDonald's inside.
10                   Tom stands outside, right by the
11          Honda Civic.  At times he will the go into, or
12          appears, it's blocked by the Suburban, but
13          appears to get into the car on -- or at least
14          disappear from the, the view because of the
15          Suburban and then will re-emerge from that
16          obscured area and go to the rear of the cars
17          several times.
18                   Q.   Does Tom Matusiewicz ever go
19          inside the Walmart?
20                   A.   No.
21                   Q.   Okay.
22                   A.   So, again, he disappears behind
23          the Suburban.  You can kind of see his head move
24          and then there will be no movement, and then a
```

```
 1          little bit later he'll return to the rear of the

 2          car.

 3                    Q.   All right.  Now, our time here,

 4          I'm going to stop it at 1027 and 40 seconds; is

 5          that correct?

 6                    A.   Yes, on February 7th.

 7                    Q.   So for the next six minutes or so,

 8          there's no real action at the vehicle; is that

 9          correct?

10                    A.   I mean, Tom does get out and

11          appear to manipulate or at least bend over at

12          the back of the car.

13                    Q.   Okay.  Well, I think -- well, let

14          me fast forward it to 10:32.

15                    A.   Yes.  Okay.  Yes.

16                    Q.   Let me ask the question.  For the

17          next six minutes, basically, what happens until

18          I fast forward it to 10:32?

19                    A.   Really, nothing.

20                    Q.   Okay.  All right.  You can play

21          it.  Now, who do we see here, Special Agent

22          Gordon?

23                    A.   So this is what I was describing.

24          Tom comes out, goes to the rear of the car.
```

```
 1        He's facing the rear of the car, bending over at

 2        times, as you see there (indicating).  He bends

 3        over a couple times.  Has something now in his

 4        hand.

 5                    MR. McCALL:  All right.  Can you

 6        pause it?

 7   BY MR. McCALL:

 8        Q.   All right.  Now, we're at

 9        10:33:26.  What's going to happen now?  Is he

10        going -- well, do you recall what happens next?

11        A.   I believe he then disappears up

12        towards the front sides of the car.  The

13        Suburban tends to obscure him.  He returns back

14        after a few seconds.

15                    MR. McCALL:  Judge, there's about

16        seven minutes that we're going to be playing

17        next and that will be it.

18                    (Video played.)

19   BY MR. McCALL:

20        Q.   Now, again, Special Agent Gordon,

21        when this is occurring, you've watched the video

22        of the interior of the wall parking lot; is that

23        correct?

24        A.   Yes.  They have a camera just
```

 1        outside the door, just inside the door, then by

 2        the registers, and you can see them clearly.

 3        David and Lenore walked in, go in, go in past

 4        registers, down towards the food, and then

 5        ultimately, they walk back out.  And eventually

 6        when we move ahead, they'll reappear at the

 7        bottom of the screen walking from the Walmart.

 8             Q.   All right.

 9                  MR. McCALL:  Can you fast-forward

10        it to the 10:35:50, please.  Okay.

11   BY MR. McCALL:

12             Q.   So I think what we're going to

13        say, correct Agent Gordon, about 10:36:30 is

14        when we'll see movement again from the area of

15        the Honda Civic; is that correct?

16             A.   Correct.  If you look at what I

17        call the Suburban, about midway down you'll

18        start to see some movement, and then you'll be

19        able to see what appears to be a head and then

20        there it is there, and then he'll walk back

21        towards the rear of the vehicle.

22                  So he is now bent over at the rear

23        of the vehicle.  Again, the car was parked front

24        in or head in, so he is bent over towards the

```
 1        rear.
 2                     So now you can see below the
 3        bumper, the Suburban, it appears that a bag has
 4        been placed on the ground, or some item.
 5                Q.   What's happening now?
 6                A.   So he goes back up, disappears
 7        from view towards the front of the car, and then
 8        he, after a few moments, now he returns to the
 9        back of the car.  Again, appears bent over
10        shuffling with an item or something.
11                Q.   Can you pause it briefly?  Thank
12        you.  What we're going to see is him drop down
13        here in a moment?
14                A.   That's correct.
15                     MR. McCALL:  All right.  If you
16        can hit play.
17    BY MR. McCALL:
18                Q.   Right there, what was that?
19                A.   He bent over almost at a 90-degree
20        angle, still is kind of bent over again.  And
21        now David and Lenore start returning from the
22        store.  Tom is still at the trunk.
23                     MR. McCALL:  Can you pause it,
24        please?
```

