IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | :<br>:<br>: | CRIMINAL ACTION |
| v. | :<br>: | No. 13-0083 |
| DAVID THOMAS MATUSIEWICZ,<br>LENORE MATUSIEWICZ, and<br>AMY GONZALEZ,<br>Defendants. | :<br>:<br>:<br>:<br>: | |

MCHUGH, J.                                                                                                       DECEMBER 21, 2015

**MEMORANDUM OPINION**

      This is a prosecution for conspiracy, interstate stalking, and cyberstalking arising out of the murder of Christine Belford at the hands of her father-in-law, Thomas Matusiewicz, on February 11, 2013, in the lobby of the New Castle County Courthouse. The case was tried to a jury over a period of six weeks in the summer of 2015, resulting in the conviction of all Defendants on all counts, and a special finding by the jury that the Defendants' conduct resulted in Ms. Belford's death. This supplemental opinion addresses one of the key evidentiary rulings at trial, in which I denied Defendants the right to present to the jury testimony about polygraph examinations pertinent to the charges.

      Polygraph examinations are virtually never admitted into evidence in American courts. There is, however, no *per se* exclusion within the Third Circuit. United States v. Lee, 315 F.3d 206, 214 (3d Cir. 2003) (citing United States v. Johnson, 816 F.2d 918, 923 (3d Cir. 1987)). Polygraphs became an issue in this case because the Government included among the overt acts specified in the Indictment the fact that two of the Defendants submitted to polygraph

1

examinations supposedly verifying their scandalous accusations about the victim, and distributed the results to third parties, as part of their conspiracy to harass.

By way of background, the deceased victim was at one time married to Defendant David Matusiewicz. The marriage ended badly, and the issue of custody over the couple's three children was highly contentious. Ultimately, custody was granted to Ms. Belford, and in retaliation, Matusiewicz, aided by his mother Lenore, kidnapped the children and took them to Central America where they lived in hiding for months. Defendants were finally located, identified, and extradited, and the children returned to their mother. Both David and Lenore Matusiewicz served time in federal prison. According to the Government, David and Lenore's arrest and imprisonment did nothing to deter them from wresting the children away from their mother. The Government alleged, and proved to the satisfaction of the jury, the existence of a conspiracy to stalk and harass Christine Belford, personally, and by use of the mails and the Internet, which included David's father Thomas, and his sister Amy Gonzalez. A clear objective of the campaign was to paint Christine Belford as an unfit mother, and central to that effort was the charge that she had physically and sexually abused her oldest daughter Laura.

As the allegations of sexual abuse unfolded, in 2011 Lenore Matusiewicz and Amy Gonzalez both underwent polygraph examinations in Texas, where the family was living at the time, performed by a local examiner, Gilbert Capuchina. Purportedly, the results of those exams proved that Lenore and Amy were being truthful in their accusations of sexual abuse. Because the results of those exams were sent to various individuals in an attempt to smear Ms. Belford, and even posted online, the Government cited dissemination of the polygraphs as conduct in furtherance of the conspiracy.

As used by the Government, the Texas polygraph exams did not raise difficult issues of admissibility, because the Government did not seek to admit the reports for the truth of their contents. To the contrary, the Government sought to prove the falsity of the results, and did so by calling the deceased victim's daughter to testify that no physical or sexual abuse ever occurred.

Counsel for Lenore Matusiewicz and Amy Gonzalez were appointed under the Criminal Justice Act (CJA). During pretrial proceedings, they submitted an *ex parte* request to retain polygraph experts, on the ground that the Government had put the validity of the polygraph examinations at issue by including the exams as overt acts in the Indictment. After a review of the pertinent case law, I granted the request as to both Defendants. The Court's scheduling order provided deadlines for the identification of expert witnesses. The Government identified an expert who was Unit Chief of the FBI Polygraph unit, and provided a summary of his potential testimony in accordance with Rule 16. Lenore Matusiewicz did not identify any polygraph expert before trial. Amy Gonzalez identified two potential experts in a timely fashion, but did not provide a summary of their testimony. When the Government pressed the issue, counsel, by way of correspondence dated March 27, 2015, advised the prosecution that he did not intend to use the experts "at this juncture."

