# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | No. 13-83-1 |
| | : | |
| | : | CIVIL ACTION |
| v. | : | No. 20-799 |
| | : | |
| DAVID MATUSIEWICZ | : | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | No. 13-83-3 |
| | : | |
| | : | CIVIL ACTION |
| v. | : | No. 20-800 |
| | : | |
| AMY GONZALEZ | : | |

## MEMORANDUM

**McHUGH, J.**                                                                                           June 16, 2022

Petitioners David Matusiewicz and Amy Gonzalez stand convicted of cyberstalking resulting in death. Their direct appeals were denied in a lengthy precedential opinion, *United States v. Gonzalez,* 905 F.3d 165 (3d. Cir. 2018), and they return now seeking collateral relief under 28 U.S.C. § 2255. The claims are couched as ones for ineffective assistance of counsel. Because there is substantial overlap in the arguments raised, for the sake of efficiency I will address both petitions together. Having reviewed the allegations of error, none of the claims have merit. Both petitions will therefore be denied and there is no basis on which to issue a certificate of appealability.

1

## I. Standard for ineffective assistance of counsel

The benchmark for ineffective assistance of counsel claims is *Strickland v. Washington,* 466 U.S. 668 (1984). A defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. A defendant must also establish actual prejudice, which requires a showing that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* The standard is an objective one, and as to prejudice requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Counsel is not required to raise claims that lack merit, and an attorney's strategic choices at trial are reviewed with a strong presumption that counsel exercised proper judgment. *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d. Cir. 1996). The standard does not allow for second-guessing in hindsight, because performance must be evaluated in light of "the facts of the particular case, viewed as of the time of counsel's conduct." *Id.*

## II. Merits of the Claims

A. Defense counsel were not ineffective for failing to request a modified charge on *Pinkerton* liability for conspiracy.

At trial, the jury was instructed as to principles established by the Supreme Court in *Pinkerton v. United States,* 328 U.S. 640 (1946)). *See United States v. Gonzalez,* 905 F.3d 165, 187-90 (3d Cir. 2018) (quoting, discussing, and affirming "death results" instruction). In *Pinkerton,* "the Supreme Court held that the criminal act of one conspirator in furtherance of the conspiracy is attributable to the

2

other conspirators for the purpose of holding them responsible for the substantive offense." *United States v. Lopez*, 271 F.3d 472, 480 (3d Cir. 2001) (internal citations removed).

Petitioners claim that their counsel should have objected to the use of *Pinkerton* in this case and argued for the trial court to eschew Third Circuit precedent and instead follow the reasoning of the Sixth Circuit in *United States v. Swiney*, 203 F.3d 397 (6th Cir. 2000) and Seventh Circuit in *United States v. Walker*, 721 F.3d 828 (7th Cir. 2013) (vacated on other grounds by *Lawler v. U.S.*, 572 U.S. 1111 (2013)). (D.I. 443 at 12; D.I. 444 at 13). Those cases involved multi-defendant drug-dealing conspiracies that resulted in an overdose death, and the respective circuit courts held that the *Pinkerton* doctrine by itself was insufficient to trigger the applicable "death results" sentencing enhancements. In place of *Pinkerton, Swiney* and *Walker* concluded that courts should utilize the standard for Relevant Conduct set forth at Section 1B1.3 of the Sentencing Guidelines: "a defendant is accountable for the conduct of other conspirators only if that conduct was (1) reasonably foreseeable to him and (2) in furtherance of the jointly undertaken criminal activity." *Swiney*, 203 F.3d at 402; *Walker*, 721 F.3d at 834-35. Although similar to the *Pinkerton* doctrine, arguably this standard "may be narrower" because it focuses on each specific defendant, what they jointly agreed to do, and what was foreseeable from their perspective. *Walker*, 721 F.3d at 835 (discussing U.S.S.G. § 1B1.3(a)(1)(B) and accompanying commentary); *Swiney*, 203 F.3d at 402 (same).