```
 1                 THE WITNESS:  Here at the vehicle
 2       area.
 3  BY MR. McCALL:
 4            Q.   Okay.  Now, as David and Lenore
 5       begin to walk up to the vehicle, can you tell
 6       the jurors, just give them a preview?  What are
 7       they going to see?
 8            A.   So as you look where Thomas is,
 9       that's the rear of the Honda Civic, again, where
10       he has been bent over and, you know, several
11       times.  He will then move towards the front of
12       the car, just as David, who is in the gray
13       sweatshirt or shirt and jeans walks up right to
14       the rear of the vehicle.
15            Q.   And where will Lenore position
16       herself?
17            A.   Lenore will kind of stay in the
18       path that she's going and she'll stand a little
19       bit further back, but right at the rear of
20       the -- at the Honda Civic.
21            Q.   And what will she have a direct
22       line of sight to?
23            A.   The rear of the Honda Civic.
24                 MR. EDELIN:  Objection.
```

     1                    THE COURT:  Basis?

     2                    MR. EDELIN:  This person can't

     3        testify to what she can see.

     4                    THE COURT:  I will sustain that

     5        objection.

     6                    MR. McCALL:  Okay.  All right,

     7        your Honor.  We'll hit play.

     8                    THE WITNESS:  And so as he moves

     9        away --

    10                    MR. McCALL:  Can you stop it

    11        again, please?

    12        BY MR. McCALL:

    13                    Q.   I have my laser pointer over

    14        something right there?

    15                    A.   Yes.  As Tom moves away, then you

    16        can see that something, because now his legs

    17        aren't obscuring anything, there's something on

    18        the ground.  As he walks away, now you have a

    19        clear shot that there's something there.

    20                    MR. McCALL:  Okay.  Hit play,

    21        please.

    22        BY MR. McCALL:

    23                    Q.   Where is he going?

    24                    A.   David walks on the other side of

```
 1        the Suburban, same side as the Civic, and then
 2        walks away.
 3                    MR. McCALL:  Now stop it.
 4        BY MR. McCALL:
 5             Q.    Okay.  Now, at this moment, David
 6        Matusiewicz is doing what?
 7             A.    David is turned and is facing back
 8        towards the building.  Again, the Honda CRV is
 9        essentially to his left, on our side.  Lenore is
10        facing Tom at the rear of the vehicle, and Tom
11        appears to be bent over to retrieve whatever it
12        is on the ground.
13                    MR. McCALL:  Hit play, please.
14        BY MR. McCALL:
15             Q.    What is Thomas doing there?
16             A.    Now you can see that the item that
17        was on the ground is gone.  There's no shadow.
18        There's nothing there.
19                    David has gone to the driver's
20        side of the CRV.  Tom has gone to his driver's
21        side of the Civic.  Lenore is going around to
22        the passenger side of the CRV, and then Tom
23        comes over to interact or stand in the area of
24        the CRV, where David is.
```

```
 1                    THE COURT:  Members of the jury,
 2        you've heard the special agent's narration of
 3        what he saw.  Obviously, you're looking at the
 4        same video.  You'll be drawing your impressions
 5        and conclusions from the video as you see them.
 6        All right?
 7                    THE WITNESS:  And now Tom is
 8        returning to where his car is parked.
 9        BY MR. McCALL:
10               Q.   And then how does the video wrap
11        up, Special Agent Gordon?
12               A.   Essentially, they leave.
13                    MR. McCALL:  Okay.  We can pause
14        it.  Can we just go back?  If you could pull up
15        Government Exhibit 340-A.
16        BY MR. McCALL:
17               Q.   All right.  There's a series of
18        stills that were pulled off of this video; is
19        that correct?
20               A.   That's correct.
21               Q.   And this is a still of what?
22               A.   So the same view you were just
23        looking at outside the Walmart, you can see the
24        Suburban or appears to be Suburban on the right
```

Gordon - direct                    3763

1    there near where the CRV and the Civic had

2    parked.

3              Q.    340-B.

4              A.    Now, again, same, same view.

5    Thomas is at the rear of the vehicle, and then

6    you see David and Lenore walking towards him, or

7    his area.

8              Q.    340-C.

9              A.    And now they're standing right in

10   the area what we just saw in the video, at the

11   rear of the Civic.

12             Q.    And D?  And again?

13             A.    And a little -- now they're a

14   little closer to it.

15             Q.    Okay.  And, again, where is, what

16   is Lenore facing when she's in this position

17   here?

18             A.    Her front appears to be towards

19   the back of the Civic and her back appears to be

20   to the traffic lane.

21             Q.    E.  And that's just another

22   picture.  That's a duplicate, actually?

23             A.    Yes.

24             MR. McCALL:  Judge, may I have one

```
 1    moment, please?