During the Government's case-in-chief, it did not present its polygraph expert. Nor did it present any testimony from the Texas polygrapher who had performed the exams. It did, however, present testimony from Special Agent Joseph Gordon, in which he compared, side-by-side, the specific wording of the questions asked of the Defendants during their polygraph exam, with the details of the accusations of abuse. The import of his testimony was that the questions asked of Defendants during the exams did not precisely match their accusations of abuse against

Ms. Belford. On cross-examination, counsel for Defendant David Matusiewicz began to question the agent about the FBI's use of polygraphs internally for purposes of hiring, and I initially sustained an objection to that line of cross-examination. During the defense case, having heard further evidence, I revisited that ruling during additional cross examination of Special Agent Gordon by counsel for Lenore Matusiewicz. Trial Transcript at 3962–63. I was persuaded that Special Agent Gordon's testimony about apparent differences between the polygraph questions and Defendants' allegations of abuse invited the jury to draw certain inferences about the results of the exams. I therefore granted defense counsel leave to lay a foundation with the witness, and then question the agent about the FBI's internal use of polygraph exams, with the caution that it might open the door to the Government calling its polygraph expert in rebuttal. Shortly after I granted such leave, trial was briefly recessed, and when testimony resumed, despite my ruling allowing cross-examination, neither counsel for Lenore Matusiewicz, nor other defense counsel, inquired into the FBI's own use of polygraphs with its employees. Trial Transcript at 5006.

    The way in which the Government introduced the polygraphs, and the decision by the defense not to expand the scope of cross-examination, was emblematic of a larger reality: both the Government and the defense were approaching the polygraphs in a delicate and strategic way. In simple terms, all of the highly experienced counsel participating in the trial recognized that the polygraphs were the proverbial "double-edged sword." Had the Government called its polygraph expert during its case, the defense would have had the opportunity to suggest that the Texas polygraphs proved a lack of criminal intent and were exculpatory. Had the defense called the Texas examiner, the Government would have had the opportunity both to explore what appeared to be his relative lack of sophistication as compared to an FBI examiner, and would

4

have been well-positioned to call its own superbly qualified expert in rebuttal to cast doubt on the Texas results. See, e.g., Trial Transcript at 5363–65; 5524–27. As a result of these decisions by counsel, the case was in a unique posture: the Government itself had introduced facially exculpatory polygraphs, to which the defense, (not surprisingly) did not object, but neither side offered expert testimony as to the meaning of the results.

A critical issue in the case was intent. As set forth in my earlier opinion denying a motion to dismiss the Indictment on First Amendment grounds, a grandmother and an aunt certainly have a legitimate and compelling interest in protection of a vulnerable family member. Criminal responsibility turned on the purpose behind the Defendants' campaign of accusations. As trial progressed, counsel for Lenore Matusiewicz and Amy Gonzalez again approached the Court *ex parte* under the Criminal Justice Act, and requested leave for their polygraph experts to visit the Defendants for the purpose of further evaluation of the significance of the polygraphs. Because the polygraphs were in evidence, and had been the subject of specific testimony during the Government's case, and because of the seriousness of the charges, with a potential of life imprisonment, the Court granted the defense's request.[1] I did not deem it appropriate to inquire into the specifics of counsel's collaboration with their polygraph experts, or the purpose for the experts' visit with the Defendants, and was therefore unaware that the purpose of the visit was to administer a second set of exams.

The underlying polygraph examinations performed in Texas asked Lenore and Amy three specific questions, each of which began with the phrase "Are you lying that ..." followed by a specific allegation of abuse against the deceased victim Christine Belford. The forensic exams conducted during trial basically reformulated these questions, focusing on the specific dates of

---

[1] At the point the request was granted, the Court was not yet aware that counsel for Defendant Gonzalez had advised the Government that he did not expect to present expert testimony on the polygraph, nor was the Court aware that counsel for Defendant Lenore Matusiewicz had not identified any polygraph expert before trial.

5

the underlying polygraph exams, asking the question "were you being truthful ..." when answering the questions posed during the exams in Texas. According to the defense examiners, both Lenore Matusiewicz and Amy Gonzalez "passed" the exam, and their counsel asked permission to call them as experts whose testimony would be relevant to the issue of criminal intent.

When the second set of examinations was disclosed to the Government, it had already rested its case. As would be expected, the Government strenuously objected on the basis of late identification in violation of the Court's Scheduling Order. A lengthy colloquy ensued about the lack of disclosure before trial, and (as described above) the defense conceded that the Government was right to assume that no expert testimony on polygraphs from retained experts[2] would be presented as part of any Defendant's case-in-chief. Trial Transcript at 7803–08. The Government made a compelling argument that the ability to call its own FBI polygraph expert in rebuttal would hardly suffice to ameliorate any prejudice, because it made strategic choices during trial and had presented its case based on the assumption that no defense expert would testify. On procedural grounds alone, there were substantial grounds for excluding the testimony.[3] In that regard, although Defendants did not request a Daubert hearing to establish a scientific basis for the admission of the proposed testimony, one would certainly have been required, interrupting an already lengthy trial.

Substantively, as expressed on the record during trial, the central basis for my ruling was that even under the unique circumstances of this case, the polygraphs were for all practical purposes still being offered as direct evidence of Defendants' guilt or innocence, for which there

---

[2] The Texas polygrapher, Gilbert Capuchina, was listed as a witness by all three Defendants.