Petitioners' argument fails for several reasons. First, the instruction given in this case followed binding precedent from the Third Circuit. *Gonzalez,* 905 F.3d at 190. With rare exceptions, counsel cannot be deemed ineffective for failing to "make an objection that would be overruled under prevailing law." *Sistrunk, supra,* 96 F, 3rd at 671. *See also United States v. Peterson*, 622 F.3d 196, 208 (3d. Cir. 2010). Significantly, since the trial of this case, neither the Third Circuit nor any District Court within the circuit has adopted either *Swiney* or *Walker.*

Second, and more importantly, the instruction given here was carefully tailored to the facts of the case. The jury was instructed that the Government "must prove that Ms. Belford's death was reasonably foreseeable to the defendant, as a member of the conspiracy, and within the scope of the agreement as the defendant understood it." (Tr. July 8, 2015, at 5935-37 (*Pinkerton* instructions) (emphasis added); *Gonzalez*, 905 F.3d at 187-88 (quoting same)). Separately, with respect to the Government's burden in proving causation, the jury was instructed it must consider:

> was Christine Belford's death the result of the particular offense in a real and meaningful way? This includes your consideration of whether her death was a reasonably foreseeable result of the particular offense and whether her death could be expected to follow as a natural consequence of the particular offense.

*United States v. Matusiewicz,* 165 F. Supp. 3d 166, 170 (D. Del. 2015), *aff'd sub nom. United States v. Gonzalez,* 905 F.3d 165 (3d Cir. 2018). In practical terms, there is little if any difference between the instructions given here and the standard endorsed in *Swiney*, 203 F.3d at 402 and *Walker*, 721 F.3d at 835. As set forth in my supplemental opinion explaining the rationale for this instruction on causation, the

purpose was to provide a "safeguard" for the defendant by requiring the jury to find a "genuine nexus" between the defendant's conduct and the resulting death. *Matusiewicz*, 165 F. Supp. 3d at 170.

Finally, the Government is correct that the evidence at trial overwhelmingly demonstrated both defendants' guilt. *Gonzalez*, 905 F.3d at 180-182. In the case of David Matusiewicz, I found a specific intent to kill at the time of sentencing. In the case of Amy Gonzalez, I found that she was aware of and facilitated the plot to murder Ms. Belford. Any further nuance in the charge to the jury would not have affected its verdict, particularly in view of the rigorous causation standard it was required to apply.

> B. Defense counsel were not ineffective for purportedly failing to engage in plea negotiations or convey plea offers from the Government.

Both petitioners allege that plea deals were offered that they would have accepted but for ineffective representation by counsel. Ms. Gonzalez alleges that she was deprived of the opportunity to enter into a *nolo contendere* plea for a five-year sentence, and Mr. Matusiewicz alleges that he was deprived of the opportunity to enter into a *nolo contendere* plea for a fifteen-year sentence. The record does not support these allegations.

Defense counsel "has a duty to communicate formal offers from the prosecution to accept a plea on terms and conditions it may be favorable to the accused." *Missouri v. Frye*, 566 U.S. 134, 145 (2012). And counsel should advise their clients to accept those offers when such advice is appropriate. *Lafler v. Cooper*, 566 U.S. 156, 163-64 (2012). Necessarily, however, where no formal plea offer has been made, a claim of

5

ineffective assistance of counsel in the plea-bargaining process "does not arise." *United States v. Penn*, Crim. No. 12-240, 2020 WL 6701022, at *7 (W.D. Pa. Nov. 13, 2020) (quoting *Lafler*, 566 U.S. at 164); *accord United States v. Nguyen*, Crim. No. 04-767-15, 2013 WL 12367023, at *5 (E.D. Pa. Nov. 5, 2013), *aff'd*, 619 Fed. App'x. 136, 141 (3d Cir. July 20, 2015) ("[T]he petitioner must begin by proving that a plea agreement was formally offered by the Government.").

Both petitioners were represented by highly experienced, capable, and respected counsel. They have supplied the affidavits attesting that aside from preliminary discussions, no formal plea offer was ever extended.