 2                    THE COURT:  You may.

 3                    (Pause while counsel conferred.)

 4                    MR. McCALL:  Your Honor, that is

 5    essentially what we have for the agent.  I know

 6    we talked about the timing of everything.

 7                    THE COURT:  2:00 o'clock in the

 8    morning you realize you've got something you

 9    would like to revisit it when we reconvene.

10                    MR. McCALL:  Yes, sir.  But if

11    that does not happen, then we would be tendering

12    him in the morning.

13                    THE COURT:  I have been in that

14    exact same position as a lawyer, and so, yes.

15    Otherwise, we will proceed with

16    cross-examination in the morning.

17                    MR. McCALL:  Thank you, your

18    Honor.

19                    THE COURT:  Ladies and gentlemen,

20    you're done your work for the day.  Thank you

21    again.  And so we rise.  We wish you a good

22    night, and all of you know the rules.

23                    (The jury was excused for the

24    evening recess.)
```

```
 1                    THE COURT:  All right.  I'd like
 2         to see counsel briefly at sidebar.  I would also
 3         ask the public if they could make haste to
 4         vacate the courtroom because we're going to
 5         allow the defendants the opportunity to meet
 6         with their counsel here, so we would appreciate
 7         your cooperation in that regard.  So meanwhile,
 8         I will see counsel.
 9                    Special Agent, you may step down.
10         Thank you.
11                    THE WITNESS:  Thank you.
12                    (Witness excused.)
13                    (Sidebar conference held as
14         follows.)
15                    MR. IBRAHIM:  I got another
16         voicemail from New Jersey.
17                    THE COURT:  Just hold on one
18         second.
19                    MR. BOSTIC:  Sorry about that,
20         your Honor.
21                    THE COURT:  That's all right.
22                    First, I will report to counsel
23         that as I had promised, I have e-mailed Marissa
24         Davidson, who is counsel to the Bureau of
```

```
 1          Prisons at the FDC in Philadelphia and told her

 2          there's a close family member of advanced years

 3          who is ill, perhaps near death, and just ask if

 4          any accommodation could be made to speak with

 5          the patient, if the patient is able to speak,

 6          but if not, whatever family member is attending

 7          to the patient at the hospital.

 8                      I have not yet heard back, but I

 9          wanted you to know that that communication has

10          been sent.  All right?

11                      And I believe, Mr. Ibrahim, you

12          have some, a second voicemail perhaps?

13                      MR. IBRAHIM:  That I have not

14          checked yet.

15                      THE COURT:  Would you like to

16          check that quickly?

17                      MR. IBRAHIM:  I will, indeed.

18                      MR. EDELIN:  Your Honor while he's

19          doing that, we did reach out and speak to Ms.

20          Kula on the break.

21                      THE COURT:  All right.

22                      MR. EDELIN:  And apparently either

23          she was going to the hospital or her husband was

24          already at the hospital.  So there may be an
```

Gordon - direct                    3767

```
 1          opportunity to call from here to there on a

 2          Speakerphone, presuming the Marshals -- and

 3          we'll follow whatever Court protocols or

 4          security protocols.

 5                          THE COURT:  All right.

 6                          MR. EDELIN:  But that may save

 7          everybody.

 8                          THE COURT:  You have my permission

 9          to do that, and I will also ask Deputy Marshal

10          Fahey if we could have the Marshals' indulgence

11          in that regard.  It's obviously not an

12          attorney/client privilege matter.  It's a matter

13          of mercy.

14                          MR. EDELIN:  Again, I don't know

15          what their policies are about people making

16          phone calls.  There may be a security risk that

17          I will think about.

18                          THE COURT:  I think the word is

19          importune them to allow the call.