[3] I express no criticism of defense counsel for the timing of their supplemental request under the CJA. A decision by a criminal defense lawyer to subject his or her client to a polygraph exam is one fraught with peril and not made lightly, and trials are organic things to which counsel must react as the evidence develops.

remains scant support under American law. In United States v. Scheffer, 523 U.S 303 (1998), in upholding a rule barring use of polygraphs in military courts, the Supreme Court comprehensively reviewed decisions from state and federal courts, and concluded that "there is simply no consensus that polygraph evidence is reliable." Id. at 309. Even after acknowledging that some circuits have held the door open for possible admission of polygraphs, the Court went on to note that "[w]hatever their approach, state and federal courts continue to express doubt about whether such evidence is reliable." Id. at 312. The proffer here was even more problematic, as Defendants sought to introduce polygraphs *about* polygraphs.

In Scheffer, the Supreme Court also refused to attach any legal significance to internal use of polygraphs by governmental agencies, and specifically rejected an argument that such use must necessarily render the tests reliable. Id. In the Court's words: "Such limited, out of court uses of polygraph techniques obviously differ in character from, and carry less severe consequences than, the use of polygraphs as evidence in a criminal trial. They do not establish the relative reliability of polygraphs as trial evidence." 523 U.S. at 312, n. 8.[4]

The defense did not present a nuanced argument in support of admitting the polygraphs, but argued generally that it was within the Court's discretion to allow the evidence. Focusing on the additional cases from within the Third Circuit cited by the Government, and those identified by the Court for the parties' consideration, such precedent did not favor admission of the polygraphs. In United States v. Johnson, 816 F.2d 918, 923 (3d Cir. 1987), a criminal defendant sought to disavow a confession at trial, suggesting that it was coerced. Part of the interrogation where the defendant admitted committing the crime involved the use of a polygraph. The trial judge cautioned counsel that such a challenge might open the door to the introduction of

---

[4] I placed no weight on the Government's argument that the use of polygraphs usurps the function of the jury, as that portion of the Court's opinion, Part IIB, did not command a majority of the Justices.

7

evidence about the polygraph, to rebut the allegation of coercion, and counsel abandoned the argument. On appeal, the defendant contended without success that this admonition from the bench inhibited his Sixth Amendment right to confrontation. The court never reached the issue of the ultimate admissibility of the polygraph, as that was unnecessary. Regardless, evidence that a polygraph was used as part of the process in securing a confession is a far different matter from introduction of test results for the purpose of establishing guilt or innocence.

In Lee v. United States, 315 F.3d 206 (3d Cir. 2003), the court considered whether a defendant who had pleaded guilty to sexual offenses involving minors could lawfully be subjected to random polygraph exams as a condition of supervised release. In affirming the sentence, the Third Circuit specifically declined to reach the issue of whether the results of such an exam would be admissible at a revocation hearing or a trial, and did not address the scientific validity or evidentiary reliability of polygraphs. Id. at 214.

In United States v. Hamilton, 579 F.Supp.2d 637. 641–42 (D.N.J. 2008), a prosecution for making false statements to the FBI, the court held that an unrepresented defendant's *offer* to take a polygraph when first interviewed about the accusations was relevant to his state of mind, and whether he had criminal intent to deceive law enforcement, but did not reach the issue of whether the results of a polygraph would represent competent evidence.

In opposing admissibility at trial, the Government relied most heavily on United States v. Kubini, No. 11-14, 2015 WL 418220 (W.D. Pa. Feb. 2, 2015). Defendant there took a polygraph of his own volition while under investigation for fraud, and sought to admit the results into evidence. No Daubert hearing was conducted, as the court concluded that the polygraph would be inadmissible regardless. In excluding the polygraphs, Judge Fischer cited a multitude of factors, one of which the Government stressed in this case, that the polygraphs were for all

practical purposes hearsay, because they represented an attempt by the defendants to introduce their out-of-court statements for the truth. Id. at 8. Many of the other factors mentioned in Kubini carried weight here: the exams were conducted years after the fact when the defendants were acutely aware of the significance of their answers; the Government was not given the opportunity to participate; a mini-trial would ensue concerning the art of polygraphy; and there was a meaningful risk of jury confusion by introducing new polygraphs with different questions. Id. at 13–17.