According to counsel for Ms. Gonzalez, Jeremy Ibrahim, "[t]he assigned AUSA indicated an openness to discuss a plea" to a conspiracy charge, but because his client was "adamant that no law was broken and that she would not agree to a statement of facts that implicated her family/codefendants," "no plea offer was sought from or offered by the government." (ECF 456 at 2-3). According to counsel for Mr. Matusiewicz, then Chief Federal Defender Edson Bostic represented that he had "preliminary discussion" with the government concerning a plea, but there was "no specific" or "formal" offer on the table, and the petitioner ultimately told Mr. Bostic "not to pursue" such discussions. (ECF 459 at 1-2). A *nolo contendere* plea was never offered. (*Id.*) On the Government's side of the case, an affidavit was supplied by Shannon T. Hanson, who was the Criminal Chief of the United States Attorney's Office during the relevant period. He attests that all proposed plea agreements must be documented in the file and approved by a supervisor, and no plea agreements were

6

proposed or approved in this case. (ECF 460-1 at 1) (Hanson Aff.). This is not surprising because the United States Department of Justice directs federal prosecutors to "oppose *nolo contendere* pleas except in the most unusual circumstances."[1] (ECF 460-1 at 1) (Hanson Aff.). In fact, Mr. Hanson has averred that "[i]n my nine years serving as Criminal Chief or First Assistant in the District of Delaware, I am not aware of a single case where an Assistant United States Attorney agreed to a *nolo contendere* plea." *Id.*

The Government has cited a litany of cases in which similar allegations of ineffective assistance of counsel were rejected by district courts. *Penn*, 2020 WL 6701022, at *9-10 (concluding that there was no formal plea offer where a prosecutor neither obtained supervisory approval for a plea nor reduced the terms of the alleged plea to writing); *Sanchez v. Madden,* No. 19-01310, 2020 WL 6832074, at *6 (C.D. Cal. Oct. 6, 2020) (finding that there was not a "formal plea offer" in part because the prosecutor had not sought approval from a supervisor) (report and recommendation); *Schnewer v. United States*, Civ. No. 13-3769 (RBK), 2016 WL 867461, at *17 (D.N.J. Mar. 7, 2016) (concluding that a "prosecutor's lack of authority to bind the government means that the plea offers lack the requisite formality to constitute a formal plea offer"); *McIntosh v. United States*, No. 13 C 4192, 2013 WL 5567578, at *4 n.4 (N.D. Ill. Oct. 9, 2013) (concluding that there was "no evidence that

---

[1] In implementation of this policy, the Department of Justice requires that a *nolo contendere* plea must be approved by a "high-ranking member of the Department, such as the Attorney General or Deputy Attorney General of the United States." (*Id.* at 1-2).

a formal plea offer was made" because the plea discussions were not reduced to writing and plea offers required the approval of a supervisor); *United States v. Waters*, Civ. No. 13-115, 2013 WL 3949092, at *10 (E.D. Pa. July 31, 2013) (Padova, J.) (concluding that there was no "formal plea offer" where the alleged offer was not reduced to writing nor approved by a supervisor as required).

In summary, there is no basis on which to conclude that a plea agreement was ever offered by the Government or would have been offered based on the facts of this case, and there is certainly no basis on which to conclude that defense counsel failed to communicate a plea offer or failed to reasonably explore the possibility of entering into a plea.

> C. Defense counsel were not ineffective for failing to present medical testimony that Thomas Matusiewicz, Defendants' father and co-conspirator, was affected by a brain tumor on the day of the murders.

On the day that Christine Belford and her friend were murdered, both David Matusiewicz and his father Thomas were present in the Wilmington Courthouse when the shootings occurred. But pursuant to the conspiracy found by the jury, after entering the building David proceeded to a courtroom while his father waited in ambush in the lobby. Petitioners contend that the murders were not foreseeable, and that the conduct of their father constitutes an intervening superseding cause because he was suffering from a brain tumor that affected his judgment. They argue that counsel were ineffective in failing to present medical testimony in support of such a theory based upon findings from their father's autopsy.