20                          MR. EDELIN:  Do you want me to

21          see --

22                          THE COURT:  Why don't you see if

23          Deputy Marshal Fahey is available.

24                          MR. IBRAHIM:  Your Honor, that was
```

Gordon - direct                    3768

1    Tom Kula indicating that the hospital, not

2    surprisingly, is unwilling to disclose any

3    information.  He provided me with the doctor's

4    name, a Dr. Shah, and he provided a telephone

5    number.

6                    THE COURT:  All right.

7                    MR. IBRAHIM:  I'm thinking maybe I

8    should just start calling.

9                    THE COURT:  Well, do we have a

10   cellphone number for the Kula relatives who are

11   going to the hospital?

12                   MR. IBRAHIM:  Tom Kula, who is

13   Lenore's brother, is at the hospital, and I do

14   have his number.

15                   THE COURT:  All right.  Why don't

16   I excuse you to call that number now and see if

17   he's standing by there while we continue this

18   sidebar conference.  All right?

19                   MR. IBRAHIM:  Certainly.

20                   THE COURT:  By all means, find a

21   quiet corner.  I've asked Deputy Marshal Fahey

22   to join us.  I have sent an e-mail to the

23   Detention Center in Philadelphia to the Office

24   of Counsel of Marissa Davidson, asking if a call

1    could be arranged.  Given the time of day and

2    her duties, which I know are numerous, we might

3    or might not get a response.  But counsel has

4    said that since it appears family may be at the

5    hospital, we might be able to call directly from

6    the courtroom.  And I just wanted to ask you

7    whether that would present -- I realize it would

8    be unorthodox, but if I were to make the request

9    of you as the Judge that a cellphone call be

10   made with the Marshals present to the relative

11   at the hospital, would that be acceptable from a

12   security standpoint, recognizing --

13                    DEPUTY MARSHAL FAHEY:  Just to

14   update the status?

15                    THE COURT:  Exactly right.  It

16   would be for purposes of updating the status and

17   giving some information or a sense of

18   perspective to the defendants.  And I recognize

19   that ordinarily, that would be a breach of

20   security regulations, and so I'm willing to take

21   responsibility for the request of you to do

22   that.

23                    DEPUTY MARSHAL FAHEY:  As long as

24   it's just for an update of status and there's

```
 1       not a lot of --

 2                   THE COURT:  Right.

 3                   DEPUTY MARSHAL FAHEY:  -- back and

 4       forth.

 5                   THE COURT:  Right.  I would say --

 6       I mean, there may be an exchange with the

 7       relatives, but I would rely upon counsel to make

 8       certain that it's not prolonged.

 9                   MR. BOSTIC:  Yes, your Honor.

10                   MR. EDELIN:  Yes, sir.

11                   THE COURT:  And certainly, we

12       would appreciate that.  And all counsel have

13       represented they will follow directions of the

14       Marshal.  Correct, counsel?

15                   MR. BOSTIC:  Absolutely.

16                   MR. EDELIN:  Absolutely.

17                   THE COURT:  All right.  So with

18       those reservations, Mr. Ibrahim is now trying to

19       see if he can establish communication with that

20       family member.

21                   DEPUTY MARSHAL FAHEY:  Okay.

22                   THE COURT:  And as always, I thank

23       you for your willingness to work with the Court.

24                   DEPUTY MARSHAL FAHEY:  I need to
```

1    run down and just pass that up the chain and I

2    will be right back.

3                    THE COURT:  Right.  And if you

4    would prefer that I remain in the courtroom

5    during that call, I will do so.

6                    DEPUTY MARSHAL FAHEY:  All right.

7                    THE COURT:  Unless the defense

8    objects.

9                    MR. EDELIN:  I don't object.

10                    MR. BOSTIC:  No objection, your

11    Honor.

12                    THE COURT:  I'm happy to remain

13    during the duration of the call, and that may

14    assist with any rulings, quote unquote, that

15    need to be made.

16                    DEPUTY MARSHAL FAHEY:  Thank you,

17    your Honor.  I will be back.

18                    THE COURT:  Thank you.

19                    MR. BOSTIC:  Your Honor, may I

20    speak with co-counsel?

21                    THE COURT:  Let's go off the

22    record.

23                    (Discussion held off the record.)

24                    DEPUTY MARSHAL FAHEY:  The Chief

1     and the Marshal are out of the office.  I'm just

2     going to go ahead with the plan, and --

3                     THE COURT:  And I will remain in

4     the courtroom therefore, because I believe that

5     for purposes of your authority and jurisdiction,

6     it's better to have Article III weighing in.

7                     DEPUTY MARSHAL FAHEY:  Thank you.

8                     MR. EDELIN:  Your Honor, I will

9     update Jeremy.

10                    THE COURT:  Yes.  Off the record.

11                    (Discussion held off the record.)

12                    (The court reporter was excused at

13    4:46 p.m.)

14                          -   -   -