Kubini was also instructive in that it was a recent decision that comported with my own conclusion from reviewing the case law, that notwithstanding a retreat from *per se* rules of exclusion and substantial judicial discussion of potential admissibility, courts almost invariably still exclude polygraphs. See generally John E. Theuman, Annotation, Admissibility in Federal Criminal Case of Results of Polygraph (Lie Detector) Test-post-Daubert Cases, 140 A.L.R. Fed 525 (2014). Viewed broadly, Daubert, which was handed down in 1993, might have changed the way in which admissibility is considered, but using a different standard for admissibility has not meaningfully changed the outcome. For example, United States v. Posado was one of the first cases to require application of Daubert to polygraphs, but on remand, the trial court still excluded the evidence as unreliable. 57 F.3d 428 (5th Cir. 1995); see United States v. Ramirez, No. 93-252, 1995 WL 918083, at *4–5 (S.D. Tex. Nov. 17, 1995). In another early post-Daubert case, United States v. Cordoba, 104 F.3d 225 (9th Cir. 1997), the evidence was also excluded following remand. See United States v. Cordoba, 991 F. Supp. 1199, 1208 (C.D. Cal. 1998) aff'd, 194 F.3d 1053 (9th Cir. 1999). The defense did not cite any specific cases in which the results of polygraphs have actually been admitted in a criminal trial. My research revealed only three: United States v. Crumby, 895 F. Supp. 1354 (D. Ariz. 1995); United States v. Galbreth,

9

908 F. Supp. 877 (D.N.M. 1995); and United States v. Padilla, 908 F. Supp. 923 (S.D. Fla. 1995). I find it highly significant that all of these cases were decided in 1995, before the Supreme Court reiterated its doubts about the reliability of polygraphs in Scheffer, and I found no cases admitting polygraphs since.[5] In summary terms, the judicial flirtation with polygraphs sparked by Daubert has certainly not developed into a sustained commitment, and ruminations that they *might* be admissible have not translated into rulings that they *are*.

Nor did I find that the consensus of the scientific community visibly changed since Scheffer. The National Academy of Sciences appointed a Committee to Review the Scientific Evidence of the Polygraph. Its report, *The Polygraph and Lie Detection*, (Washington, DC: The National Academies Press, 2003),[6] comprehensively reviewed the field of polygraphy, and the conclusions reached only reinforced the doubts expressed in Scheffer, including the following:

**Polygraph Accuracy** *Almost a century of research in scientific psychology and physiology provides little basis for the expectation that a polygraph test could have extremely high accuracy.*

**Theoretical Basis** *The theoretical rationale for the polygraph is quite weak, especially in terms of differential fear, arousal, or other emotional states that are triggered in response to relevant or comparison questions.*

---

[5] In a non-precedential decision, Nawrocki v. Twp. of Coolbaugh, a panel of the Court of Appeals held that the district court did not abuse its discretion in admitting the results of a polygraph in a civil case for malicious prosecution, where the issue was the existence of probable cause to make an arrest. 34 Fed. App'x. 832 (3d Cir. 2002). The Court emphasized that the polygraphs were not introduced to prove the truth of the contents of the exam. Id. at 838

[6] Accessible to the Court in its entirety online: http://www.nap.edu/read/10420/chapter/1. The American Psychological Association also published a statement as of 2004, also accessible electronically, http://www.apa.org/research/action/polygraph.aspx, disavowing polygraphs, but it is a brief and conclusory document lacking the weight of the National Academy's in-depth review.

***Research Progress** Research on the polygraph has not progressed over time in the manner of a typical scientific field. It has not accumulated knowledge or strengthened its scientific underpinnings in any significant manner.*

***Realism of Evidence** The research on polygraph accuracy fails in important ways to reflect critical aspects of field polygraph testing, even for specific-incident investigation.*[7]

As noted above, Defendants did not request a <u>Daubert</u> hearing or represent that they were prepared to establish the scientific reliability of polygraphs. Their burden would have been substantial. The general problem of reliability was made more acute because the defense sought to introduce polygraphs intended to prove the reliability and accuracy of *other* polygraphs, effectively doubling down on a procedure viewed already with suspicion by the courts.

It also bears emphasis that with the Government having introduced the polygraphs into evidence, and the defense having identified the original examiner as a witness for trial, Defendants were free to call that examiner about his examinations.[8] In realistic terms, the decision to perform a second exam was a strategic one, seeking to present expert polygraphers with stronger credentials and greater expertise than Mr. Capuchina. Allowing such testimony would create an anomalous result: Defendants would be permitted call experts seeking to validate the findings of another expert they lacked the confidence to present as their own. The right to receive a fair trial does not necessarily encompass the right to be given every strategic advantage.

---

[7] Stephen E. Fienberg et al., National Research Council, The Polygraph and Lie Detection 212–14 (2003).

[8] The possibility that he might be called remained open until the very end of the trial. <u>See</u> Trial Transcript at 5362–66.

For the reasons set forth above, Defendants' request to present testimony about the polygraphs taken during trial was denied.

                                                                              Gerald Austin McHugh
                                                                              United States District Court Judge