8

As the Government accurately points out, the medical witness petitioners identify would not have supported the claim that they advance. Specifically, Dr. Barry Gordon wrote a report that was reviewed by defense counsel. It stated in part as follows:

> b. The meningioma that was known to be present on the inside of Mr. Matusiewicz's skull since at least 1990 and confirmed that autopsy would not have been expected to have appreciably affected Mr. Matusiewicz's ability to control his behavior on February 11, 2013, nor is there evidence that it did appreciably affect his ability to control his behavior prior to that time (based upon what is cited in the available records, and the behaviors reported by Mr. Bostic in his conversation with me on April 7, 2015). Although the meningioma did produce some mass effect on at least the surface of Mr. Matusiewicz's left hemisphere (at least judging from the CAT scan report cited in the 1990 note by Dr. Barolat), it had hardly changed in size in the over 20 year interval between the time of the CAT scan and time of the autopsy. Moreover, there is no reliable evidence that it affected deeper areas of Mr. Matusiewicz's brain, those that might have caused alterations in his ability to control his behavior.
>
> d. There is no reliable evidence available that Mr. Matusiewicz had any other 'extrinsic' organic neurologic condition affecting the control of his behavior, either prior to February 11, 2013, or on February 11, 2013.
>
> e. It is highly unlikely that any further investigation at this point in time, and at this state of medical science, of Mr. Matusiewicz's past behaviors, his past medical history, or a microscopic or other analysis of his brain tissue, could reveal any reliable evidence for there having been an 'extrinsic' pathologic alteration of Mr. Matusiewicz's control of his behavior, as these terms are currently generally understood.

(ECF 459-2 at 4).

I can discern no way in which testimony from Dr. Gordon would have been of assistance to the defense.

The Government also cogently argues that even if there were some effect on Thomas Matusiewicz's behavior attributable to the tumor, which had been present since 1990, the evidence in the record is overwhelming that petitioners knowingly

9

participated in a conspiracy with him both aimed at, and virtually certain to cause, the death of Christine Belford. There is no reasonable probability that testimony from Dr. Gordon would have affected the jury's verdict.

> D. Defense counsel was not ineffective in the way that they approached video evidence allegedly showing that Christine Belford abused her children.

As part of the campaign of harassment found by the jury, David Matusiewicz hired a private investigator in 2006, Michael O'Rourke, who then engaged another individual to conduct video surveillance of Christine Belford. (Tr. July 6, 2015, at 5409-10, O'Rourke testimony). Those steps were taken in connection with an earlier custody battle over the children. Petitioners contend that their counsel was ineffective for failing to introduce these videos to establish that their accusations of child abuse against Ms. Belford were true.

As a factual matter, the videos were in fact shown to the jury as part of the prosecution's case. And it is not clear in what respect petitioners believe the videos established child abuse. The private investigator testified that the videos had been provided to Family Court in 2006. (Tr. July 6, 2015, at 5420-21). Ms. Belford prevailed in those proceedings. A coworker of defendant Gonzalez who assisted her in uploading the videos to the internet in 2011, Michael Solon, testified at trial that he did not see any "physical abuse or harm" in the recordings, (Tr. June 19, 2015, at 2813). Independently, I observed nothing in the videos suggestive of physical abuse, and there was nothing about the activity that represented anything other than normal conduct on the part of children and their mother. In summary, I see no basis

10

for an argument that the counsel failed to make appropriate use of evidence that would have supported the theory that Ms. Belford was an abuser.

> E. Defense counsel were not ineffective in failing to present evidence that victim Christine Belford "admitted" to child abuse during an appointment with a physician.

Petitioners further argue that their attorneys were ineffective because they did not produce evidence that Christine Belford admitted to abusing her daughter during a visit to a physician.

As a threshold matter, it bears mention that defense counsel did pursue such a line of questioning during the cross-examination of forensic psychologist Dr. Samuel Romirowsky who David Matusiewicz hired to perform a child custody evaluation in 2006. (Tr. June 17, 2015, at 2098). Defense counsel focused on a note in the witness's report pertaining to an interview with Ms. Belford:

> She spoke of an incident occurring in the office of her 2¾ year old daughter's [sic] Lee's pediatrician that led to a risk that she would be charged with child abuse.

(*Id.* at 2149). But, as Dr. Romirowsky explained, and as the note itself reflects, Ms. Belford did not *admit* to child abuse during that earlier pediatrician visit, but rather expressed that she had "concerns" about a report of possible child abuse emanating from that visit, (Tr. June 17, 2015, at 2145-46). Dr. Romirowsky further testified that Ms. Belford reported that the pediatrician, Dr. Curt Blacklock, (erroneously referred to as "Dr. Blalock"), ultimately withdrew "his criticism over [the] treatment of her daughter and that it was a nonissue." (*Id.* at 2172).

11

More importantly, Dr. Blacklock himself testified at trial and confirmed that Ms. Belford did not abuse Leigh or make an admission to that effect. He explained that in 2005, he treated a "two-year-old child" named Leigh Matusiewicz when her mother brought her to an urgent care facility. (Tr. June 25, 2015, at 3791-92). He remembered nothing "out of the ordinary" about the visit, and, whatever the source of Ms. Belford's concern, if in fact he had witnessed any evidence of abuse, he would have so documented in his records.[2] (*Id.* at 3793-94). Those records contained no such entry. (*Id.*).

In short, defense counsel attempted to take advantage of a reference to possible abuse in medical records but was stymied when the two medical professionals involved testified that there was, in reality, no evidence of abuse. This does not reflect ineffective assistance of counsel, but rather only proof of the maxim that "facts are stubborn things."

    F. Defense counsel were not ineffective for failing to suggest that there was evidence of abuse because Christine Belford shaved her daughter's pubic hair.

Next, petitioners raise an argument that is both strange and troubling. They contend that counsel should have cross-examined either their niece Laura or Dr. Jason Hann-Deschane, the physician who cared for her and her sisters from 2004 through 2013, about whether her mother started shaving her pubic hair at age nine.

---

[2] Dr. Blacklock did, however, recall receiving a letter from "the patient's father's sister from Texas" – Amy Gonzalez – "alleging events that seemed to me to be totally out of context to what had happened. It sounded fairly bizarre." (*Id.* at 3795).

12

As a preliminary matter, I can discern no evidence in the record that in fact such shaving occurred. Furthermore, as the Government correctly points out, from the time that Laura Matusiewicz, then age six, was rescued from having been kidnapped in 2009, none of the defendants in this case would have had contact with her. Consequently, they would not be in any position to know such intimate physical details about her body.

From the standpoint of trial strategy, I cannot imagine any competent defense counsel who would ask such a question of a frightened and emotionally distraught teenager, testifying before a jury in a case where her mother had been brutally murdered by her grandfather with the assistance of her grandmother, aunt, and father. That is particularly so when that same teenage girl had already given testimony under direct examination that her mother had never sexually abused her in any way. (Tr. June 22, 2015, at 2926-29). Even assuming the relevance of such a grooming habit to claims of sexual abuse, Dr. Hann-Deschane testified unequivocally that there was no reason to suspect any form of abuse against any of the decedent's daughters. (Tr. June 22, 2015, at 3069, 3084). And as the Court of Appeals recognized, there was "overwhelming, uncontradicted evidence that the accusations that Belford sexually molested and abused her children were false." *Gonzalez*, 905 F.3d at 19.

Petitioners' latest argument appears to be a variation on a theme that the jury rejected at trial. Co-conspirator Lenore Matusiewicz had publicly claimed that she inspected Laura's hymen prior to the kidnapping and found that it was "torn." This

13

was specifically rebutted by Dr. Hann-Deschaine, who testified that upon his physical examination of Laura in April 2009 – immediately after the children were rescued from Defendants in Nicaragua – her hymen was "normal," with no evidence of trauma. (Tr. June 22, 2015, at 3079-84).

Even assuming some factual basis for Petitioner's argument, such a line of questioning at trial would not only have failed to bear fruit but would almost certainly have offended the jury. In no respect can counsel's purported failure to pursue this point be deemed ineffective assistance.

> G. Defense counsel were not ineffective for failing to object to the trial judge's request that the jury clarify its note seeking further instruction.

Finally, Petitioners claim that their counsel were ineffective for failing to object to what they characterize as an *ex parte* communication with the jury by the Court "resulting in confusion" about the "'causation' instruction ('but-for' question from jury)." (D.I. 444 at 20; D.I. 443 at 19).

As a threshold matter, it is not clear what meaning Petitioners attach to the term "*ex parte.*" The Government assumes in its response that they challenge the method by which the Court communicated with the jury in response to a question. Another possibility, one I believe to be more likely, is that Petitioners challenge the content of the supplemental instruction given to the jury, which they deem "*ex parte*" because I rejected the position advanced by defense counsel in answering the jury's question. There is no basis for relief either as to procedure or as to substance.

On the second day of deliberations, the jury sent a note asking the following: "We would like . . . (further explanation, more) determining the jury interrogatory

14

questions." (Tr. July 9, 2015, at 6030-31). The Court reviewed the note with counsel, but there was not a consensus as to whether this question referred to the jury instructions or the verdict form. (*Id.* at 6032). Accordingly, after conferring with counsel, and without objection, I sent a written note back to the jury that asked the following:

> Members of the jury: When you were released to deliberate, you were provided with a fifty-eight-page document entitled "jury instructions" and three separate documents entitled "jury verdict form" and the name of each defendant. Would you please reply in writing as to whether your question pertains to the "jury instructions" or the "jury verdict forms" for each defendant.

(Id. at 6035).

This communication was not substantive, but merely sought clarity as to the jury's inquiry, and counsel was fully apprised of the content of the note sent back. Such a communication, crafted in open court in consultation with counsel, and read into the record, cannot be considered *ex parte* in any meaningful sense.

The jury responded in writing, making it clear they had questions about "the instructions as they pertain to the verdict form." (*Id.* at 6037). Then, *after* hearing argument from counsel, the Court provided the jury with a series of supplementary and clarifying instructions in open court and with all parties present. (Tr. July 10, 2015, at 6054-65).

The crucial determination in addressing questions from the jury is whether the defendant and counsel have been given the opportunity to be heard, with "the opportunity to convince the judge that some other or different response would be more appropriate." *United States v. Toliver*, 330 F.3d 607, 617 (3d Cir. 2003). Here, counsel

15

was consulted as to procedure before the note requesting clarification was sent out to the jury, and, far more importantly, consulted as to substance before clarifying instructions were delivered. (Tr. July 10, 2015, at 6032-65). As noted above, those instructions were given in open court with defendants and their counsel present. No error occurred.

And again, even if one assumes error, there was no prejudice. Procedurally, Petitioners can point to no detrimental effect from the method the Court chose to seek clarity as to the jury's question. Substantively, Petitioners have identified no error in the supplemental instructions given, which is hardly surprising given that the Court of Appeals has already determined there is no error in the record.

### III. There is no reason to grant discovery or convene an evidentiary hearing

Petitioners have requested both discovery and an evidentiary hearing. As to discovery, Rule 6 of the Rules Governing Section 2255 Proceedings require that there be good cause shown. Petitioners have failed to make such a showing here. As to a hearing, where the record shows "conclusively that the movant is not entitled to relief," a petition for relief under Section 2255 may be denied without a hearing. *United States v. Nahodil,* 36 F.3d 323, 326 (3d Cir. 1994).3 In particular, a petitioner is not entitled to a hearing if their allegations are "contradicted conclusively by the record," or if they are "patently frivolous." *Solis v. United States,* 252 F.3d 289, 295

---

3 Because an evidentiary hearing is not required, Petitioners do not have a right to the appointment of counsel pursuant to Rule 8(c) of the Rules Governing Section 2255 proceedings. On the record here I conclude that appointment of counsel is not required in the interest of justice.

(3d Cir. 2001); *see also Gov't of Virgin Islands v. Forte,* 865 F.2d 59, 62 (3d Cir. 1989). And the Third Circuit has made clear that "bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing…" *Mayberry v. Petsock*, 821 F.2d 179, 185 (3d Cir. 1987).

  Here, neither Petitioner comes close to satisfying their burden to show either constitutionally deficient performance by their counsel or that they were prejudiced. Neither discovery nor a hearing is required for a fair evaluation of their claims.

               /s/ Gerald Austin McHugh
               United States District Judge